**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **CAGLE'S, INC.,** | ) | **Case No. 11-80202** |
| **CAGLE'S FARMS, INC.,** | ) | **Case No. 11-80203** |
| | ) | |
| Debtors. | ) | |
| | ) | |

**DECLARATION OF MARK M. HAM IV IN SUPPORT OF**
**FIRST DAY MOTIONS AND APPLICATIONS**

MARK M. HAM IV, being duly sworn, deposes and says:

1.    I am an Executive Vice President and the Chief Financial Officer of Cagle's, Inc., the parent corporation of Cagle's Farms, Inc. (collectively, the "Company" or the "Debtors").  In this capacity, I am familiar with the day-to-day operations, business, and financial affairs of the Company.

2.    I am authorized to submit this declaration in support of the Debtors' First Day Motions (as hereinafter defined).  Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs.  If I were called upon to testify, I would testify competently to the facts set forth herein.

**BACKGROUND**

3.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are authorized to operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

17483072.9

4.      The Debtors are currently engaged in the production, marketing, and distribution of a variety of fresh and frozen poultry products.  The Company's operations consist of the breeding, hatching, and growing of chickens; feed milling; and processing, further processing, and marketing of poultry products.

## A.      Company History

5.      George L. Cagle was a pioneer in the North Georgia poultry business. After moving to Atlanta from the farm, he worked in many areas of the egg and poultry industry. In 1945, he decided it was time to concentrate on a business of his own.

6.      With $8,000 and the help of his wife Letty and son J. Douglas, he set up a poultry shop in the Five Points area of downtown Atlanta.  Service was personal.  George Cagle could help his customers pick out the live chicken they wanted, then process it the way they wanted, while they waited.  Mr. Cagle also sold his freshly processed poultry to hotels, hospitals and restaurants.

7.      In 1965, the Company acquired Strain Poultry Farms, Inc. (which eventually was renamed Cagle's Farms, Inc.) to vertically integrate as both a grower and processer of poultry. Throughout the 1960's and the 1970's the Company continued to expand by acquiring additional processing facilities.

8.      In 1973, Cagle's, Inc. was listed on the American Stock Exchange.

9.      In 1984, the Company remodeled its Pine Mountain Valley, Georgia processing plant.  At that time, the Company began its relationship with Keystone Foods ("Keystone"), a major supplier for the McDonald's restaurant chain.  Keystone purchased substantial quantities of the Company's product from the Pine Mountain Valley processing plant on a cost-plus basis. Over the following fifteen years, the Company and Keystone continued to work together, and formed joint ventures together in Camilla, Georgia and Albany, Kentucky.

2

10.     In 2000, the Company began construction on a one million square foot facility in Perry, Georgia.  The Perry facility constituted an $86 million investment for the Company.

11.     Shortly before the completion of the Perry facility, Keystone announced that it would no longer purchase from the Pine Mountain Valley facility and would not purchase from the new Perry facility.  Despite this, the Company's relationship with Keystone continued until the mid-2000's when the Company sold its interests in the Camilla and Albany joint ventures.

12.     In 2003, shortly after the completion of the Perry facility, the chicken industry experienced a significant downturn and the Company sold the Perry facility in order to resolve certain liquidity constraints that it had been experiencing

**B.     Events Leading to Filing**

13.     Several factors have led to the commencement of these chapter 11 cases.  Over the past three years, the cost of feed ingredients used by the Debtors in their business increased to record amounts, while the price of poultry products decreased significantly due to the historic economic downturn and oversupply in the industry.  This combination of high input costs and lower pricing resulted in significant losses for the Debtors.

14.     Profitability in the poultry industry is materially affected by the commodity prices of feed ingredients.  The cost of corn and soybeans, the Debtors' primary feed ingredients, increased significantly in early 2008 as a result of, among other things, increasing demand for these products because of the passage of the Energy Independence and Security Act of 2007 (the "EISA").  The EISA requires a gradual increase in the production of biofuels, including ethanol (which is made from corn), from nine billion gallons in 2008 to sixteen billion gallons by 2022.  As a result, following passage of the EISA, the demand for, and price of, corn increased significantly. The price of corn has historically been between $2 and $3 per bushel, but rose as

3

high as $7.65 per bushel in June 2008. This resulted in significantly higher feed expenses for the Debtors.

15.     The recent recession in the United States also had a significant impact on the poultry industry in 2008. Demand for poultry products, including the Debtors' products, declined considerably resulting in lower product pricing. Further limiting the pricing of poultry products was the resulting oversupply in the industry.

16.     These two factors, high feed costs coupled with declining product pricing, led to the financial decline of several poultry processing companies, including the bankruptcy of one of the largest poultry processing companies in the United States, Pilgrim's Pride Corporation.  As a result of these factors, the Debtors incurred a loss of approximately $11.4 million in 2009.

17.     In April through October of 2010, the Company, along with most of the poultry industry, was profitable.  Several factors, however, led to a significant downturn in the winter of 2010.  The profitability of the prior summer resulted in an expansion of supply in the industry. Furthermore, a weak November corn crop resulted in corn prices surging to as high as $8 per bushel.

18.     The deteriorating market conditions resulted in the Company losing as much as $3 million per month.  The Company continued to fund its working capital needs by drawing on its pre-petition revolving credit facility, but it soon reached its borrowing limits.  As the Debtors' liquidity position continued to worsen, the Debtors determined that the only means of protecting the interests of all stakeholders was to seek protection under the Bankruptcy Code.

## C.     Description of the Debtors' Current Business Operations

19.     All of the Company's business activities are conducted within one industry segment, poultry products.  The Company's various poultry products are closely related, have similar purposes and uses, and are similar in terms of profitability and types and degrees of risks.

In addition, the production processes are similar to the extent that (a) production facilities are shared or are interchangeable and (b) the same types of raw materials, labor, and capital are used. Markets and marketing methods are comparable for all products to the extent that they are generally sold to the same types of customers by a common sales force and are sensitive to changes in economic conditions to the same degree.

20.     The Company currently processes approximately 1.72 million birds per week in its two processing plants.  Of the Company's total production, approximately 620,000 birds per week are deboned.

21.     The complete cycle for growing broilers begins with the placement on a farm of a day-old breeder chick.  This bird is reared for 25 weeks, at which time it begins to produce hatching eggs.  The breeder produces eggs for approximately 40 weeks.  These eggs are set in the Company's hatchery, and in three weeks, a baby chick is hatched.

22.     The day-old broiler chick is placed on a farm where it will grow for five to eight weeks depending upon the size of bird desired, at which time it is transported to the processing plant for slaughter.  A significant investment in field inventories is required to support the Company's operating cycle.

23.     All feed for all flocks is produced in a feed mill owned by the Company.  The Company's goal is to add value to all of its birds. This value-added product can take the form of seasoned deli products, deboned breast and thigh meat, cut-up marinated raw breaded chicken, fast-food cuts, and IQF (individually quick frozen) products.

### *Raw Materials*

24.     The primary raw materials used by the Company are corn, soybean meal, and other ingredients; packaging materials; cryogenic materials; and breeder chicks.  The major source of supply is the Midwestern grain belt of the United States, although local supplies are

5

utilized when available. Prices for the feed ingredients are sensitive to supply fluctuations worldwide, and weather conditions, especially drought, can cause significant price volatility. Because feed is the most significant factor in the cost of producing a broiler chicken, those fluctuations can have significant effects on margins. The Company also purchases product outside for further processing requirements.

### Sales and Marketing

25.    The Company's products are sold to national and regional independent and chain supermarkets, food distributors, food processing companies, national fast-food chains, and institutional users, such as restaurants, schools, and distributors, by the Company's sales staff and through brokers selected by the Company. Export sales of the Company's products are entirely through third party export companies.

## D.    Production and Facilities

### Breeding and Hatching

26.    The Company supplies its broiler chicks by producing hatching eggs from breeder flocks owned by the Company. These breeder flocks are maintained on approximately 40 contract grower farms. In addition, the replacement breeder pullets are maintained on approximately 20 contract grower farms where the breeders are reared from one day old to approximately 21 weeks old and then moved to the breeder farm where they begin to produce eggs at about 25 weeks of age. These farms are located in north Georgia and Tennessee.

27.    The Company owns a hatchery located in Dalton, Georgia, at which eggs are incubated and hatched. This is a continuous process and requires 21 days to complete. After the chicks are removed from the incubator, they are vaccinated against disease and moved by an environmentally controlled vehicle, to the Company's grow-out farms. The hatchery has an aggregate capacity of 2.9 million eggs per week.

### *Grow-Out*

28.    The Company places its broiler chicks on approximately 150 contract grower farms.

29.    The independent contract growers provide the housing, equipment, utilities, and labor to grow the baby chicks to market age, which varies from five to eight weeks, depending on the market for which they are intended.  The Company supplies the baby chicks, the feed, and all veterinary and technical services.  Title to the birds remains with the Company at all times. The contract growers are paid on live weight and are guaranteed a minimum rate with various incentives based upon a grower's performance as compared to other growers whose birds are marketed during the same week.  These contract farms are located in Georgia and Alabama.

### *Feed Mill*

30.    The Company owns a feed mill in Rockmart, Georgia, which has production capacity of over 15,000 tons per week which can be increased to 20,000 tons per week with additional equipment.

### *Processing*

31.    As the broilers reach the desired processing weight, they are removed from the houses and transported by the Company's trucks to a processing plant.  The processing plants are located in Pine Mountain Valley, Georgia and Collinsville, Alabama.  The Collinsville plant can process up to 18,000 birds per hour.  The Pine Mountain plant has the capacity to process 8,400 birds per hour.

### *Further Processing and Deboning*

32.    The Company has a stated goal of marketing the majority of its product as value-added product consisting of marinated rotisserie deli, fast-food cuts, boneless portioned breast,

7

marinated and breaded parts, individual quick frozen parts, and other convenience-type products. Further processing is conducted at the Collinsville, Alabama plant and big bird deboning is conducted at the Company's Pine Mountain Valley, Georgia plant.

### Freezer Storage

33.     The Company's facilities located in Atlanta, Georgia; Collinsville, Alabama; and Pine Mountain Valley, Georgia; have freezer storage facilities with aggregate capacity of approximately 14.0 million pounds of frozen product.  The Company utilizes outside storage services as needed to supplement its own freezer capacity.

### Local Distribution

34.     As an extension of the Company's sales division, local distribution is operated from warehouse facilities in Atlanta, Georgia, and Collinsville, Alabama, and are designed to provide storage and delivery service for those customers.

### Executive Offices

35.     The Company's executive offices are located in a company owned facility at 1385 Collier Road NW, Atlanta, Georgia.

## E.     Pre-Petition Capital Structure of the Debtors

### Corporate Structure

36.     Cagle's, Inc., a Georgia corporation, is the sole owner of one hundred percent of the equity interest in Cagle's Farms, Inc., a Georgia corporation.

### Prepetition Secured Debt

37.     The Debtors and AgSouth Farm Credit, ACA, an agricultural credit association ("AgSouth"), are parties to that certain Third Amended and Restated Revolving Line of Credit and Security Agreement (as amended, the "Restated Agreement").  Pursuant to the Restated Agreement, AgSouth provided a Revolving Credit Facility (as defined in the Restated

8

Agreement) to the Debtors.  The Debtors' obligations under the Restated Agreement are secured by a first priority security interest in the Debtors' accounts receivable and inventories and the Debtors' real property in Atlanta and Pine Mountain Valley.  In connection with a recent amendment to the Restated Agreement, the Debtors granted AgSouth a second priority lien in the MetLife Collateral (as defined below).  The Debtors' total obligations under the Restated Agreement are approximately $33,500,000

38.    Cagle's, Inc., as borrower, and Metropolitan Life Insurance Company, a New York corporation ("MetLife"), are parties to that certain Loan Agreement dated March 28, 2001 (as amended from time to time, the "Loan Agreement").  The Debtors' obligations under the Loan Agreement are secured by a first priority security interest in the Debtors' processing plant in Collinsville, the Dalton hatchery, and the Rockmart feedmill (collectively, the "MetLife Collateral").  The Debtors' total obligations under the Loan Agreement are approximately $7,685,00.

## THE FIRST DAY MOTIONS[1]

39.    Contemporaneously with the filing of their bankruptcy petitions and certain other motions, the Debtors filed the motions and applications listed on Exhibit A (collectively, the "First Day Motions").  I submit this declaration in support of the First Day Motions.  I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct.  Such representation is based upon information and belief, through my review of various materials and other information, and my experience and knowledge of the Debtors' operations

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant motion or application.

and financial condition.  If called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

40.     As a result of my first-hand experience, and through my review of various materials and other information, discussions with other of the Debtors' executives, and discussions with the Company's professionals, I have formed opinions as to (a) the necessity of obtaining the relief sought in the First Day Motions; (b) the importance of the relief sought in the First Day Motions for the Debtors to continue to operate effectively; and (c) the negative impact upon the Debtors of not obtaining the relief sought in the First Day Motions.

41.     As described more fully below, the relief sought in the First Day Motions will minimize the adverse effects of the chapter 11 cases on the Debtors and ensure that the Debtors' reorganization efforts proceed as efficiently as possible and result in maximum recovery for creditors, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate as debtors in possession.

## I.      Procedural Motions

**A.      Debtors' Emergency Motion for an Order Directing Joint Administration of Chapter 11 Cases**

42.     The Debtors request the entry of an order directing that their bankruptcy cases be jointly administered for procedural purposes only under the caption of the case filed by Cagle's, Inc.

43.     The Debtors believe that it would be more efficient for these cases to be jointly administered.  The Debtors anticipate significant activity during these cases and believe that most hearings and contested matters will apply to both of the Debtors' cases equally. Consequently, joint administration of these cases will promote the economical and efficient

administration of the Debtors' estates, unencumbered by the procedural problems otherwise attendant to the administration of separate, albeit related, cases.

**B.    Debtors' Emergency Motion for an Order Establishing Notice and Administrative Procedures**

44.    The Debtors request the entry of an order establishing appropriate notice procedures.  Currently, literally thousands of creditors and parties-in-interest may be technically entitled to receive notice in these cases.  To require the Debtors to provide notice of all pleadings and other papers filed in these cases to these parties in interest would be extremely burdensome and costly to the Debtors' estates as a result of the photocopying, postage, and other expenses associated with such large mailings.

**C.    Debtors' Emergency Motion for an Order to Extend Time to File Schedules and Statements of Financial Affairs**

45.    The Debtors request the entry of an order extending the time to file their schedules and statements of financial affairs (collectively, "Schedules") until December 2, 2011.

46.    To prepare the Schedules, the Debtors must gather information from books, records, and documents relating to a multitude of transactions.  Consequently, collection of the necessary information requires the expenditure of substantial time and effort on the part of the Debtors' limited and already over-burdened employees.  The efforts of the Debtors' employees during the initial stages of these cases are critical and need to be focused on attending to the Debtors' business and maximizing the value of the Debtors' estates.  The Debtors' employees will begin working diligently to assemble and collate the necessary information.  The Debtors anticipate that they will need a minimum of 30 additional days than that otherwise prescribed by the Bankruptcy Rules in order to prepare and file their Schedules in the appropriate format.

## II.    Operational Motions

**A.    Debtors' Emergency Motion to Authorize Payment of Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits, and Related Expenses, and Other Compensation to Employees (the "<u>Employee Obligations Motion</u>")**

47.    The Debtors seek authority to pay the Employee Obligations (as defined in the Employee Obligations Motion) that become payable during the pendency of these chapter 11 cases and to continue at this time their practices, programs, and policies with respect to their employees, as such practices, programs, and policies were in effect as of the Petition Date.

48.    The Debtors employ approximately 1,600 people (the "<u>Employees</u>"), of which approximately 25 reside in their corporate office, with approximately 1,575 people located throughout their mills, plants, farms, and other facilities.  Of the Debtors' 1,600 employees, approximately 150 are employed on a full-time salaried basis and approximately 1450 are employed on a full-time hourly basis.

49.    Even though the Debtors have incurred certain Employee Obligations prior to the Petition Date, certain of the Employee Obligations will become due and payable in the ordinary course of the Debtors' businesses on and after the Petition Date.  The Employee Obligations include, without limitation: (i) wages, salary, and other compensation; (ii) payroll taxes; (iii) vacation and sick day programs; (iv) qualified 401(k) plan obligations; (v) health and welfare benefits; and (vi) expense reimbursements and other benefit programs.  The Employee Obligations are more specifically described as follows:

- *Wages, salaries, and other compensation.*  These obligations consist of pre-relief wages, salaries, and commissions owed to the Employees (the "<u>Payroll Obligations</u>").  The Debtors pay their payroll weekly, in arrears;  accordingly, because the Debtors commenced these cases during the middle of the week, the Payroll Obligations include the full week prior to the filing as well as the portion of the week in which the filings occurred.  The average weekly gross amount of the Payroll Obligations is approximately $910,000.  This gross amount includes certain deductions described separately below, such as payroll taxes owed by the employees and 401(k) contributions.  Approximately 10% of the Payroll

Obligations are deposited directly into the employees' bank accounts and the remaining 90% are paid by check. Because the Debtors' payroll is paid one week in arrears, as of the Petition Date, the Debtors estimate that they owe approximately $1,456,000 in Payroll Obligations.

- *Payroll taxes.* These obligations consist of federal, state, and local income taxes, social security, and Medicare taxes. The payroll taxes include the amounts owed by Employees that the Debtors withhold from the gross amount of the Employees' wages or salary as well as the amounts separately owed by the Debtors. The Debtors' average weekly payroll tax liability for Employees is approximately $205,000. This includes approximately $65,000 for the employer obligation and $140,000 for the employee component. The employee component is included in the gross amount of the Payroll Obligations discussed above. Because the Debtors' payroll is paid one week in arrears, as of the Petition Date, the Debtors estimate that they owe approximately $442,000 in payroll taxes. Of this amount, $101,000 is not included in the total Payroll Obligations described in the paragraph above.

- *Unemployment taxes.* The Debtors also pay certain state and federal unemployment taxes. The Debtors' average weekly unemployment tax liability is $4,200. Because this obligation is paid quarterly, as of the Petition date, the Debtors owe approximately $67,000 in unemployment taxes. This amount is not included in the total Payroll Obligations described above.

- *Vacation, sick, and holiday programs.* These obligations consist of time off for vacation, illness and company holidays. The Debtors recognize seven holidays per year. Salaried employees receive sick leave from the date of hire for a maximum of ten days per year. Employees receive paid vacation as follows:

  o Salaried employees receive paid vacation based upon years of service as follows: (i) after one year of employment, the employee receives one week vacation per year; (ii) after three years of employment, the employee receives two weeks vacation per year; and (iii) after ten years of employment, the employee receives three weeks vacation per year.

  o Hourly employees receive paid vacation based upon hours worked per week and years of service as follows: (i) after one year of employment, the employee receives one week vacation per year; (ii) after three years of employment, the employee receives two weeks vacation per year; and (iii) after ten years of employment, the employee receives three weeks vacation per year.

Employees accrue the full amount of their allotted vacation on their anniversary date of employment with the Debtors for the upcoming year, however employees may not carry over unused vacation remaining on that anniversary date. At the time of separation, Employees are paid for any earned and unused vacation hours. The Debtors desire to continue to honor their obligations for vacation, sick days,

and holidays on a going forward basis.  As of the Petition Date, the Debtors estimate that they owe approximately $700,000 in total unused vacation pay that will be due to Employees at the time of separation.  This amount is not included in the total Payroll Obligations described above.

- *401(k) plan obligations*.  The Debtors maintain a 401(k) plan, under which Employees may defer a portion of their salary.  After completing three months of employment working at least 32 hours, Employees 21 years of age or older can contribute up to 100% of their annual pay (up to the annual maximum deferral amount).    Under the plan, the Debtors match 50% of each participating employee's contributions; however, the Debtors' matching contribution is limited to 2% of the participating employee's salary.   All collected funds are remitted weekly.   Because the Debtors' payroll is paid one week in arrears, as of the Petition Date, the Debtors estimate that they owe approximately $4,800 in matching 401k contributions, which are not included in the estimated total Payroll Obligations described above, and $12,571 in collected but unremitted employee contributions.   This amount is included in the estimated Payroll Obligations above.

- *Expense Reimbursements and Other Benefits*.  The Debtors customarily offer various other employee benefit policies and programs.   The Debtors also reimburse eligible employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors.   These reimbursement obligations include such things as travel expenses, relocation expenses, cellular phone reimbursements, and professional memberships.   The amount of these reimbursement obligations is approximately $10,000 per month.   As of the Petition Date, the Debtors estimate that they owe approximately $2,500 in other expense reimbursements.

- *Winter Holiday Payroll Deferral.*  Some Employees elect to defer a small portion of their income each week until December.  The amount is deducted from the paycheck of each participating Employee.  As of the Petition Date, the Debtors estimate that they owe approximately $100,000 under this program.  This amount is not included in the estimated Payroll Obligations above.

- *Health and welfare benefits.*  The Debtors provide several health and welfare benefit plans for the Employees, including insurance plans relating to medical, health, prescription, dental, disability, and life insurance.

  - *Health Care Plan.*  The Debtors maintain and provide two health care plans for their Employees.  Salaried employees may enroll in the plans after thirty days of continuous service.  Hourly Employees may enroll after ninety days of continuous service.  The Debtors fund the medical plans, and the plans are managed by Blue Cross Blue Shield of Alabama and Blue Cross Blue Shield of Georgia.  Both are PPO plans with annual deductibles of $400 for individuals and $800 for families.  Prescription drugs are covered by the plans.  The Debtors' current average monthly

claims, premiums and administration fees (which include all of the premium and administration costs associated with the plans) approximate $358,000 in connection with the health plans (this includes reinsurance, COBRA fees, PPO fees, network fees, etc.). The Debtors believe that approximately $644,223 is due and outstanding under the plans for claims provided prior to the Petition Date. This amount is not included in the estimated Payroll Obligations described above. For calendar year 2011, the Debtors estimate that the health programs will cost $5,034,533 (which includes the approximate $358,000 monthly premiums, administration fees and estimated cost of claims). By way of background, the total net program expense was $4,887,743 in 2010.

- The costs include health insurance for current and former employees. There are 2 former employees covered under COBRA (covered 18 months from departure).

- For Georgia employees, the Debtors receive a claims run each week and the amount is automatically drafted from their account. The Debtors are current on all payments until each Friday, when the new amounts are due. For Alabama employees, a weekly deposit is made and the account is periodically "trued up". The Debtors currently owe approximately $75,000. This amount is included in the estimated health care obligations described above.

- The costs include stop loss coverage purchase by the Debtors with an annual premium of approximately $81,000.

o *Executive Medical Reimbursement (EMR) Plan.* The Debtors maintain and provide an additional health care plan for the seven corporate officers. The plan reimburses the officers for incurred medical expenses that the Debtors' health care plan did not cover, each up to $50,000 per calendar year. The Debtors pay $1,600 monthly, per Officer, to Blue Cross of Georgia to fund the plan. Annually the Debtors and Blue Cross of Georgia reconcile the funding to claims paid and settle the balance. As of the Petition Date, the Debtors owe approximately $11,200. This amount is not included in the estimated Payroll Obligations described above.

o *Pension Plan.* Under a collective bargaining agreement, the Debtors contribute to a multi-employer pension plan for the benefit of certain employees who are union members. A separate actuarial valuation for this plan is not made for the Debtors. Accordingly, information with respect to accumulated plan benefits and net assets available for benefits is not available. The Debtors' contribution rate is a fixed-dollar amount per eligible employee. The Debtors made total contributions to the union plan of $109,000, $109,000 and $103,000 in fiscal years 2011, 2010 and 2009, respectively. Currently, the Debtors make monthly contributions

15

of approximately $5,600 to the pension plan.  Because the Debtors' payroll is paid one week in arrears, as of the Petition Date, the Debtors owe approximately $2,000 in pension plan contributions. This amount is not included in the estimated Payroll Obligations described above.

o   *Basic Life Insurance*. The Debtors provide life insurance at no cost to Employees to their salaried Employees after 30 days of continuous service and to their hourly Employees after 90 days of continuous service.  The Debtors' annual premium is approximately $65,000.  As of the Petition Date, the Debtors owe approximately $5,500. This amount is not included in the estimated Payroll Obligations described above.

o   *Accident Death and Dismemberment Insurance*. The Debtors provide Accident Death and Dismemberment Insurance to their salaried Employees after 30 days of continuous service and to their hourly Employees after 90 days of continuous service.  The annual cost to the Debtors is $13,500.  As of the Petition Date, the Debtors owe approximately $1,100.  This amount is not included in the estimated Payroll Obligations described above.

o   *Short Term Disability*.  After 3 months of continuous employment, the Debtors provide short-term disability coverage for hourly production Employees who are totally disabled.  This runs from the date of disability through the first twelve weeks of disability.  The Debtors estimate that this program costs $71,000 annually.  As of the Petition Date, the Debtors owe approximately $6,000. This amount is not included in the estimated Payroll Obligations described above.

o   *Dependent Life Insurance*.  The Debtors provide certain Employees with Dependent Life Insurance.  The annual premium paid by the Debtors is approximately $1,710.  As of the Petition Date, the Debtors owe approximately $150.  This amount is not included in the Payroll Obligations described above.

**The following are "pass-through" programs for which the Debtors make no contributions or payments.  The Debtors withhold the necessary amounts from the Employee's paycheck and remit the amounts to the benefit provider.  Accordingly, the Debtors ask for authority to remit amounts collected from the Employees before the petition date but not yet remitted to the carrier.**

o   *Dental.* The Debtors permit Employees to enroll in certain dental plans. The Debtors collect funds from the enrolled Employees and remit the funds to the insurance company, but do not provide any reimbursement for this program.  There is no material cost to the Debtors for this program. As of the Petition Date, the Debtors hold approximately $2,700 in premiums collected from employees but not yet remitted to the carrier.

This amount is included in the estimated Payroll Obligations described above.

o *Supplemental Life Insurance*. The Debtors provide employees who have basic life insurance with the option of increasing their coverage by purchasing supplemental insurance. The Debtors collect funds from employees and remit the funds to the insurance company, but do not provide any reimbursement for this program. There is no material cost to the Debtors for this program. As of the Petition Date, the Debtors hold approximately $1,350 in premiums collected from employees but not yet remitted to the carrier. This amount is included in the estimated Payroll Obligations described above.

o *Spousal Supplemental Life Insurance*. The Debtors provide employees with the option of purchasing spousal supplemental life insurance. The Debtors collect funds from employees and remit the funds to the insurance company, but do not provide any reimbursement for this program. There is no material cost to the Debtors for this program. As of the Petition Date, the Debtors hold approximately $200 in premiums collected from employees but not yet remitted to the carrier. This amount is included in the estimated Payroll Obligations described above.

o *Long-term Disability*. After 30 days of continuous employment, the Debtors provide Employees the option to purchase long-term disability coverage of up to 60% of the employee's annual salary and wages for employees after satisfying a 90-day elimination period. The 60% coverage lasts for the first twenty-seven months of disability, after which the benefit is reduced to 20% of employee's pre-disability earnings. The Debtors collect premiums from employees and remit same to the insurance company, but do not subsidize this program. There is no material cost to the Debtors for this program. As of the Petition Date, the Debtors hold approximately $1,600 in premiums collected from employees but not yet remitted to the carrier. This amount is included in the estimated Payroll Obligations described above.

50.     The Debtors believe that all claims for Employee Obligations would constitute priority claims pursuant to sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

51.     Any delay in paying Employee Obligations will adversely impact the Debtors' relationships with their Employees and will irreparably impair the morale, dedication, confidence, and cooperation of the very people upon whom the Debtors rely for their businesses to be successful. The Debtors must have the support of their Employees in order for the Debtors'

reorganization efforts to succeed.  Put quite simply, if the relief requested by the Employee Obligations Motion is not granted, the Debtors will likely be out of business altogether.

52.     Moreover, absent an order granting the relief requested in the Employee Obligations Motion, the Debtors' employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain of the employees to meet their own personal financial obligations.  The stability of the Debtors will thus be undermined, perhaps irreparably, by the possibility that otherwise loyal employees will seek other employment alternatives.

53.     The Debtors do not seek to alter their compensation, vacation, and other benefit policies in the Employee Obligations Motion, and the Employee Obligations Motion is not to be deemed an assumption or adoption of any agreement or policy providing for any such benefits. Instead, the Employee Obligations Motion is intended only to permit the Debtors, in their discretion, to make payments consistent with those policies and to permit the Debtors, in their discretion, to continue to honor their practices, programs, and policies with respect to their employees, as such practices, program, and policies were in effect as of the Petition Date.

54.     The Debtors request that they be authorized to pay any cost or penalty incurred by a person to which Employee Obligations are owed in the event that a check issued by the Debtors for payment of the Employee Obligations is inadvertently not honored because of the filing of the Debtors' bankruptcy cases.  Though the Debtors estimate any such costs or penalties to be *de minimis* in amount, if the Debtors are not authorized to pay such costs or penalties, then their employees will suffer the exact type of harm that the Employee Obligations Motion seeks to prevent, and the Debtors will suffer from loss of employee goodwill.

**B.**     **Debtors' Emergency Motion for Authority to Continue Pre-Existing Insurance Programs, to Maintain Insurance Premium Financing Programs, and to Pay Pre-Petition Premiums and Related Obligations (the "<u>Insurance Motion</u>")**

55.     The Debtors seek an order (a) authorizing them to maintain their insurance programs, insurance policies, insurance premium financing programs, workers' compensation program, and any related agreements, as such practices, programs, and policies were in effect as of the Petition Date and to pay, in their sole discretion, pre-petition amounts accrued in connection therewith, and (b) authorizing applicable banks and other financial institutions to receive, process, and pay any and all checks and other transfers related to such claims.

56.     In connection with the operation of their businesses, the Debtors maintain various insurance policies and programs through several different insurance carriers (the "<u>Insurance Carriers</u>").  All of the Debtors' various insurance policies are listed on the <u>Exhibit A</u> to the Insurance Motion, together with a list of the Insurance Carriers, policy terms and the premiums due thereunder.

57.     The Debtors' insurance policies and programs include liability and property insurance policies, which provide the Debtors with insurance coverage relating to, among other things, general liability, general property, automobile liability, workers' compensation, fiduciary liability, and directors' and officers' liability.

58.     The Debtors are required to pay premiums based upon a fixed rate established by each Insurance Carrier.  The premiums for most of these policies are determined annually and are either directly billed to the Debtors or to the Debtors' insurance broker.

59.     As of the Petition Date, the Debtors believe that they are current on pre-petition premiums with respect to their insurance policies and programs.  To the extent there is an outstanding insurance policy premium for the pre-petition period, however, the Debtors seek

authority to pay the pre-petition premiums in the ordinary course and as such payments are necessary to keep their insurance policies and programs in force.

60.     In many of the Debtors' policies of insurance, there are certain self-insured retention and deductible amounts set forth in the policy language for each claim.

61.     If there are certain deductible amounts set forth in the policy language for each claim, claims for losses and expenses are paid by the Insurance Carriers directly to claimants, attorneys, and investigators, as incurred.  The Insurance Carriers then bill the Debtors for reimbursement of losses and expenses that fall under the deductible amounts set forth in the policy.

62.     Paying expenses such as attorneys' fees and costs of investigation that may fall within the self-insured retention or deductible under the Debtors' insurance policies is necessary to continue to address and process claims.

63.     The Debtors spend approximately $1,628,000 annually on insurance premiums. The Debtors are currently parties to two insurance premium financing agreements (the "Premium Financing Programs") whereby certain of the Debtors' insurance policies and programs are financed by Premium Financing Specialists, Inc. ("PFS") and Imperial Credit Corporation ("Imperial").  Exhibit A indicates which of the insurance policies and programs are included in the premium financing agreements.

64.     Pursuant to the terms of the premium financing agreement with PFS, the Debtors make a down payment contemporaneously with the execution of the Premium Financing Agreement and then make nine monthly installments to PFS toward the balance of the financing over the term of the premium financing agreement.

65.    Pursuant to the terms of the premium financing agreement with Imperial, the Debtors make a down payment contemporaneously with the execution of the Premium Financing Agreement and then make eleven monthly installments to Imperial toward the balance of the financing over the term of the premium financing agreement.

66.    Under Georgia law, the Debtors are required to maintain workers' compensation policies and programs to provide their employees with coverage for claims arising from or related to their employment with the Debtors.  The Debtors maintain a workers' compensation policy (the "Workers' Compensation Program") with Safety National, which covers all employees.  The annual premium for the Workers' Compensation Program is $67,656 and there is a self-insured retention amount of $400,000 per occurrence.

67.    In connection with the Workers' Compensation Program, the state of Georgia holds a cash deposit of approximately $1,250,000.  If the Debtors fail to honor their obligations under the Workers' Compensation Program, this deposit could be depleted.

68.    The Debtors' Workers' Compensation is managed by American Professional Risk Services, Inc. ("AmPro").  As of the Petition Date, the Debtors owe approximately $11,500 to AmPro.

69.    It is essential to the continued operation of the Debtors' businesses and their efforts in these chapter 11 cases that the Insurance Programs be maintained on an ongoing and uninterrupted basis.  The failure to pay premiums when due may affect the Debtors' ability to renew the insurance policies.  If the insurance policies are allowed to lapse, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others.  Such exposure could have an extremely negative impact on the Debtors' ongoing business operations and would also place the Debtors' assets at risk.

70.    Continued effectiveness of directors' and officers' liability policies is necessary to the retention of qualified and dedicated senior management and directors.

71.    Finally, pursuant to the terms of many of their leases and commercial contracts, as well as the guidelines established by the United States Trustee, the Debtors are obligated to remain current with respect to certain of their primary insurance policies.

72.    The amounts the Debtors propose to pay in respect of the Insurance Programs are minimal in light of the size of the Debtors' estates and the potential exposure of the Debtors, absent insurance coverage.  Therefore, it is critical that the Debtors continue to maintain their Insurance Programs on an uninterrupted basis and be permitted to pay any obligations in the ordinary course of business and consistent with pre-petition practices.

73.    The maintenance of the Workers' Compensation Program is likewise justified because applicable state law mandates this coverage, and 28 U.S.C. § 959(b) requires the Debtors to comply with valid state laws.  In addition, the Debtors' employees all depend on the protection that the Workers' Compensation Program provides.

**C.    Debtors' Emergency Motion for Authority to (A) Maintain Existing Bank Accounts and Continue Use of Existing Cash Management System, (B) Continue Use of Existing Business Forms, and (C) Continue Existing Investment Practices (the "Cash Management Motion")**

74.    The Debtors respectfully request an order (a) authorizing them to continue to maintain their existing bank accounts and to continue use of their existing cash management system; (b) authorizing them to continue to utilize their existing business forms, including checks; and (c) granting them a waiver, to the extent required, from the United States Trustee's guidelines with respect to those requirements identified above.  Finally, the Debtors seek to continue their investment policies during their bankruptcy cases, without the posting of any bonds pursuant to section 345(b) of the Bankruptcy Code

75.    Prior to the commencement of these chapter 11 cases, the Debtors maintained six bank accounts at four different banks, a schedule of which is attached to the Cash Management Motion as <u>Exhibit A</u>.  The Debtors' primary cash management bank is RBC Bank ("<u>RBC</u>").  The Debtors maintain three accounts with RBC through which substantially all of their collections are deposited and disbursements are made.  The Debtors' cash management system operates as follows:

(a)    The Debtors collect receipts primarily through (1) checks received at a lockbox processed by RBC; (2) checks received at their corporate office in Atlanta; and (3) checks received by the Debtors at a P.O. Box in Atlanta. The Debtors' incoming receipts are all deposited into an RBC operating master account (the "<u>Operating Master Account</u>").

(b)    The Operating Master Account funds two disbursement accounts: a payroll account (the "<u>Payroll Account</u>") and a general disbursements account (the "<u>Disbursement Account</u>").  As needed, the Debtors transfer funds from the Operating Master Account to the Payroll Account and the Disbursements Account to cover expected presentments.  At all times, the Payroll Account and the Disbursement Account maintain a zero balance.

(c)    Before the Petition Date, on a daily basis, the Debtors typically applied any excess funds in the Operating Master Account to pay down the pre-petition revolving line of credit with AgSouth Farm Credit, ACA (the "<u>Pre-petition Revolver</u>").  To the extent the Operating Master Account did not have sufficient funds to adequately fund the Payroll Account or the Disbursement Account, the Debtors would draw upon the Pre-petition Revolver.

(d)    In addition to the three accounts with RBC, the Debtors maintain three other checking accounts with the other banks listed in Exhibit A.  These accounts are used to deposit the small amount of funds that the Debtors occasionally receive at their other facilities.

76.    Authorizing the Debtors to continue to use their existing bank accounts is essential to a smooth and orderly transition of the Debtors into chapter 11 and to avoid disruption of their businesses.  New accounts would inevitably lead to delays, confusion, and disruption of payments to employees that would likely adversely affect employee morale at this critical juncture.

77.    Moreover, a transition to new debtor-in-possession bank accounts at this time would be disruptive and time-consuming.  By permitting existing accounts to remain open, preserving business continuity, and avoiding the operational and administrative paralysis that closing the accounts and opening new ones would necessarily entail, all parties-in-interest, including the Debtors' employees, will be best served, and the Debtors' estates will benefit considerably.

78.    Finally, by virtue of the nature and scope of the Debtors' businesses, the number of accounts, and the numerous employees, suppliers of goods and services, and others with whom the Debtors transact business, it is imperative that the Debtors be permitted to continue to use their existing business forms, including checks.  A substantial amount of time and expense would be required to print new business forms and stationery and would also likely result in a substantial risk of disruption to the Debtors' ordinary business affairs.

79.    The Debtors' practices generally conform with the intent of section 345(b) to protect and maximize the value of their estates.  The Debtors believe that their existing investment procedures are designed to protect the principal invested while maximizing liquidity and, therefore, believe that sufficient cause exists to waive the investment requirements of section 345(b) to allow the Debtors to continue their existing investment procedures.

80.    Moreover, the Debtors believe that the deposits at issue are safe because of the relative strength of the bank in which the Debtors' accounts are maintained.  The bank the Debtors use is well-established and invests the Debtors' funds in accordance with their standard investment guidelines.  Requiring the Debtors to open multiple accounts at different banks so that the deposits in each such bank would be insured by FDIC would be unnecessarily

burdensome and would lead to the same delays and disruption to the Debtors' businesses that the

Cash Management Motion seeks to avoid.

**D.      Debtors' Emergency Motion for an Order Authorizing the Debtors to Pay Pre-Petition Sales, Use, Trust Fund, and Other Taxes and Related Obligations (the "<u>Tax Motion</u>")**

81.      The Debtors seek authority to pay, in their sole discretion, undisputed pre-petition

sales and use tax obligations ("<u>Sales and Use Taxes</u>") owed to the state and local taxing

authorities listed on the schedule attached to the Tax Motion as <u>Exhibit A</u> (collectively, the

"<u>Taxing Authorities</u>") in the ordinary course of business.  As explained more fully in the Tax

Motion, (i) such taxes constitute "trust fund" taxes and thus are not property of the Debtors'

estates, (ii) such taxes constitute priority taxes, and (iii) the failure to pay such taxes could

disrupt the Debtors' businesses.  In connection with the normal operation of their businesses, the

Debtors collect sales taxes from their customers and other third parties for remittance to the

Taxing Authorities.   In addition, the Debtors accrue and incur state use taxes.  The Debtors

estimate that, as of the Petition Date, they hold approximately $5,400 in collected but unremitted

sales taxes and accrued state use taxes.

82.      The Debtors have sufficient cash reserves and will have sufficient cash from

ongoing operations to pay the amounts described in the Tax Motion in the ordinary course of

business.

83.      The Debtors' failure to pay the Sales and Use Taxes could have a material adverse

impact on their ability to operate in the ordinary course.

**E.      Debtors' Emergency Motion for an Order Authorizing the Debtors to Maintain and Administer Customer Programs and Honor Certain Pre-Petition Obligations Related Thereto (the "<u>Customer Obligations Motion</u>")**

84.      The Debtors respectfully request entry of an order authorizing the Debtors, in

their sole discretion, to honor or pay all pre-petition obligations arising under the Customer

Programs (the "Obligations").  The Debtors believe that honoring and paying the Obligations and maintaining the Customer Programs is the best way to maximize the value of the Debtors' estates and to minimize the negative impact of these chapter 11 cases on the Debtors' customers.

85.     In the ordinary course of the Debtors' businesses—as is customary with most chicken processing businesses—the Debtors maintain a number of customer-service policies including, without limitation: an advertising and marketing allowance program (the "Allowance Program") and a broker payment program (the "Broker Program") which are designed to enhance the Debtors' ability to generate continuing revenues in their businesses (collectively, the "Customer Programs").  The Customer Programs are more particularly described as follows:

A.  Allowance Program.  The Allowance Program consists of various marketing and advertising allowances paid to some customers at various rates based upon the amount of product the customer purchases.  As of the Petition Date, the Debtors estimate that the outstanding amount owed to customers under the Allowance Program was $920,000.

B.  Broker Program.  The Debtors sell substantial amounts of their product through certain brokers affiliated with various customers.  The Debtors customarily pay the brokers amounts based upon the quantity of product purchased by the customer.  Certain large customers purchase the Debtors' product exclusively through these brokers.  As of the Petition Date, the Debtors estimate that the outstanding amount owed to brokers was $180,000.

86.     The success and viability of the Debtors' businesses is dependant upon the loyalty of its customers.  The Debtors believe that the uninterrupted maintenance of the above-described Customer Programs is essential to maintaining such loyalty.  The Debtors' Customer Programs are designed to enable the Debtors to compete effectively with other businesses who offer comparable programs.  Any disruption which would necessarily result from the termination of some or all of these Customer Programs would undoubtedly threaten the Debtors' customer base and have an adverse effect on the value of the Debtors' assets and businesses.  Based on the

foregoing, the Debtors submit that approval of the relief requested herein is necessary and appropriate.

**F.      Debtors' Emergency Motion For Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service on Account of Prepetition Invoices, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion")**

87.      The Debtors respectfully request the entry of an interim and final order (the "Interim Order" and the "Final Order", respectively): (i) prohibiting utility companies from altering, refusing, or discontinuing service on account of pre-petition invoices, (ii) deeming the Utility Companies adequately assured of future performance, and (iii) establishing procedures for resolving disputes relating to adequate assurance of payment.

88.      Utility services are essential to the Debtors' ability to sustain their operations while these chapter 11 cases are pending.  In the normal conduct of their businesses, the Debtors have relationships with approximately thirty utility companies (collectively, the "Utility Companies") for the provision of telephone, internet, electric, gas, water, sewer, waste management, cable and other services (the "Utility Services").  A list identifying the Utility Companies and their notice addresses is attached to the Utilities Motion as Exhibit A (the "Utilities Service List").[2]

---

[2] The listing of any entity on Exhibit A is not an admission that any listed entity is a utility within the meaning of section 366.  The Debtors reserve all rights to further address the characterization of any particular entities listed on Exhibit A as a utility company the meaning of section 366(a) of the Bankruptcy Code.  The Debtors further reserve the right to terminate the services of any Utility Company at any time and to seek an immediate refund of any utility deposit without effect to any right of setoff or claim asserted by a utility company against the Debtors.  The Utilities Motion does not seek assumption or rejection of any executory contract under section 365 of the Bankruptcy Code, and the Debtors reserve the right to claim that any contract with the Utility Companies is or is not an executory contract, as the facts may dictate.  The relief requested in the Utilities Motion is with respect to all utility companies and is not limited only to those listed on Exhibit A.

89.     At all relevant times, the Debtors have attempted to remain current with regard to their utility bills.  Furthermore, to the best of the Debtors' knowledge, the Debtors are current on all amounts owing to the Utility Companies, other than payment interruptions that may be caused by the commencement of these chapter 11 cases.

90.     Continued and uninterrupted Utility Service is vital to the Debtors' ability to sustain their operations during these chapter 11 cases.  Because of the nature of the Debtors' operations, termination or interruption of the Debtors' utility service would dramatically impair the Debtors' ability to conduct business and cause considerable inconvenience to the Debtors' customers and employees.  If utility providers are permitted to terminate or disrupt service to the Debtors, the Debtors' primary revenue source would be threatened.

**G.      Debtors' Emergency Motion for an Order Authorizing the Debtors to Honor Prepetition Obligations to and Continue Prepetition Practices with Shippers, Warehousemen and Other Lien Claimants**

91.     The Debtors respectfully request entry of an order authorizing the Debtors, in their sole discretion, to honor or pay all pre-petition obligations to the Shippers, the Warehousemen and the Lien Claimants (as those terms are defined below).  The Debtors believe that honoring and paying these obligations is the best way to maximize the value of the Debtors' estates and to minimize the negative impact of these chapter 11 cases on the Debtors' operations

92.     The Debtors manage the breeding, hatching and growing of chickens. They also process chickens and prepare chicken products for distribution and sale along with other poultry related products. Maintaining the Debtors' businesses requires the coordinated efforts of certain critical third party common and other carriers and freight shipment providers (collectively, the "Shippers") who transport goods via truck and rail. The Debtors also utilize a number of third party warehouse facilities (collectively, the "Warehousemen").

### *The Shippers*

93.     In the ordinary course of their business, the Debtors engage Shippers in various aspects of their business including, but not limited to, moving chicken between processing plants, warehouse facilities, and customers, as well as transporting the grain, packaging, and ingredients necessary for the Debtors' operations. To facilitate efficient and timely shipment and delivery, the Debtors rely upon the services of the Shippers. It is critical to the Debtors' operations and efforts to maximize the value of their estates that they maintain a reliable and efficient transport system to ensure timely shipment and delivery of materials and goods, which will require the continued and uninterrupted services of the Shippers.

94.     Any failure by the Debtors to honor their obligations to the Shippers (the "Shipper Obligations") will likely have a materially adverse impact on the reliability and efficiency of the current transport system. If Shipper Obligations remain unpaid, the Debtors face the real possibility that certain of the Shippers may refuse to continue their respective services.

95.     To avoid any potential interruption or delay in the Debtors' transport system, which interruption or delay will likely have a material adverse impact on the Debtors' operations and efforts to maximize the value of their estates, it is imperative that the Debtors have the ability to satisfy the Shipper Obligations in order to maintain the continued and uninterrupted services of the Shippers.

96.     The average aggregate weekly amount of Shipper Obligations is approximately $100,000.  As of the Petition Date, the Debtors estimate that the aggregate outstanding amount of Shipper Obligations is approximately $500,000.

### *The Warehousemen*

97.    In the ordinary course of the Debtors' business, the Debtors regularly utilize the services of third-party warehouses to store goods in transit (which are being shipped to the Debtors' customers) and goods that are being processed.

98.    Any failure by the Debtors to honor their obligations to the Warehousemen (the "Warehousemen Obligations") will likely have a materially adverse impact on the reliability and efficiency of the current warehousing and transport system. If Warehousemen Obligations remain unpaid, the Debtors face the real possibility that certain of the Warehousemen may refuse to continue their respective services.

99.    To avoid any potential interruption or delay in the Debtors' transportation and storage systems, which interruption or delay will likely have a material adverse impact on the Debtors' operations and efforts to maximize the value of their estates, it is imperative that the Debtors have the ability to satisfy Warehousemen Obligations in order to maintain the continued and uninterrupted services of the Warehousemen.

100.    The average aggregate weekly amount of Warehousemen Obligations is approximately $10,000. As of the Petition Date, the Debtors estimate that the aggregate outstanding amount of Warehousemen Obligations is approximately $55,500.

### *Other Lien Claimants*

101.    In the ordinary course of the Debtors' business, the Debtors sometimes require the services of third-party service providers that install, repair and/or replace various parts and components essential to the continued and uninterrupted operation of the Debtors' equipment and machinery (the "Lien Claimants"). Although the Debtors have the capability to perform certain routine repairs and maintenance, when necessary, the Debtors rely heavily upon the highly-skilled or critically-located Lien Claimants to provide timely repairs and maintenance to

equipment parts and components. Prior to the Petition Date, the Lien Claimants performed such services both on-site, as well as in their respective repair shops. At any given time, the Debtors may have certain critical parts and components in the process of being serviced by the Lien Claimants.

102.    As of the Petition Date, the Debtors believe that there are no outstanding amounts owed to the Lien Claimants.

103.    In the event that there are any outstanding obligations to the Lien Claimants (the "Lien Claimant Obligations") that are not honored, however, the Debtors face the real possibility that certain of the Lien Claimants may refuse to continue their respective services for the Debtors, including repair, maintenance, installation and other servicing obligations—services critical to the reliability and efficiency of the Debtors' operations.

104.    Accordingly, it is imperative that the Debtors have the ability to satisfy all Lien Claimant Obligations to the extent discovered by the Debtors.

105.    The Debtors' maintenance of their positive relationships with the Shippers, the Warehousemen and the Lien Claimants is critical to the continued reliability and efficiency of their transport and storage system, as well as their equipment and machinery, and, therefore, to ongoing operations. The Debtors' ability to maintain continued and uninterrupted operations during this crucial time will in turn serve to maximize value of their estates for the benefit of their estates and creditors. Accordingly, the Debtors' ability to pay certain prepetition claims of the Shippers, the Warehousemen, and the Lien Claimants will facilitate a smooth and orderly transition into these chapter 11 cases.

106.    The Debtors do not believe there are cost-effective and/or readily accessible alternatives to the Shippers, the Warehousemen, and the Lien Claimants under the current circumstances.

107.    Payment of the prepetition claims of the Shippers, the Warehousemen, and the Lien Claimants is essential to the continued supply of goods and services necessary to maintain the Debtors' operations. Even a minor delay could undermine the Debtors' ability to meet internal schedules or fulfill their customers' purchase needs. Such disruptions also would likely cause the Debtors' relationships with their customers to be severely, and possibly irreparably impaired. Any such delay or disruption could jeopardize the Debtors' ability to maximize the value of their estates while they evaluate their strategic options.

**H.    Debtors' Emergency Motion for an Order Authorizing Debtors to Honor Prepetition Obligations to Growers and Catchers (the "Growers Motion")**

108.    By the Growers Motion, the Debtors respectfully request the entry of an order authorizing, but not directing, the Debtors, in their business judgment and sole discretion, to honor prepetition obligations owed to the Growers, the Catchers and the Vaccinators (as defined below) in the ordinary course of business.

### *The Growers*

109.    In addition to the poultry processing arms of their businesses, the Debtors, in the ordinary course of business, raise chickens for slaughter.  Specifically, the Debtors purchase chicks, called "pullets," and deliver them to grow-out farms to be raised.  Once pullets reach approximately 25 weeks of age, they are moved to Growers at breeding farms who care for and tend to the breeding stock during their productive egg laying period through approximately 65 weeks of age.

110.    Broiler eggs laid at breeder farms are delivered to hatcheries to be incubated for three weeks at which time the chicks hatch and are assigned and delivered to broiler grow-out farms.  At the broiler grow-out farms, chicks are raised for five to eight weeks depending on the desired size of the broiler.  When broiler chickens reach full growth, they are transported to processing plants.

111.    The Debtors rely primarily on the services of approximately 187 independent contract growers, which are comprised of approximately 12 pullet growers, 34 breeder growers, and 141 broiler growers to raise and care for the Debtors' chickens.  Specifically, the Debtors enter into contractual growing arrangements (the "Growing Arrangements") with individuals with whom they contract to (i) raise chicks to become breeder hens and roosters (the "Pullet Growers"), (ii) raise and care for the Debtors' breeding stock (the "Breeder Growers"), and (iii) raise and care for the Debtors' broiler chickens (the "Broiler Growers," and, together with the Pullet Growers and Breeder Growers, the "Growers").  As of the Petition Date, the Growers are in possession of approximately ten million of the Debtors' live chickens, which are worth approximately $18,000,000.

112.    The Growers are independent contractors.  Pursuant to the typical Growing Arrangements, the Growers supply the farm, chicken houses, equipment, utilities and labor required to raise and care for the Debtors' chickens, while the Debtors provide the live poultry as well as feed, veterinary services, technical assistance, and the Debtors' recommendations as to the technical aspects of efficiently growing, feeding and caring for the chickens. In almost all cases, the Growers are independent farmers who raise poultry solely for the Debtors.

113.    The Debtors pay the Growers in the aggregate approximately $550,000 per week.

*The Catchers*

114.    Separate and apart from the Growers, the Debtors also pay a third-party independent contractor to provide chicken catchers (the "Catchers") to enter the chicken houses to capture the chickens and place them in chicken crates, which are then loaded onto trucks and transported to the Debtors' processing facilities.  The Catchers play an indispensable role in the production of the Debtors' poultry products, and without their services, the Debtors would not be able to receive a live chicken supply on a continuous basis.

115.    The Debtors pay the Catchers in the aggregate approximately $50,000 per week.

## C.    The Vaccinators

116.    In addition to the Growers and the Catchers, the Debtors pay third-party independent contractors to provide vaccinations to the Debtors' live chickens (the "Vaccinators").  The Vaccinators play an indispensable role in the production of the Debtors' poultry products.  Specifically, the Vaccinators prevent the Debtors' live chickens from contracting potentially deadly diseases.  Without the services of the Vaccinators, the Debtors' chicken supply would be at substantial risk.

117.    The Debtors pay the Vaccinators in the aggregate approximately $7,000 per week

118.    The Growers, the Catchers, and the Vaccinators are paid weekly, in arrears; because the Debtors commenced these cases during the middle of the week, the obligations to the Growers, the Catchers and the Vaccinators include the full week prior to the filing as well as the portion of the week in which the filings occurred.  As of the Petition Date, the Debtors' owed the Growers approximately $730,000, the Catchers approximately $66,000, and the Vaccinators approximately $10,000 (collectively, the "Growout Obligations").

119.    It is critical to the Debtors' businesses that their live chickens receive proper care.  If the Growers stop caring for the Debtors' chickens, or the Catchers stop catching the live

chickens to be hauled to the Debtors' processing facilities, the Debtors' inventories would be diminished for months.  The Debtors would be unable to meet customer expectations and their customers would quickly find alternative suppliers.  Once a customer switches to a competitor, the Debtors may not regain that customer's business for an extended period of time, if at all.  In addition, many of the Debtors' major customers regularly audit the Debtors for their compliance with industry standards for animal welfare.  Any interruption in proper care of the Debtors' birds by the Growers or any interruption of the Catchers' services, as well as any publicity generated by such interruption, could endanger important relationships with the Debtors' customers.

120.    A failure to pay the Growers may result in an inability or unwillingness of the Growers to care for the Debtors' chickens that are currently in such Growers' possession.  Many of the Growers with claims against the Debtors arising from prepetition services continue to be in possession of the Debtors' chickens postpetition.  Further, the farms of the Growers are typically small, family-run organizations, many of which are subject to mortgages and other expenses that must be paid monthly or on a flock-by-flock basis.  Many, if not all, of the Growers would face severe financial hardship were the Debtors not authorized to pay the prepetition amounts owed to such Growers, and many may face foreclosure actions by secured lenders and/or be forced to shut down operations due to lack of resources.  Such action would endanger the Debtors' chickens that are currently in such Growers' possession.  In fact, if the Growers are unable to or refuse to care for the Debtors' chickens, there is a substantial likelihood that the chickens may die.

121.    In addition, if the Debtors' Growers terminate or suspend their services, the Debtors could not find replacement growers in a reasonable time because most existing non-affiliated Growers in the Debtors' complex areas are already contracted with other poultry

producers.  The Debtors' currently contracted base of Growers is extremely valuable to the Debtors because it has taken many years to develop this base of Growers to its current level.  The current Growers' farms are already properly equipped to raise and care for the Debtors' birds. At this point, it would not be feasible to enlist the assistance of other growers.

122.    In sum, a failure to pay the Growers could cause the Growers to stop caring for the Debtors' birds, which would threaten the birds' ability to survive, and thereby impose enormous time and cost burdens on the Debtors, jeopardize future sources of revenue for months to come, and compromise the Debtors' investment of time and money in the flocks currently progressing through growing and breeding cycles.

I.      **Debtors' Emergency Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 for Interim and Final Orders (i) Authorizing Debtors to Incur Postpetition Secured Superpriority Indebtedness  Pursuant to Sections 105(a), 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d); (ii) Modifying the Automatic Stay; and (iii) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c) (the "DIP Financing Motion")**

123.    The Debtors seek authority, pursuant to sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), the entry of an interim and final order, *inter alia,* authorizing the Debtors to obtain a post-petition secured loan (the "DIP Facility") in a principal amount equal to $6,500,000 pursuant to that certain Debtor in Possession Credit and Security Agreement (the "DIP Loan Agreement") by and between Cagle's, Inc. and Cagle's Farms, Inc. as the Debtors and Debtors in Possession, and the Lender attached to the DIP Financing Motion as Exhibit A

124.    Without adequate post-petition financing, the Debtors may not have sufficient available sources of working capital to operate their businesses in the ordinary course for a period of time sufficient to maximize the value of their assets for the benefit of all stakeholders. The uncertainty concerning the Debtors' financial condition has curtailed the Debtors'

availability of credit and acceptable credit terms.  More specifically, the Debtors' ability to finance their operations and administer these bankruptcy cases is dependent on their ability to obtain the funds made available under the DIP Facility and to use the cash collateral of the Lender.

125.    Any disruption of the Debtors' operations would be devastating at this critical juncture.  The inability of the Debtors to obtain sufficient liquidity and to make payments on certain obligations on a timely basis may result in, *inter alia*, the Debtors' inability to continue the operation of their processing facilities and the Debtors' inability to provide critical feed to their live chickens.  If either of these events were to occur, the impact on the Debtors' estates would be catastrophic and would result in material harm to all of the Debtors' creditors and other constituents.  In light of the foregoing, the Debtors have determined, in the exercise of their sound business judgment, that a post-petition credit facility, which permits the Debtors to obtain up to $6,500,000 in financing, and to use such credit to finance the operation of their businesses, is critical to their ongoing operations and stability during their bankruptcy process.

126.    The Debtors believe that the debtor in possession financing offered by the Lender presents the best option available to them and would enable the Debtors to preserve their value as a going concern.   The Debtors have engaged in good-faith and extensive, arm's-length negotiations with the Lender.  These negotiations culminated in an agreement by the Lender to provide post-petition financing on the terms and subject to the conditions set forth in the DIP Loan Agreement and the interim order attached to the DIP Financing Motion as Exhibit B (the "Interim Order").

127.    The credit provided under the DIP Facility will enable the Debtors to finance their business operations, including the ability to operate their businesses in an orderly and reasonable

manner to preserve and enhance the value of their assets and enterprise for the benefit of all parties in interest. It is expected that the availability of credit under the DIP Facility will provide the Debtors with the necessary liquidity to continue their ordinary course business operations in order to maximize the return available to the Debtors' creditors in these bankruptcy cases. Finally, the implementation of the DIP Facility will be viewed favorably by the Debtors' employees, vendors and customers and thereby permit the Debtors to continue to operate their businesses during the bankruptcy process.

128.    The Debtors are unable to obtain unsecured credit or debt allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available to maintain ongoing operations, nor have the Debtors been able to obtain post-petition financing from an alternative prospective lender on more favorable terms and conditions than those for which approval is sought herein.

129.    A working capital facility of the type needed in these cases could not have been obtained on an unsecured basis. Moreover, potential sources of the proposed DIP Facility for the Debtors were extremely limited.

130.    In this extremely challenging credit market, the Debtor has been unable to find alternative or better financing on the terms and of the type and magnitude required in these chapter 11 cases on an unsecured basis, or without offering terms substantially similar to those of the DIP Facility. The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated by the parties in good faith and at arm's length.

131.    After appropriate investigation and analysis and given the exigencies of the circumstances, the Debtors' management has concluded that the DIP Facility is the only alternative available in the circumstances of these cases.

132.     As with most other large businesses, the Debtors have significant cash needs. Accordingly, access to substantial credit is necessary to meet the day-to-day costs associated with financing the operation of the Debtors' businesses.  In the absence of access to cash and credit, the Debtors may be unable to operate their businesses or to complete the bankruptcy process.  In turn, without the DIP Facility, the Debtors' prospects for a successful reorganization will be seriously impaired and the Debtors' creditors, estates and other parties in interest will be materially harmed.

133.     Given the Debtors' constrained liquidity, the DIP Facility is of critical importance to operating the Debtors' businesses and preserving the value of the Debtors' assets, thereby providing a greater recovery to the Debtors' creditors than would be realized if the Debtors were forced to convert to chapter 7.

**[signature on following page]**

Executed on October 19, 2011, at Atlanta, Georgia.

/s/ Mark M. Ham IV
Mark M. Ham IV
Executive Vice President and Chief Financial
Officer of Cagle's, Inc.

Further Affiant Sayeth Not.

Sworn To and Subscribed Before me this 19th day of October, 2011.

/s/ Sally Thomas
Notary Public
My Commission Expires: May 6, 2014

[NOTARIAL SEAL]

**EXHIBIT A**

**INDEX OF FIRST DAY MOTIONS**

| Pleadings |
|---|
| Debtors' Emergency Motion for an Order Directing Joint Administration of Chapter 11 Cases |
| Debtors' Emergency Motion for an Order Establishing Notice and Administrative Procedures |
| Debtors' Emergency Motion for an Order to Extend Time to File Schedules and Statements of Financial Affairs |
| Debtors' Emergency Motion to Authorize Payment of Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits, and Related Expenses, and Other Compensation to Employees |
| Debtors' Emergency Motion for Authority to Continue Pre-Existing Insurance Programs, to Maintain Insurance Premium Financing Programs, and to Pay Pre-Petition Premiums and Related Obligations |
| Debtors' Emergency Motion for Authority to (A) Maintain Existing Bank Accounts and Continue Use of Existing Cash Management System, (B) Continue Use of Existing Business Forms, and (C) Continue Existing Investment Practices |
| Debtors' Emergency Motion for an Order Authorizing the Debtors to Pay Pre-Petition Sales, Use, Trust Fund, and Other Taxes and Related Obligations |
| Debtors' Emergency Motion for an Order Authorizing the Debtors to Maintain and Administer Customer Programs and Honor Certain Pre-Petition Obligations Related Thereto |
| Debtors' Emergency Motion For Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service on Account of Prepetition Invoices, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment |
| Debtors' Emergency Motion for an Order Authorizing the Debtors to Honor Prepetition Obligations to and Continue Prepetition Practices with Shippers, Warehousemen and Other Lien Claimants |
| Debtors' Emergency Motion for an Order Authorizing Debtors to Honor Prepetition Obligations to Growers and Catchers |
| Debtors' Emergency Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 for Interim and Final Orders (i) Authorizing Debtors to Incur Postpetition Secured Superpriority Indebtedness  Pursuant to Sections 105(a), 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d); (ii) Modifying the Automatic Stay; and (iii) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c) |