## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **CAGLE'S, INC.,** | ) | **Case No. 11-80202** |
| **CAGLE'S FARMS, INC.,** | ) | **Case No. 11-80203** |
| | ) | |
| **Debtors.** | ) | |
| | ) | |

**DEBTORS' EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO INCUR POSTPETITION SECURED SUPERPRIORITY INDEBTEDNESS  PURSUANT TO SECTIONS 105(A), 362, 364(C)(1), 364(C)(2), 364(C)(3) AND 364(d);(II) MODIFYING THE AUTOMATIC STAY; AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND 4001(C)**

Cagle's, Inc. and Cagle's Farms, Inc. (collectively, the "Debtors" or the "Borrowers") each a debtor-in-possession (collectively, the "Debtors"), pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), hereby move this Court (the "Motion") for entry of interim and final orders (A) authorizing the Debtors to obtain post-petition financing, (B) authorizing the Debtors to use cash collateral of the Lender (as defined below), (C) granting adequate protection to the Lender, (D) modifying the automatic stay, and (E) scheduling a final hearing pursuant to Rules 4001(b) and 4001(c) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules").  In support thereof, the Debtors respectfully represent as follows:

### SUMMARY OF RELIEF REQUESTED

Among other things, the Debtors seek authority to obtain post-petition secured loans equal to $6,000,000, subject to the terms and conditions of the DIP Loan Agreement (as defined below) and the related loan documents.  In accordance with Bankruptcy Rule 4001, below is a

summary of the terms of the proposed DIP Facility (as defined below) and the Debtors' use of cash collateral of the Lender:[1]

     (a) <u>Borrowers</u>.  Cagle's, Inc. and Cagle's Farms, Inc.

     (b) <u>Lender</u>.  AgSouth Farm Credit, ACA. (the "<u>Association</u>" or the "<u>Lender</u>")

     (c) <u>Borrowing Limits</u>.  $6,000,000.

     (d) <u>Interest Rate.</u>  LIBOR Variable Rate plus 6.5%.  The default interest rate is the otherwise applicable interest rate plus 2%.

     (e) <u>Fees and Expenses</u>.  The Borrowers shall pay the Lender a fully earned and non-refundable origination fee of $55,000, due and payable upon entry of the Interim Order (as defined below).  The Borrowers shall pay on demand all costs and expenses, including reasonable attorneys' fees, actually incurred by the Lender in connection with the DIP Facility.

     (f) <u>Termination</u>. The earliest to occur of (a) one hundred and eighty days after the Closing Date, (b) the date the Lender demands payment of the Obligations following an Event of Default pursuant to Section 7.1 of the DIP Loan Agreement, (c) the effective date of any Reorganization Plan which does not meet the requirements of an Acceptable Plan, (d) the date of closing of any sale of all or substantially all of the Collateral (as defined below), or (e) the date on which any MetLife (as defined below) or the Lender is granted relief from the automatic stay.

     (g) <u>Acceptable Plan</u>.  It shall be an Event of Default under the DIP Loan Agreement for the Debtors to file any plan of reorganization which does not provide for (i) Full Payment of all Obligations (as defined below) on the effective date of such plan; (ii) an effective date no later than 30 days after the date of entry of the Confirmation Order with respect to such plan; and (iii) a full and complete release of any and all claims that the Debtors or their estates might have or assert against the Lender, or which is not otherwise acceptable to the Lender in its reasonable discretion.

     (h) <u>Purpose</u>.   The DIP Facility shall be used to (1) fully pay and satisfy the Emergency Pre-Petition Note Obligations (as defined below); and (2) provide for the working capital requirements and other general corporate purposes of the Debtors during the pendency of their chapter 11 cases, in accordance with the terms of the DIP Budget (as defined below).   The repayment of the Emergency Pre-Petition Note Obligations shall be subject to the reservation of rights of parties in interest as to the validity, amount, extent, priority and character of such claims and the liens that secure such claims.

---

[1] Terms not defined in the summary are defined herein or in the DIP Loan Agreement.

(i) <u>Priority and Liens</u>.    Subject to the Carve Out, all obligations under the DIP Facility shall, at all times: (i) pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to super-priority claim status in the chapter 11 cases (the "<u>DIP Superpriority Claim</u>"); (ii) pursuant to section 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, be secured by perfected liens (the "<u>DIP Liens</u>") on substantially all of the Debtors' assets (other than claims or causes of action arising under sections 544, 545, 547, 548, 550 or 553 of the Bankruptcy Code (collectively, the "<u>Avoidance Actions</u>")) (the "<u>Collateral</u>").  The DIP Liens shall be senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the Collateral, except that the DIP Liens shall be junior only to (a) the Prior Permitted Liens (including the Liens of Metlife on the Metlife Primary Collateral (as defined below)) solely to the extent that such Prior Permitted Liens constitute valid, perfected and non-avoidable Liens as of the Petition Date;[2] and (b) the Carve Out (as defined below).  The DIP Superpriority Claim shall not attach to or be paid from proceeds of Avoidance Actions.

(j) <u>Use of Cash Collateral</u>.  Cash collateral of the Lender will be used by the Debtors pursuant to the terms of the DIP Budget until the Termination Date.

(k) <u>Adequate Protection</u>.  As adequate protection of the interests of the Lender in the Pre-Petition Collateral (as defined below) against any diminution in value of such interests in the Pre-Petition Collateral on account of, among other things, the granting of the DIP Liens; the Debtors' use of cash collateral; the use, sale or lease of any other Pre-Petition Collateral; market value decline of collateral; the priming of the Pre-Petition Liens (as defined below); and the imposition of the automatic stay, the Lender shall receive perfected post-petition security interests and liens on the Collateral (the "<u>Adequate Protection Liens</u>") to the extent of any diminution in value.  The Adequate Protection Liens shall be junior only to: (A) the Prior Permitted Liens; (B) the Carve Out; (C) the DIP Liens; and (D) the Pre-Petition Liens (as defined below) on the Pre-Petition Collateral.  As further adequate protection against the diminution in value described above, the Lender will be provided, to the extent of any diminution in value, a superpriority administrative expense claim pursuant to Section 507(b) of the Bankruptcy Code (the "<u>Pre-Petition Superpriority Claim</u>").    The Pre-Petition Superpriority Claim shall be junior to the DIP Superpriority Claim and the Carve Out and shall not attach to or be paid from the Avoidance Actions or proceeds thereof.

(l) <u>Section 506(c) Waiver</u>.  As a further condition of the DIP Loan Agreement and any obligation of the Lender to make credit extensions pursuant to the DIP Loan Agreement, upon entry of the Final Order approving this provision, the Debtors, their estates, and any of their respective Subsidiaries and Affiliates (as defined in the DIP Loan Agreement), shall be deemed to have waived any claim to surcharge the Collateral under section 506(c) of the Bankruptcy Code, excluding, however, any such claims for matters provided for in the Budget (as defined in the DIP Loan Agreement) and incurred prior to the termination of the

---

[2] "Prior Permitted Liens" are defined in section 6.3(a)(ii) of the DIP Loan Agreement as: "Liens in existence on the date hereof and listed in <u>Schedule 6.3</u> [of the DIP Loan Agreement], including without limitation the Liens of Metlife on the Metlife Primary Collateral which shall be the only Liens which have priority over the Liens granted hereunder."

DIP Facility but not paid by the Debtors (subject to the Lender's rights to object to any such claims).

(m)Carve Out.  The DIP Facility provides for a "Carve Out" from the Collateral, the Pre-Petition Collateral, the DIP Superpriority Claims, the Adequate Protection Liens, and the Pre-Petition Superpriority Claims for: (i) statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6); and (ii) after the occurrence of an Event of Default under the DIP Loan Agreement and following delivery of a Carve Out Trigger Notice, the following expenses: an amount (the "Case Professionals Carve Out") equal to the sum of (a) the allowed and unpaid professional fees and disbursements for any Case Professional (as defined below) incurred after the delivery of a Carve Out Trigger Notice in an aggregate amount not in excess of $250,000, plus (b) all unpaid professional fees and disbursements of such Case Professionals incurred prior to the delivery of a Carve Out Trigger Notice to the extent allowed or later allowed and payable by order of the Court (which order has not been vacated or stayed, unless the stay has been vacated) under Sections 328, 330, 331 or 363 of the Bankruptcy Code and any interim compensation procedures order, but solely to the extent that the same constitute Budgeted Professional Fees.  "Budgeted Professional Fees" shall mean those fees and expenses incurred by Case Professionals in accordance with the professional fee schedule which is incorporated as part of the Budget.  "Case Professionals" shall mean any professional retained by the Debtors and any official committee appointed in these cases (a "Statutory Committee") pursuant to a final order of the Court (which order has not been vacated or stayed, unless the stay has been vacated) under Sections 327, 328, 363 or 1103(a) of the Bankruptcy Code and any claims agent.  The Carve Out shall not be used to pay any fees or expenses incurred in the prosecution of any litigation or the assertion of any claims raised against or with respect to the Lender or the Collateral.  On Monday of each week, the Debtors shall deposit the Budgeted Professional Fees for such week in an escrow account maintained by counsel for the Debtors.

(n) Rights and Remedies Upon Default.  Any automatic stay otherwise applicable to the Lender shall be modified so that after the occurrence of any Event of Default and at any time thereafter, upon five (5) business days prior written notice of such occurrence, in each case given to each of the Debtors, counsel to the Debtors, counsel to any Statutory Committee, if any and the United States Trustee, the Lender shall be entitled to exercise their rights and remedies in accordance with the DIP Loan Agreement, as applicable.  Immediately following the giving of notice by the Lender of the occurrence of an Event of Default: (i) the Debtors shall pay 100% of their revenues to the Lender as provided in the DIP Loan Agreement and the Interim Order; (ii) the Lender shall continue to apply such proceeds in accordance with the provisions of the Interim Order and of the DIP Loan Agreement; (iii) the Debtors shall have no right to use any of such proceeds other than towards the satisfaction of the Obligations and the Carve Out; and (iv) any obligation otherwise imposed on the Lender to provide any loan or advance to the Debtors pursuant to the DIP Facility shall be suspended.  If the Debtors do not contest the right of the Lender to exercise its remedies based upon whether an Event of Default has occurred within such five (5) business day time period, or this Court, after notice and  hearing, declines to stay the enforcement thereof, the

automatic stay as to the Lender shall automatically terminate at the end of such notice period.[3]

## JURISDICTION AND VENUE

This Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## BACKGROUND

On October 19, 2011 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.

On the Petition Date, each Debtor filed a substantially similar motion with this Court seeking to have its bankruptcy case jointly administered with the other Debtor's case pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

The factual background relating to the Debtors' commencement of these cases is set forth in detail in the *Declaration of Mark M. Ham IV in Support of First Day Motions and Applications* filed on the Petition Date and incorporated herein by reference.

The Debtors have continued in possession of their properties and have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

As of the date of this filing, no official committee of unsecured creditors has been appointed in any of these cases, and no request has been made for the appointment of a trustee or examiner.

---

[3] The description contained herein of the terms of the DIP Facility is intended as a summary of the terms expressly stated in the DIP Loan Agreement.  The summary of the terms contained herein is qualified in its entirety by the DIP Loan Agreement.  To the extent there is

## RELIEF REQUESTED

1.      The Debtors seek authority, pursuant to sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), the entry of an interim and final order, *inter alia,* authorizing the Debtors to obtain a post-petition secured loan (the "DIP Facility") in a principal amount equal to $6,000,000 pursuant to that certain Debtor in Possession Credit and Security Agreement (the "DIP Loan Agreement") by and between Cagle's, Inc. and Cagle's Farms, Inc. as the Debtors and Debtors in Possession, and the Lender substantially in the form attached hereto as Exhibit A.[4]

## DEBTORS' PRE-PETITION DEBT STRUCTURE AND HISTORY

2.      The Debtors and the Lender are parties to that certain Third Amended and Restated Revolving Line of Credit and Security Agreement dated September 4, 2008, (as amended, modified and restated, the "Pre-Petition Credit Agreement"), pursuant to which the Lender made certain pre-petition loans, advances and other amounts totaling $33,500,00 as of the date hereof (collectively, the "Pre-Petition Obligations").   The Lender asserts that the Pre-Petition Obligations are secured by a first priority lien (the "Pre-Petition Liens") on certain of the Debtors' accounts, inventory, real estate and equipment and other personal property assets and a second priority security interest in the Metlife Primary Collateral[5] (the "Pre-Petition Collateral")

---

any discrepancy between this summary and the DIP Loan Agreement, the DIP Loan Agreement controls.

[4] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the DIP Loan Agreement.

[5] The "Metlife Primary Collateral" is the real and personal property more fully described in Exhibit F to the DIP Loan Agreement.

and that all of the Debtors' cash on hand, including the cash in any deposit account, constitutes the cash collateral of the Lender for the Pre-Petition Obligations.

3. The Debtors and Metropolitan Insurance Company ("Metlife") are party to that certain Loan Agreement dated March 28, 2001 (as amended, modified and restated, the "Metlife Credit Agreement"), pursuant to which Metlife has made certain prepetition loans, advances and other amounts totaling approximately $7,685,650 as of the date hereof (collectively, the "Metlife Obligations"). Metlife asserts that the Metlife Obligations are secured by a first priority security interest in the Metlife Primary Collateral

4. On or about September 30, 2011, the Debtors executed and delivered to the Lender that certain Revolving Variable Rate Note in the principal amount of $500,000 (as amended, modified and restated, the "Emergency Pre-Petition Note"), pursuant to which the Lender has made certain pre-petition loans, advances and other amounts (collectively, the "Emergency Pre-Petition Note Obligations"). The Lender asserts that the Emergency Pre-Petition Note Obligations are secured by a first priority security interest in the Pre-Petition Collateral.

## THE DEBTORS' POST-PETITION FINANCING ARRANGEMENTS

5. Without adequate post-petition financing, the Debtors may not have sufficient available sources of working capital to operate their businesses in the ordinary course for a period of time sufficient to maximize the value of their assets for the benefit of all stakeholders. The uncertainty concerning the Debtors' financial condition has curtailed the Debtors' availability of credit and acceptable credit terms. More specifically, the Debtors' ability to finance their operations and administer these bankruptcy cases is dependent on their ability to

obtain the funds made available under the DIP Facility and to use the cash collateral of the Lender.

6.      Any disruption of the Debtors' operations would be devastating at this critical juncture.  The inability of the Debtors to obtain sufficient liquidity and to make payments on certain obligations on a timely basis may result in, *inter alia*, the Debtors' inability to continue the operation of their processing facilities and the Debtors' inability to provide critical feed to their live chickens.  If either of these events were to occur, the impact on the Debtors' estates would be catastrophic and would result in material harm to all of the Debtors' creditors and other constituents.  In light of the foregoing, the Debtors have determined, in the exercise of their sound business judgment, that a post-petition credit facility, which permits the Debtors to obtain up to $6,000,000 in financing, and to use such credit to finance the operation of their businesses, is critical to their ongoing operations and stability during their bankruptcy process.

7.      The Debtors believe that the debtor in possession financing offered by the Lender presents the best option available to them and would enable the Debtors to preserve their value as a going concern.  The Debtors have engaged in good-faith and extensive, arm's-length negotiations with the Lender.  These negotiations culminated in an agreement by the Lender to provide post-petition financing on the terms and subject to the conditions set forth in the DIP Loan Agreement and the interim order substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Interim Order</u>").  The significant elements of the proposed DIP Facility and the Interim Order are set forth above.

## LEGAL BASES FOR REQUESTED RELIEF

### A.    The Proposed DIP Facility

8.    Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, then the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in sections 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien.  *See* 11 U.S.C. § 364(c).

9.    Section 364(d)(1) of the Bankruptcy Code provides that the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt if:

> (A)  the trustee is unable to obtain such credit otherwise; and
>
> (B)  there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

*See* 11 U.S.C. § 364(d)(1); *see also In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

10.    The credit provided under the DIP Facility will enable the Debtors to finance their business operations, including the ability to operate their businesses in an orderly and reasonable manner to preserve and enhance the value of their assets and enterprise for the benefit of all parties in interest.  It is expected that the availability of credit under the DIP Facility will provide the Debtors with the necessary liquidity to continue their ordinary course business operations in

order to maximize the return available to the Debtors' creditors in these bankruptcy cases. Finally, the implementation of the DIP Facility will be viewed favorably by the Debtors' employees, vendors and customers and thereby permit the Debtors to continue to operate their businesses during the bankruptcy process.

       1.    <u>**The Debtors Do Not Have An Alternative to the DIP Facility**</u>

      11.    The Debtors are unable to obtain unsecured credit or debt allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available to maintain ongoing operations, nor have the Debtors been able to obtain post-petition financing from an alternative prospective lender on more favorable terms and conditions than those for which approval is sought herein.

      12.    A working capital facility of the type needed in these cases could not have been obtained on an unsecured basis. Moreover, potential sources of the proposed DIP Facility for the Debtors were extremely limited. It is well established that the appropriateness of a proposed post-petition financing facility must be considered in light of current market conditions. *See, e.g.*, *In re Lyondell Chem. Co.*, No. 09-10023, Transcript of Record at 734-35:24-1 (Bankr. S.D.N.Y. Mar. 5, 2009) (recognizing "the terms that are now available for DIP facilities in the current economic environment aren't as desirable" as they have been in the past); *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor is not required to seek credit from every possible lender before determining such credit is available). Indeed, where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search for financing." *See, e.g.*, *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989).

13.     No party in interest can credibly deny that the current market for financing is exceedingly strained.  Simply put, because of current economic conditions, there is no ready market for any financing, including debtor-in-possession financing or otherwise and provisions once considered "extraordinary" in debtor-in-possession financing arrangements have, for the time being, become standard.  *See, e.g.*, *Lyondell*, Tr. at 740:4-6 ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions reasonable here and now.").

14.     In this extremely challenging credit market, the Debtor has been unable to find alternative or better financing on the terms and of the type and magnitude required in these chapter 11 cases on an unsecured basis, or without offering terms substantially similar to those of the DIP Facility.  The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated by the parties in good faith and at arm's length.  Based on this, as well as the foregoing factors, the DIP Facility is the only feasible financing option for the Debtors and is in the best interests of the Debtors' estates.

**2.      Application of the Business Judgment Standard**

15.     As described above, after appropriate investigation and analysis and given the exigencies of the circumstances, the Debtors' management has concluded that the DIP Facility is the only alternative available in the circumstances of these cases.  Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money.  *See, e.g.*, *Group of Institutional Investors v. Chicago, Mil., St. P., & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc*., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).  "More exacting scrutiny would slow

the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

16.    In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Assocs.*, 14 B.R. 506, 511–13 (Bankr. D. Utah 1981).  Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code." *Id.* at 513–14 (footnotes omitted).

17.    The Debtors have exercised sound business judgment in determining that a post-petition credit facility is appropriate and have satisfied the legal prerequisites to borrow under the DIP Facility.  The terms of the DIP Facility are fair and reasonable, are the result of arms-length negotiations and are in the best interests of the Debtors' estates.  Accordingly, the Debtors should be granted authority to enter into the DIP Facility and borrow funds from the Lender on the secured, administrative superpriority basis described above, pursuant to section 364(c) and (d) of the Bankruptcy Code, and take the other actions contemplated by the DIP Loan Agreement and as requested herein.

### 3.    The DIP Facility is Necessary to Effectively Preserve the Assets of the Debtors' Estates and to Operate Their Businesses

18.    As with most other large businesses, the Debtors have significant cash needs.  Accordingly, access to substantial credit is necessary to meet the day-to-day costs associated with financing the operation of the Debtors' businesses.  In the absence of access to cash and credit, the Debtors may be unable to operate their businesses or to complete the bankruptcy

process.  In turn, without the DIP Facility, the Debtors' prospects for a successful reorganization will be seriously impaired and the Debtors' creditors, estates and other parties in interest will be materially harmed.

19.    Given the Debtors' constrained liquidity, the DIP Facility is of critical importance to operating the Debtors' businesses and preserving the value of the Debtors' assets, thereby providing a greater recovery to the Debtors' creditors than would be realized if the Debtors were forced to convert to chapter 7.  Accordingly, the Debtors submit that the availability of credit under the DIP Facility is necessary to preserve and enhance the value of their estates for the benefit of all stakeholders in these chapter 11 cases.

**4.    Adequate Protection**

20.    Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of post-petition debt secured by senior or "priming" liens, provides that the Court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if–
>
> (A) the trustee is unable to obtain credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

*See* 11 U.S.C. § 364(d)(1).

21.    The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996).  "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process."  *Id.*

(quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).    Examples of

adequate protection are provided for in section 361 of the Bankruptcy Code and include, but are

not limited to:  (i) making a cash payment or periodic cash payments to a secured creditor to the

extent that the estate's use of property will result in a decrease in the value of such creditor's

interest in the property; (ii) provisions for an additional or replacement lien to the extent that the

use of such property will cause a decrease in the value of such entity's interest in the property;

and (iii) granting such other relief as will result in the realization by the creditor of the

indubitable equivalent of such creditor's interest in the property.  *See In re C.G. Chartier

Constr., Inc.*, 126 B.R. 956, 960 (E.D. La. 1991).

22.      In accordance with section 364(d), and consistent with the purposes underlying

the provision of adequate protection, the proposed Interim Order provides that adequate

protection will be provided to the Lender in connection with the Pre-Petition Liens to the extent

of any diminution in value of their Pre-Petition Collateral, as follows: (1) replacement liens on

all assets of the Debtors' estates (excluding Avoidance Actions), immediately junior to the DIP

Liens, the Carve Out, the Prior Permitted Liens, and the Pre-Petition Liens; and (2) a

superpriority claim, immediately junior to the DIP Liens, the Carve Out, the Prior Permitted

Liens, and the Pre-Petition Liens.

### 5.      The Terms of the DIP Facility Are Fair, Reasonable, and Appropriate

23.      The proposed terms of the DIP Facility are fair, reasonable and adequate in that

its terms neither (a) tilt the conduct of these cases and prejudice the powers and rights that the

Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent motions by parties in

interest from being decided on their merits.  The purpose of the DIP Facility is to enable the

Debtors to meet their ongoing operational expenses and allowed administrative bankruptcy

expenses, thereby enabling the Debtors to maximize the return available to the Debtors' creditors.

24.     The proposed DIP Facility provides that the security interests granted to the Lender are subject to the Carve Out.  Bankruptcy courts generally find that such "carve-outs" are not only reasonable, but are necessary to insure that official committees and the debtor's estate will be assured of the assistance of counsel.  *See, e.g.*, *In Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).

25.     Likewise, the various fees and charges required by the Lender under the DIP Facility are reasonable and appropriate under the circumstances.  Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in section 364 of the Bankruptcy Code.  *See, e.g.*, *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316–18 (9th Cir. BAP 1992) (authorizing credit arrangement under section 364, including a lender "enhancement fee").

26.     The DIP Loan Agreement and the DIP Facility should be approved pursuant to section 364(e) of the Bankruptcy Code.  Section 364(e) was designed to "encourage the extension of credit to debtors" by allowing lenders to "rely on a bankruptcy court's authorization of the transaction."  *See In re EDC Holding Co.*, 676 F.2d 945, 947 (7th Cir. 1982) (the purpose of section 364(e) is "to overcome people's natural reluctance to deal with a bankrupt firm whether as purchaser or lender by assuring them that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction that they need not worry about their priority merely because some creditor is objecting to the transaction and is trying to get the district court or the court of appeals to reverse the bankruptcy judge."); *see also In re North Atlantic Millwork Corp.*, 155 B.R. 271, 279 (Bankr. Mass. 1993) ("The purpose of section 364(e) is to allow good-

faith lenders to rely upon conditions as the time they extend credit and to encourage lenders to lend to bankrupt entities.")

27.    The DIP Loan Agreement was the result of good faith and arm's length negotiations, with all parties represented by counsel.  As set forth above, the Debtors believe that the terms of the DIP Loan Agreement are fair and reasonable under the circumstances, and that the Lender is entitled to the benefits of section 364(e) of the Bankruptcy Code.

### 6.    Request for Modification of Automatic Stay

28.    As set forth more fully in the proposed Interim Order, the proposed DIP Loan Agreement contemplates a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code to permit the Lender to take certain actions required or permitted by the Interim Order.  More specifically, the Interim Order provides the Lender with relief from the automatic stay upon the occurrence of specified events of default, and after the Debtors' failure to cure or contest same successfully, to allow the Lender, *inter alia*, to enforce the remedies available to it under the DIP Loan Agreement.  The Interim Order further provides that prior to the exercise of any enforcement or liquidation remedies available to the Lender under the DIP Loan Agreement, the Lender shall be required to give five (5) business days' written notice to each of counsel for the Debtors, any official committees appointed in these cases and the U.S. Trustee.  If the Debtors do not contest the right of the Lender to exercise its remedies based upon whether an Event of Default has occurred within such five (5) business day time period, or the Court, after notice and  hearing, declines to stay the enforcement thereof, the automatic stay as to the Lender shall automatically terminate at the end of such notice period.

29.    Stay modification provisions of the sort requested herein are ordinary and usual features of post-petition debtor-in-possession financing facilities and, in the Debtors' business

judgment, are reasonable under the present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Loan Agreement and the Interim Order.

**B.** **Cash Collateral**

30. The Debtors seek to use cash collateral of the Lender commencing immediately following the entry of the Interim Order. The cash collateral will be used by the Debtors to the extent necessary to meet their working capital needs.

31. Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or lease cash collateral unless: "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." *See* 11 U.S.C. § 363(c)(2).

32. Additionally, section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property. . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest." *See* 11 U.S.C. § 363(e).

33. In addition to the approval of the DIP Facility, the Debtors are also requesting authority to use the full amount of the cash collateral, for the purposes and amounts set forth in the agreed-upon budget (the "DIP Budget").

34. For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of their estates.

35. To the extent the fourteen day stay of Bankruptcy Rule 6004(h) may be construed to apply to the subject matter of this Motion, the Debtors request that such stay be waived.

## NOTICE

36.     Notice of this Motion has been provided to the Office of the United States Trustee, counsel for the Lender, Metlife, the Internal Revenue Service, the Securities and Exchange Commission, and the Debtors' thirty (30) largest unsecured creditors on a consolidated basis. In light of the nature of the relief requested, the Debtors submit that no further notice is necessary.

## Conclusion

WHEREFORE, the Debtors respectfully request that the Court:

(a)     enter the Interim Order substantially in the form attached hereto as <u>Exhibit B</u>; and

(b)     grant the Debtors such other and further relief as is just and proper.

Dated:  October 19, 2011           Respectfully submitted,
        Atlanta, Georgia

                                   KING & SPALDING LLP

                                   /s/ Paul K. Ferdinands
                                   Sarah R. Borders
                                   Georgia Bar No. 610649
                                   sborders@kslaw.com
                                   Paul K. Ferdinands
                                   Georgia Bar No. 258623
                                   pferdinands@kslaw.com
                                   Jeffrey R. Dutson
                                   Georgia Bar No. 637106
                                   jdutson@kslaw.com
                                   1180 Peachtree Street
                                   Atlanta, Georgia 30309-3521
                                   Telephone:    (404) 572-4600
                                   Facsimile:    (404) 572-5128

                                   PROPOSED COUNSEL FOR THE
                                   DEBTORS-IN-POSSESSION

# **EXHIBIT A**

## **Form of DIP Credit Agreement**

**DEBTOR IN POSSESSION CREDIT AND SECURITY AGREEMENT**

**BY AND BETWEEN**

**CAGLE'S INC. and CAGLE'S FARMS, INC.,**
**the Debtors and Debtors in Possession**

**AND**

**AgSOUTH FARM CREDIT, ACA,**
**Lender**

**dated as of October ___, 2011**

SGR\9196860.1

## TABLE OF CONTENTS

## TABLE OF EXHIBITS AND SCHEDULES

Exhibit A          Budget

Exhibit B          Commercial Tort Claims

Exhibit C          Budget Compliance Certificate

Exhibit D          Final Borrowing Order

Exhibit E          Interim Borrowing Order

Exhibit F          Metlife Primary Collateral

Exhibit G          Premises

Exhibit H          Revolving Advance Request

Exhibit I          Form of Revolving Note

Exhibit J          First Day Orders

Schedule 3.8       Organizational Information

Schedule 5.1       Trade Names, Chief Executive Office, Principal Place of Business, and
                   Locations of Collateral

Schedule 5.5       Subsidiaries

Schedule 5.7       Litigation Matters

Schedule 5.11      Intellectual Property Disclosures

Schedule 5.14      Environmental Matters

Schedule 6.3       Prior Permitted Liens

Schedule 6.4       Permitted Indebtedness and Guaranties

# DEBTOR IN POSSESSION CREDIT AND SECURITY AGREEMENT

Dated as of October \_\_\_, 2011

This Debtor in Possession Credit and Security Agreement is dated as of October \_\_\_, 2011 and is by and among **CAGLE'S INC.**, a Georgia corporation ("Cagle's"), and **CAGLE'S FARMS, INC.**, a Georgia corporation ("CFI"), each in the capacity of a borrower hereunder, each as a debtor and debtor in possession (individually, a "Borrower" and collectively, the "Borrowers"), and **AgSOUTH FARM CREDIT, ACA**, an agricultural credit association (the "Lender" or "Association").

## RECITALS

On October \_\_\_\_, 2011 (the "Petition Date"), the Borrowers commenced cases (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Northern District of Georgia (together with any other court which has jurisdiction over these Chapter 11 Cases, the "Bankruptcy Court"), and each Borrower has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its business as debtor in possession.

The Borrowers and  AgSouth Farm Credit, ACA, in its capacity as the initial lender thereunder (together with each Participant or Assignee thereunder, the "Pre-petition Lenders") are parties to that certain Third Amended and Restated Revolving Line of Credit and Security Agreement dated September 4, 2008 (as amended, modified and restated, the "Pre-Petition Credit Agreement"), pursuant to which the Pre-petition Lenders have made and the Borrowers are indebted to Pre-petition Lenders for certain pre-petition loans, advances and other amounts thereunder (collectively, the "Pre-Petition Obligations"); and

The Borrowers executed and delivered to Lender that certain Revolving Variable Rate Note, dated September 30, 2011, in the face principal amount of $500,000 (as amended, modified and restated, the "Emergency Pre-Petition Note"), pursuant to which the Lender has made and each Borrower is indebted to the Lender for certain pre-petition loans, advances and other amounts thereunder (collectively, the "Emergency Pre-Petition Note Obligations").

The Borrowers are unable to obtain funds or credit on any terms other than as set forth herein or from lender other than the Lender.

The Borrowers have asked the Lender to make post-petition loans and advances to the Borrowers consisting of a debtor in possession credit facility as Revolving Advances in an aggregate principal amount not to exceed $6,000,000 at any time outstanding.

The Lender is willing to provide such financing, subject to the terms and conditions set forth herein, including that all of the Obligations hereunder and under the other Loan Documents constitute allowed superpriority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code in the Chapter 11 Cases as set forth herein and are secured by a Lien on all

of the Borrowers' real and personal property pursuant to Section 364(d)(1) of the Bankruptcy Code, subject only to the Prior Permitted Liens.

NOW THEREFORE, in consideration of the foregoing recitals and the covenants and agreements contained herein, the parties hereto agree as follows:

# ARTICLE I

## DEFINITIONS

**Section 1.1    Definitions**.   For all purposes of this Agreement, except as otherwise expressly provided, the following terms shall have the meanings assigned to them in this Section or in the Section referenced after such term:

"Acceptable Plan" shall mean a Reorganization Plan which provides for Full Payment of all Obligations on the effective date of such Reorganization Plan, provides for an effective date no later than 30 days after the date of entry of the Confirmation Order with respect to such Reorganization Plan, and provides for a full and complete release of any and all claims that the Borrowers or the Estates might have or assert against the Lender, or which is otherwise acceptable to the Lender in its discretion.

"Accounts" has the meaning given to it under the UCC.

"Advances" means the Revolving Advances.

"Affiliate" or "Affiliates" means any Person controlled by, controlling or under common control with the Borrowers, including any Subsidiary of the Borrowers.  For purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" means this Debtor in Possession Credit and Security Agreement, as may be supplemented, amended or modified from time to time.

"Association Stock" means all of Cagle's Class C stock in the Association in the amount of $1,000.00 total par value and all distributions of property, whether or not in cash, made by the Association to Cagle's on account of its interest in the above-described property, including stock dividends, allocated surplus as evidenced by book entries on the Association's books, as well as all other property so distributed, together with all documents, instruments, and share certificates, if any, of Cagle's relating to the above, and all Proceeds of the foregoing.

"Avoidance Actions" means any claim or cause of action under Chapter 5 of the Bankruptcy Code.

"Bankruptcy Code" means Title 11, United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

SGR\9196860.1

"Bankruptcy Court" has the meaning set forth in the Recitals of this Agreement.

"Budget" means any set of projections approved by the Lender in its reasonable discretion showing all projected cash receipts and all projected cash disbursements for the Borrowers delivered to the Lender pursuant to Section 5.6(b) or 6.2(b). The initial Budget shall be substantially in the form of **Exhibit A** annexed hereto and made a part hereof, and all Budgets thereafter shall be in form and detail reasonably acceptable to the Lender .

"Business Day" means a day on which the Federal Reserve Bank of Georgia is open for business.

"Capital Expenditures" means for a period, any expenditure of money during such period for the purchase, lease or construction of assets, or for improvements or additions thereto, which are capitalized on the Borrowers' balance sheet.

"Carveout" shall have the meaning ascribed to it in the Financing Orders.

"Chapter 11 Cases" has the meaning set forth in the Recitals of this Agreement.

"Closing Date" means the date upon which the Interim Borrowing Order has been entered and all conditions precedent to the Advances have been satisfied or waived in writing by the Lender.

"Collateral" means all of the Borrowers' Accounts, chattel paper and electronic chattel paper, deposit accounts, documents, Equipment, General Intangibles, Goods, Instruments, Inventory, Investment Property, letter-of-credit rights, letters of credit, Commercial Tort Claims (excluding Avoidance Actions); life insurance policies; the Association Stock; all real property, whether owned or leased, and any improvements, rents, permits, contracts, records and proceeds related thereto, together with (a) all substitutions and replacements for and products of any of the foregoing; (b) in the case of all goods, all accessions; (c) all accessories, attachments, parts, equipment and repairs now or hereafter attached or affixed to or used in connection with any goods; (d) all warehouse receipts, bills of lading and other documents of title now or hereafter covering such goods; (e) all collateral subject to the Lien of any Security Document; (f) any money, or other assets of the Borrowers that now or hereafter come into the possession, custody, or control of the Lender; (g) all sums on deposit in any deposit account of the Borrowers; (h) to the extent not covered in the foregoing, all other property of the Borrowers, whether tangible or intangible, real or personal; (i) proceeds of any and all of the foregoing; (j) books and records of the Borrowers, including all mail or electronic mail addressed to the Borrowers; (k) to the extent not covered in the foregoing, all other property of the Borrowers, whether tangible or intangible, real or personal, and (l) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which the Borrowers now has or hereafter acquires any rights.

"Commercial Tort Claims" shall have the meaning set forth in the UCC and shall include (i) those items listed on **Exhibit B** hereof and (ii) all other causes of actions and claims, but excluding any Avoidance Action.

"Commitment" means the Lender's commitment to make Advances to the Borrowers.

"Compliance Certificate" means a certificate of the Borrowers' chief financial officer, substantially in the form of **Exhibit C** hereto.

"Confirmation Order" shall mean an order entered by the Bankruptcy Court confirming a Reorganization Plan.

"Constituent Documents" means with respect to any Person, as applicable, such Person's certificate of incorporation, articles of incorporation, by-laws, certificate of formation, articles of organization, limited liability company agreement, management agreement, operating agreement, shareholder agreement, partnership agreement or similar document or agreement governing such Person's existence, organization or management or concerning disposition of ownership interests of such Person or voting rights among such Person's owners.

"Controlled Account" means bank account number 6010024820 maintained by Borrowers at the Depositary Bank and used by Borrowers as their general operating account, or such other account as Borrowers may, from time to time, with the approval of the Lender, designate to be used as Borrowers' general operating account including any debtor in possession account.

"Control Agreement" means an agreement among Borrowers, the Depositary Bank and Lender, in form and substance satisfactory to Lender, requiring, among other things, the Depositary Bank to comply with the instructions of Lender directing disposition of the funds in the Controlled Account without the consent of Borrowers, or either Borrower, and providing that Lender shall have a security interest in the Controlled Account as collateral for the Obligations.

"Credit Facility" means the credit facility under which Revolving Advances may be made available to the Borrowers by the Lender under Article II.

"Debt" of a Person as of a given date, means all items of indebtedness or liability which in accordance with GAAP would be included in determining total liabilities as shown on the liabilities side of a balance sheet for such Person and shall also include the aggregate payments required to be made by such Person at any time under any lease that is considered a capitalized lease under GAAP.

"Default" means an event that, with giving of notice or passage of time or both, would constitute an Event of Default.

"Default Period" means any period of time beginning on the day a Default or Event of Default occurs and ending on the date identified by the Lender in writing as the date that such Default or Event of Default has been cured or waived.

"Default Rate" means an annual interest rate, in effect during a Default Period or following the Termination Date, of two percent (2%) in excess of the Floating Rate.

"Depositary Bank" means RBC Centura Bank or such other commercial bank as Borrowers may, from time to time, with the approval of Lender and United States Trustee, designate as the bank at which Borrowers desire to maintain the Controlled Account.

SGR\9196860.1

"Director" means a director of the Borrowers.

"Environmental Law" means any federal, state, local or other governmental statute, regulation, law or ordinance dealing with the protection of human health and the environment.

"Equipment" means all of the Borrowers' equipment, as such term is defined in the UCC, whether now owned or hereafter acquired, including all present and future machinery, vehicles, rolling stock, furniture, fixtures, manufacturing equipment, shop equipment, office and recordkeeping equipment, parts, tools, supplies, and including specifically the goods described in any equipment schedule or list herewith or hereafter furnished to the Lender by the Borrowers.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is a member of a group which includes the Borrowers and which is treated as a single employer under Section 414 of the IRC.

"Estates" shall mean the Estates created in the Chapter 11 Cases pursuant to 11 U.S.C. § 541(a).

"Event of Default" is defined in Section 7.1.

"Final Borrowing Order" means a final order of the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code approving this Agreement and the other Loan Documents, confirming the Interim Borrowing Order and authorizing the incurrence by the Borrowers of permanent post-petition secured and super priority Debt in accordance with this Agreement, and as to which no stay has been entered and which has not been reversed, modified, vacated or overturned, in substantially the form of **Exhibit D** hereto and which is in form and substance satisfactory to the Lender.

"Financing Order" means the Interim Borrowing Order or the Final Borrowing Order, and "Financing Orders" means the Interim Borrowing Order and the Final Borrowing Order.

"Floating Rate" means with respect to Revolving Advances evidenced by the Revolving Note, an annual interest rate equal to the sum of the LIBOR Variable Rate plus 6.5 percent (6.5%), which interest rate shall, in each case, change when and as the LIBOR Variable Rate changes.

"Full Payment" shall mean, with respect to the Obligations, full, final and indefeasible payment of such Debt in immediately available funds.

"Funding Date" is defined in Section 2.1.

"GAAP" means generally accepted accounting principles, applied on a basis consistent with the accounting practices applied in the financial statements described in Section 5.6.

"General Intangibles" shall have the meaning given it under the UCC.

"Hazardous Substances" means pollutants, contaminants, hazardous substances, hazardous wastes, petroleum and fractions thereof, and all other chemicals, wastes, substances and materials listed in, regulated by or identified in any Environmental Law.

"IRC" means the Internal Revenue Code of 1986, as amended from time to time.

"Indemnified Liabilities" has the meaning set forth in Section 8.6.

"Indemnitees" has the meaning set forth in Section 8.6.

"Infringement" or "Infringing" when used with respect to Intellectual Property Rights means any infringement or other violation of Intellectual Property Rights.

"Intellectual Property Rights" means all actual or prospective rights arising in connection with any intellectual property or other proprietary rights, including all rights arising in connection with copyrights, patents, service marks, trade dress, trade secrets, trademarks, trade names or mask works.

"Interest Payment Date" has the meaning set forth in Section 2.7(a).

"Interim Borrowing Order" means that certain order entered by the Bankruptcy Court in substantially the form of **Exhibit E** hereto and otherwise in form and substance satisfactory to the Lender.

"Interest Period"  means the 30-day period beginning on the day the initial Advance is made hereunder and each consecutive 30-day period thereafter.

"Inventory" shall have the meaning given it under the UCC and shall include without limitation, farm products, crops and livestock (including all broilers, breeders, pullets, chicks and the progeny of the foregoing), dressed poultry inventory, grain and feed, prepaid grain and feed, eggs, vaccines and packaging inventory.

"Investment Property" shall have the meaning given it under the UCC.

"LIBOR Variable Rate" means a variable interest rate per annum equal to the prevailing 30-day London Interbank Offered Rate (LIBOR), as published in The Wall Street Journal for the first (1st) day before the day the initial Advance is made hereunder (the "LIBOR Rate"), rounded to the nearest one-eighth of one percent (0.125%), such rate to change on the first day of each Interest Period, if necessary, to produce an effective interest rate that is equal to the LIBOR Rate published for the last day of the immediately preceding Interest Period (or, if such rate has not been so published for such day, the last day prior to such day on which such rate was so published), rounded to the nearest one-eighth of one percent (0.125%); provided that should The Wall Street Journal cease publishing the LIBOR Rate, Lender shall, using reasonable judgment, substitute for the LIBOR Rate a similar index, which will thereafter apply in place of the LIBOR Rate for purposes of determining the LIBOR Variable Rate hereunder, provided further that Lender gives Borrowers prompt written notice of such substitution;

"Licensed Intellectual Property" has the meaning set forth in Section 5.11(c).

SGR\9196860.1

"Lien" means any security interest, mortgage, deed of trust, pledge, lien, charge, encumbrance, title retention agreement or analogous instrument or device, including the interest of each lessor under any capitalized lease and the interest of any bondsman under any payment or performance bond, in, of or on any assets or properties of a Person, whether now owned or subsequently acquired and whether arising by agreement or operation of law.

"Loan Documents" means this Agreement, the Note, the Security Documents, each Budget and the Financing Orders, together with every other agreement, note, document, contract or instrument to which the Borrowers now or hereafter is a party related to the Obligations and that is required by the Lender.

"Material Adverse Effect" means any of the following:

(a)    A material adverse effect on the business, operations, results of operations, prospects, assets, liabilities or financial condition of the Borrowers, except for the commencement of the Chapter 11 Cases and events that would typically result from the commencement of the Chapter 11 Cases as reasonably determined by the Lender;

(b)    A material adverse effect on the ability of the Borrowers to perform its obligations under the Loan Documents; or

(c)    A material adverse effect on the ability of the Lender to enforce the Obligations or to realize the intended benefits of the Security Documents, including a material adverse effect on the validity or enforceability of any Loan Document, or on the status, existence, perfection, priority (subject to Permitted Liens) or enforceability of any Lien securing payment or performance of the Obligations.

"Maturity Date" means forty five (45) days after the Closing Date.

"Maximum Line Amount" means $6,000,000.

"Metlife" means the Metropolitan Life Insurance Company.

"Metlife Obligations" means the Borrowers' obligations to Metlife under that certain Loan Agreement, dated on or about March 20, 2001, by and among Borrowers and Metlife not to exceed the principal amount of $_____, (the "Metlife Loan Agreement") together with interest thereon, charges and fees thereunder, and costs of collection thereof.

"Metlife Primary Collateral" shall mean the real and personal property more fully described in **Exhibit F** and in which Metlife has a first priority security interest and Pre-petition Lenders have a second priority security interest.

"Multiemployer Plan" means a multiemployer plan (as defined in Section 4001(a)(3) of ERISA) to which the Borrowers or any ERISA Affiliate contributes or is obligated to contribute.

"Obligations" means the Advances and each and every other debt, liability and obligation of every type and description which the Borrowers may now or at any time hereafter owe to the Lender pursuant to this Credit Facility whether it arises in a transaction involving the Lender

alone or in a transaction involving other creditors of the Borrowers, and whether it is direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or sole, joint, several or joint and several, and including all indebtedness of the Borrowers arising under any Loan Document between the Borrowers and the Lender, whether now in effect or hereafter entered into.

"Officer" is an officer of a Borrower.

"Owned Intellectual Property" has the meaning set forth in Section 5.11(a).

"Pension Plan" means a pension plan (as defined in Section 3(2) of ERISA) maintained for employees of the Borrowers or any ERISA Affiliate and covered by Title IV of ERISA.

"Permitted Lien" and "Permitted Liens" have the meanings set forth in Section 6.3(a).

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Petition Date" has the meaning set forth in the Recitals of this Agreement.

"Plan" means an employee benefit plan (as defined in Section 3(3) of ERISA) maintained for employees of the Borrowers or any ERISA Affiliate.

"Pre-Petition Credit Agreement" has the meaning set forth in the recitals of this Agreement.

"Pre-Petition Emergency Note" has the meaning set forth in the recitals of this Agreement.

"Pre-Petition Lenders" has the meaning set forth in the recitals of this Agreement.

"Pre-Petition Loan Documents" means the Pre-Petition Credit Agreement and each of the "Loan Documents" as defined therein.

"Pre-Petition Obligations" has the meaning set forth in the recitals of this Agreement.

"Premises" means all locations where the Borrowers conduct their business or have any rights of possession, including the locations legally described in **Exhibit G** attached hereto.

"Prior Permitted Liens" shall have the meaning set forth in Section 6.3(ii) hereof.

"Reorganization Plan" shall mean a plan of reorganization proposed by the Borrowers or any other Person (including the Lender) in the Chapter 11 Cases.

"Reportable Event" means a reportable event (as defined in Section 4043 of ERISA), other than an event for which the 30-day notice requirement under ERISA has been waived in regulations issued by the Pension Benefit Guaranty Corporation.

SGR\9196860.1

"Revolving Advances" is defined in Section 2.1.

"Revolving Advances Request" shall mean a revolving Advances request in the form of **Exhibit H** hereto.

"Revolving Note" means the Borrowers' revolving promissory note, payable to the order of the Lender in substantially the form of **Exhibit I** hereto, as same may be renewed and modified, amended and or restated from time to time, and all replacements thereof.

"Security Documents" means this Agreement and any other document delivered to the Lender from time to time to secure the Obligations.

"Security Interest" has the meaning set forth in Section 3.1.

"Subsidiary" means any Person of which more than 50% of the outstanding ownership interests having general voting power under ordinary circumstances to elect a majority of the board of directors or the equivalent of such Person, regardless of whether or not at the time ownership interests of any other class or classes shall have or might have voting power by reason of the happening of any contingency, is at the time directly or indirectly owned by the Borrowers, by the Borrowers and one or more other Subsidiaries, or by one or more other Subsidiaries.

"Termination Date" means the earliest of (a) the Maturity Date, (b) the date the Lender demands payment of the Obligations following an Event of Default pursuant to Section 7.1, (c) the effective date of any Reorganization Plan which does not meet the requirements of an Acceptable Plan, (d) the date of closing of any sale of all or substantially all of the Collateral, or (e) the date on which any Pre-Petition Lender, MetLife or the Lender is granted relief from the automatic stay.

"UCC" means the Uniform Commercial Code as in effect in the State of Georgia, or in any other state whose laws are held to govern this Agreement or any portion of this Agreement.

**Section 1.2    Other Definitional Terms; Rules of Interpretation**.    The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP.  All terms defined in the UCC and not otherwise defined herein have the meanings assigned to them in the UCC.  References to Articles, Sections, subsections, Exhibits, Schedules and the like, are to Articles, Sections and subsections of, or Exhibits or Schedules attached to, this Agreement unless otherwise expressly provided.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  Unless the context in which used herein otherwise clearly requires, "or" has the inclusive meaning represented by the phrase "and/or".  Defined terms include in the singular number the plural and in the plural number the singular.  Reference to any agreement (including the Loan Documents), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof (and, if applicable, in accordance with the terms hereof and the other Loan Documents), except where otherwise explicitly provided, and reference to any promissory note includes any

promissory note which is an extension or renewal thereof or a substitute or replacement therefor. Reference to any law, rule, regulation, order, decree, requirement, policy, guideline, directive or interpretation means as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect on the determination date, including rules and regulations promulgated thereunder. Any reference herein or in any other Loan Document to the "Budget", unless otherwise stated, shall be deemed to be a reference to the Budget, as of the date of determination, most recently submitted by the Borrowers to the Lender and accepted in writing by the Lender, it being understood that the Lender shall have no obligation to accept any Budget which is not satisfactory to the Lender in its discretion.

## ARTICLE II

## AMOUNT AND TERMS OF THE CREDIT FACILITY

**Section 2.1    Revolving Advances**.  The Lender agrees, subject to the terms and conditions of this Agreement and the Financing Orders, to make advances ("Revolving Advances") to the Borrowers from time to time from the date that all of the conditions set forth in 4.1 are satisfied (the "Funding Date") to and until (but not including) the Termination Date in an amount not to exceed in the aggregate at any one time outstanding the Maximum Line Amount.  The Lender shall have no obligation to make a Revolving Advance to the extent that the amount of the requested Revolving Advance together with all outstanding Revolving Advance exceeds the Maximum Line Amount.  The Borrowers' obligation to pay the Revolving Advances shall be evidenced by the Revolving Note and shall be secured by the Collateral.  The Credit Facility is a revolving loan facility and within the limits set forth in this Section 2.1, the Borrowers may borrow, prepay pursuant to Section 2.10, and reborrow.

**Section 2.2    Procedures for Requesting Advances**.  The Borrowers shall comply with the following procedures in requesting Revolving Advances:

(a)    Borrowers shall request Revolving Advances hereunder by giving Lender a Revolving Loan Request prior to 11:00 a.m. (prevailing Eastern time) on the Business Day on which Borrowers desire for Revolving Advances to be made.

(b)    Such Revolving Loan Request, once received by Lender, shall not thereafter be revocable by Borrowers.

(c)    Not later than 4:00 p.m. (prevailing Eastern time) on each Banking Day on which Borrowers desire for Revolving Advances to be made, Lender shall, unless it determines that any applicable condition specified herein has not been satisfied, fund such Revolving Loan Request by crediting a debtor in possession checking account maintained by Borrowers.

(d)    All Revolving Loan Requests shall specify the date, amount, purpose and such other information called for in the form of the Revolving Loan Request.  Any such notice which Lender believes in good faith to have been given by a duly authorized agent of either Borrower shall be deemed given by Borrowers.

(e)      Each Revolving Loan Request shall include a reaffirmation by Borrowers that all representations and warranties contained in this Loan Agreement are (unless otherwise specified in writing to Lender) true and correct on and as of the date of the request, and that no Event of Default or event that upon notice or lapse of time or both would constitute a Default shall have occurred and is continuing.

**Section 2.3      Payment of the Revolving Advances**.  The entire principal amount of the Revolving Note outstanding will be due and payable on the Maturity Date.

**Section 2.4      Use of Revolving Loan Proceeds**.  The proceeds of the Revolving Advances may be used by the Borrowers solely for the following purposes: (i) first, to fully pay and satisfy the Pre-petition Emergency Loan Obligations and (ii) thereafter to fund working capital needs of the Borrowers pursuant to the Budget.

**Section 2.5      Interest; Default Interest Rate; Application of Payments; Participations; Usury**.

(a)      Interest.  Except as provided in Section 2.5(b), the principal amount of each Advance shall bear interest at the Floating Rate.

(b)      Default Interest Rate.  At any time during any Default Period or following the Termination Date, in the Lender's sole discretion and without waiving any of its other rights or remedies, the outstanding principal amount of the Revolving Note shall bear interest at the Default Rate or such lesser rate as the Lender may determine, effective as of the day such Default Period begins through the last day of such Default Period, or any shorter time period that the Lender may determine.  The decision of the Lender to impose a rate that is less than the Default Rate or not to impose the Default Rate for the entire duration of the Default Period shall be made by the Lender in its sole discretion and shall not be a waiver of any of its other rights and remedies, including its right retroactively to impose the full Default Rate for the entirety of any such Default Period or following the Termination Date.

(c)      Usury.  In any event no rate change shall be put into effect which would result in a rate greater than the highest rate permitted by law.  Notwithstanding anything to the contrary contained in any Loan Document, all agreements which either now are or which shall become agreements between the Borrowers and the Lender are hereby limited so that in no contingency or event whatsoever shall the total liability for payments in the nature of interest, additional interest and other charges exceed the applicable limits imposed by any applicable usury laws.  If any payments in the nature of interest, additional interest and other charges made under any Loan Document are held to be in excess of the limits imposed by any applicable usury laws, it is agreed that any such amount held to be in excess shall be considered payment of principal hereunder, and the indebtedness evidenced hereby shall be reduced by such amount so that the total liability for payments in the nature of interest, additional interest and other charges shall not exceed the applicable limits imposed by any applicable usury laws, in compliance with the desires of the Borrowers and the Lender.  This provision shall never be superseded or

waived and shall control every other provision of the Loan Documents and all agreements between the Borrowers and the Lender, or their successors and assigns.

**Section 2.6    <u>Fees</u>**.

(a)    <u>Origination Fee</u>.  The Borrowers shall pay the Lender a fully earned and non-refundable origination fee of $55,000, due and payable upon entry of the Interim Borrowing Order.

(b)    <u>Collection of Fees</u>.  The Borrowers authorize the Lender to collect such fee and all other charges due hereunder from the proceeds of any Revolving Advance. Should there be insufficient funds or from the proceeds of any Revolving Advance to pay all such sums when due, the full amount of such deficiency shall be immediately due and payable by the Borrowers.

**Section 2.7    <u>Time for Interest Payments; Payment on Non-Business Days; Computation of Interest and Fees</u>**.

(a)    <u>Time For Interest Payments</u>.  Accrued and unpaid interest shall be due and payable on the first day of each month and on the Termination Date (each an "Interest Payment Date"), or if any such day is not a Business Day, on the next succeeding Business Day. Interest will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of Advances to the Interest Payment Date.  If an Interest Payment Date is not a Business Day, payment shall be made on the next succeeding Business Day.

(b)    <u>Payment on Non Business Days</u>.  Whenever any payment to be made hereunder shall be stated to be due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest on the Advances or the fees hereunder, as the case may be.

(c)    <u>Computation of Interest and Fees</u>.  Interest accruing on the outstanding principal balance of the Advances and fees hereunder outstanding from time to time shall be computed on the basis of actual number of days elapsed in a year of 360 days.

(d)    <u>Single Loan</u>.   All Advances to Borrowers and all of the other Obligations of Borrowers arising under this Agreement and the other Loan Documents shall constitute one general obligation of Borrowers secured by all of the Collateral.

**Section 2.8    <u>Grants, Rights and Remedies</u>**. The Liens, security interests and the administrative priority granted pursuant to Article III may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into.  This Agreement, the Interim Borrowing Order, the Final Borrowing Order and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Lender hereunder and thereunder are cumulative.

Section 2.9    **Perfection**. The Liens and security interests securing the Obligations, as granted in Article III, shall be deemed valid and perfected by entry of the Interim Borrowing Order, and entry of the Interim Borrowing Order shall have occurred on or before the date of any Loan. The Lender shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the Interim Borrowing Order or Final Borrowing Order or any other Loan Document shall be deemed perfected without Lender taking any action whatsoever. Notwithstanding the foregoing, Borrowers agree, promptly upon request by the Lender to take all actions reasonably requested by the Lender to perfect its Lien on all or any portion of the Collateral.

Section 2.10    **Voluntary Prepayment.**    Except as otherwise provided herein, the Borrowers may prepay the Advances in whole at any time or from time to time in part without premium or penalty.

Section 2.11    **Waiver of Claims to Surcharge**.    In accordance with the Interim Borrowing Order and Final Borrowing Order, the Borrowers, their Subsidiaries and Affiliates and the Borrowers' bankruptcy Estates hereby waive and shall cause each of their respective Subsidiaries to waive, any claims to surcharge the Collateral under section 506(c) of the Bankruptcy Code.

## ARTICLE III

## SECURITY INTEREST; OCCUPANCY; SETOFF

Section 3.1    **Grant of Security Interest**.    The Borrowers hereby pledge, assign and grant to the Lender a lien on and security interest in the Collateral (collectively referred to as the "Security Interest"), as security for the payment and performance of the Obligations and as an element of the consideration for the Advances. The Security Interest shall constitute valid and perfected first priority Liens against the Collateral subject only to Permitted Liens and, except for the Prior Permitted Liens (including the Liens of Metlife in the Metlife Primary Collateral), shall be prior to all other Liens, now existing or hereafter arising, in favor of any other creditor or Person whatsoever.

Section 3.2    **Lien Perfection; Further Assurances**.    The Liens granted to the Lender pursuant to the provisions of this Agreement and the Security Documents shall be in addition to all Liens conferred upon the Lender pursuant to the terms of the Financing Orders. The Interim Borrowing Order and, if and when it becomes effective, the Final Borrowing Order, shall be sufficient and conclusive evidence of the validity, perfection and priorities of the Lender's Liens upon the Collateral, without the necessity of filing or recording any financing statement, assignment, mortgage, deed of trust, trademark security agreement, copyright security agreement, patent security agreement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Liens of the Lender in and to the Collateral or to entitle the Lender to the priorities granted herein; provided, however, that the Borrowers shall, promptly following the request of the Lender, execute such instruments, assignments, mortgages, deeds of trust, trademark security agreements, copyright security agreements, patent security agreements or other documents as are

13

necessary to perfect Lender's liens upon any of the Collateral and shall take such other action as may be required to perfect or to continue the perfection of the Lender's Liens upon the Collateral. Each Borrower hereby irrevocably authorizes the Lender at any time and from time to time to file in any UCC jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of the Borrowers or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of the State of Georgia, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by part 5 of Article 9 of the Uniform Commercial Code of the State of Georgia, for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether each Borrower is an organization, the type of organization and any organization identification number issued to the Borrowers, and, (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates. The Borrowers agree to furnish any such information to the Lender promptly upon request. The Borrowers also ratify its authorization for the Lender to have filed in any UCC jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof. No such filing or recordation shall be necessary or required in order to create or perfect any such Lien. The parties agree that a carbon, photographic or other reproduction of this Agreement shall be sufficient as a financing statement and may be filed in any appropriate office in lieu thereof. At the Lender's request, the Borrowers shall also promptly execute or cause to be executed and shall deliver to Lender any and all documents, instruments and agreements deemed necessary by Lender to give effect to or carry out the terms or intent of the Loan Documents.

**Section 3.3    Superpriority Administrative Expense Claim**. Subject to the Carve-Out, the Obligations shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code, a superpriority administrative claim having priority over any and all administrative expenses of and unsecured claims against the Borrowers now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code. The Lender shall have a superpriority administrative expense claim against the Estates pursuant to Section 364(c)(1) of the Bankruptcy Code for the Obligations and all related costs and expenses as provided in the Financing Orders. The Obligations are claims to be afforded priority over administrative expenses pursuant to Section 364(c)(1) of the Bankruptcy Code, as provided herein and/or in the Financing Orders and secured by liens pursuant to Section 364 of the Bankruptcy Code as provided herein. Any superpriority claim granted to Lender shall not attach to or be paid from the proceeds of any Avoidance Actions.

**Section 3.4    Notification of Account Debtors and Other Obligors**. During any Default Period, the Lender may at any time notify any account debtor or other Person obligated to pay the amount due that such right to payment has been assigned or transferred to the Lender for security and shall be paid directly to the Lender. The Borrowers will join in giving such notice if the Lender so requests. At any time after the Borrowers or the Lender gives such notice to an account debtor or other obligor, the Lender may, but need not, in the Lender's name or in the Borrowers' name, demand, sue for, collect or receive any money or property at any time payable or receivable on account of, or securing, any such right to payment, or grant any

14

extension to, make any compromise or settlement with or otherwise agree to waive, modify, amend or change the obligations (including collateral obligations) of any such account debtor or other obligor. During any Default Period, the Lender may, in the Lender's name or in the Borrowers' name, as the Borrowers' agent and attorney-in-fact, notify the United States Postal Service to change the address for delivery of the Borrowers' mail to any address designated by the Lender, otherwise intercept the Borrowers' mail, and receive, open and dispose of the Borrowers' mail, applying all Collateral as permitted under this Agreement and holding all other mail for the Borrowers' account or forwarding such mail to the Borrowers' last known address.

Section 3.5    **Assignment of Insurance**. As additional security for the payment and performance of the Obligations, each Borrower hereby assigns to the Lender any and all monies (including proceeds of insurance and refunds of unearned premiums) due or to become due under, and all other rights of each Borrower with respect to, any and all policies of insurance now or at any time hereafter covering the Collateral or any evidence thereof or any business records or valuable papers pertaining thereto, and each Borrower hereby directs the issuer of any such policy to pay all such monies directly to the Lender. During a Default Period, the Lender may (but need not), in the Lender's name or in the Borrowers' name, execute and deliver proof of claim, receive all such monies, endorse checks and other instruments representing payment of such monies, and adjust, litigate, compromise or release any claim against the issuer of any such policy. Any monies received as payment for any loss under any insurance policy mentioned above (other than liability insurance policies) or as payment of any award or compensation for condemnation or taking by eminent domain, shall be paid over to the Lender to be applied, at the option of the Lender, to the prepayment of the Obligations in such order as the Lender may elect or shall be disbursed to the Borrowers under staged payment terms reasonably satisfactory to the Lender for application to the cost of repairs, replacements, or restorations. Any such repairs, replacements, or restorations shall be affected with reasonable promptness and shall be of a value at least equal to the value of the items or property destroyed prior to such damage or destruction.

Section 3.6    **Occupancy**.

(a)    Subject to the rights of Metlife in the Metlife Primary Collateral, the Borrowers hereby irrevocably grant to the Lender the right to take exclusive possession of the Premises at any time during a Default Period without notice or consent.

(b)    Subject to the rights of Metlife in the Metlife Primary Collateral, the Lender may, during a Default Period, use the Premises only to hold, process, manufacture, sell, use, store, liquidate, realize upon or otherwise dispose of goods that are Collateral and for other purposes that the Lender may in good faith deem to be related or incidental purposes.

(c)    The Lender's right to hold the Premises shall cease and terminate upon the earlier of (i) Full Payment of all Obligations, (ii) final sale or disposition of all goods constituting Collateral and delivery of all such goods to purchasers, and (iii) the end of the Default Period giving rise to the Lender's right to hold the Premises.

(d)    If the Lender pays or accounts for any rent or other compensation for the possession, occupancy or use of any of the Premises, the Borrowers shall reimburse the

15

Lender promptly for the full amount thereof.  In addition, the Borrowers will pay, or reimburse the Lender for, all taxes, fees, duties, imposts, charges and expenses at any time incurred by or imposed upon the Lender by reason of the execution, delivery, existence, recordation, performance or enforcement of this Agreement or the provisions of this Section 3.6.

**Section 3.7    License**.  Without limiting the generality of any other Security Document, each Borrower hereby grants to the Lender a non-exclusive, worldwide and royalty-free license to use or otherwise exploit all Intellectual Property Rights of each Borrower for the purpose of: (a) completing the manufacture of any in-process materials during any Default Period so that such materials become saleable Inventory, all in accordance with the same quality standards previously adopted by the Borrowers for its own manufacturing and subject to the Borrowers' reasonable exercise of quality control; and (b) selling, leasing or otherwise disposing of any or all Collateral during any Default Period.

**Section 3.8    Financing Statement**.  Each borrower authorizes the Lender to file from time to time such financing statements against collateral described as "all personal property" or "all assets" or describing specific items of collateral including commercial tort claims as the Lender deems necessary or useful to perfect the Security Interest.  All financing statements filed before the date hereof to perfect the Security Interest were authorized by each Borrower and are hereby re-authorized.  A carbon, photographic or other reproduction of this Agreement or of any financing statements signed by the Borrowers are sufficient as a financing statement and may be filed as a financing statement in any state to perfect the security interests granted hereby.  For this purpose, each Borrower represents and warrants that the exact legal name, address, state of organization, organizational identification number, federal employer identification number and type of organization of the Borrowers are as set forth on Schedule 3.8.

**Section 3.9    Further Assurances**.  Each Borrower shall (a) promptly notify the Lender in writing upon the Borrowers' obtaining any Collateral consisting of deposit accounts, Investment Property, letter-of-credit rights or electronic chattel paper and, upon the Lender's request, shall promptly execute such agreements and do such other acts or things deemed appropriate by the Lender to confer upon the Lender control with respect to such Collateral, and (b) promptly notify the Lender in writing upon the Borrowers' obtaining any Collateral consisting of documents or instruments and, upon the Lender's request, shall promptly execute such agreements and do such other acts or things deemed appropriate by the Lender to deliver to it possession of such documents as are negotiable and instruments, and, with respect to non-negotiable documents, to have such non-negotiable documents issued in the name of the Lender, and (c) at the request of Lender, with respect to Collateral in the possession of a third party, other than certificated securities and Inventory covered by a document, use its commercially reasonable efforts to obtain an acknowledgment from the third party that is in possession of such Collateral that such third party holds such Collateral for the benefit of the Lender.

**Section 3.10    Setoff**.  The Lender may, at any time or from time to time, at its sole discretion and without demand and without notice to anyone, setoff any liability owed to each borrower by the Lender, whether or not due, against any Obligation, whether or not due.  In addition, each other Person holding a participating interest in any Obligations shall have the right to appropriate or setoff any deposit or other liability then owed by such Person to each Borrower,

whether or not due, and apply the same to the payment of said participating interest, as fully as if such Person had lent directly to each borrower the amount of such participating interest.

Section 3.11  **Collateral**.  This Agreement does not contemplate a sale of accounts, contract rights or chattel paper, and, as provided by law, the Borrowers are entitled to any surplus and shall remain liable for any deficiency.  The Lender's duty of care with respect to Collateral in its possession (as imposed by law) shall be deemed fulfilled if it exercises reasonable care in physically keeping such Collateral, or in the case of Collateral in the custody or possession of a bailee or other third Person, exercises reasonable care in the selection of the bailee or other third Person, and the Lender need not otherwise preserve, protect, insure or care for any Collateral.  The Lender shall not be obligated to preserve any rights the Borrowers may have against prior parties, to realize on the Collateral at all or in any particular manner or order or to apply any cash proceeds of the Collateral in any particular order of application.  The Lender has no obligation to clean-up or otherwise prepare the Collateral for sale.  Each Borrower waives any right it may have to require the Lender to pursue any third Person for any of the Obligations.

Section 3.12  **Survival**.  The Liens, lien priority, administrative priorities and other rights and remedies granted to the Lender pursuant to this Agreement, the Financing Orders and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority and priming lien provided for herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by the Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Chapter 11 Cases, or by any other act or omission whatsoever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)    The Liens in favor of the Lender set forth in Section 3.1 hereof shall constitute valid and perfected first priority Liens against the Collateral subject only to the Prior Permitted Liens (including the Liens of Metlife in the Metlife Primary Collateral), and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(b)    the Liens in favor of the Lender set forth herein and in the other Loan Documents shall continue to be valid and perfected without the necessity that the Lender file or record financing statements, mortgages or otherwise perfect its Lien under applicable non-bankruptcy law.

Section 3.13  **Controlled Account**.  Borrowers shall deposit into the Controlled Account all money, checks, and other instruments and remittances received in payment of or otherwise on account of any and all Accounts, on the day received, if a Business Day, or on the next Business Day, if a day which is not a Business Day.  Borrowers hereby authorize Lender, from time to time at the sole discretion of the Lender, to direct the Depository Bank to cease following the instructions of Borrowers, or either of them, respecting the disposition of funds in the Controlled Account and, until further notice from Lender, to transfer to such bank account as Lender shall designate, on a daily basis, all funds deposited in and available for withdrawal from the Controlled Account.  All funds so transferred to such bank account will be applied, at the

17

discretion of the Lender, to the Obligations (whether or not due), in such order of application as the Lender may designate from time to time in its discretion. Except with the consent of the Lender, the Borrowers shall not establish or maintain any deposit accounts, investment accounts or maintain any of its cash or deposits in any account or location other than the Controlled Account, provided, however, the Borrowers may maintain petty cash accounts, each having an aggregate balance at any time of up to $100,000 for no more than two (2) consecutive Business Days after collection of good funds and the aggregate balance of each not otherwise exceeding $5,000, except for such foregoing 2-day periods, at each of the following respective locations of each of the Borrowers: Atlanta, Georgia; Dalton, Georgia; Pine Mountain Valley, Georgia; and Collinsville, Alabama.

## ARTICLE IV

## CONDITIONS OF LENDING

**Section 4.1** **Conditions Precedent to the Initial Advance**. The Lender's obligation to make the Initial Advance shall be subject to the condition precedent that the Lender shall have received all of the following, each properly executed by the appropriate party and in form and substance satisfactory to the Lender in its discretion:

(a) This Agreement.

(b) The Revolving Note.

(c) Current searches of appropriate filing offices showing that no Liens have been filed and remain in effect against the Borrower except Permitted Liens or Liens held by Persons who have agreed in writing that upon receipt of proceeds of the Advances, they will satisfy, release or terminate such Liens in a manner satisfactory to the Lender.

(d) A certificate of each Borrower's Secretary or Assistant Secretary, or other duly appointed officer of such Borrower, certifying that attached to such certificate are (i) the resolutions of such Borrower's Directors authorizing the execution, delivery and performance of the Loan Documents, (ii) true, correct and complete copies of such Borrower's Constituent Documents, and (iii) examples of the signatures of such Borrower's Officers or agents authorized to execute and deliver the Loan Documents and other instruments, agreements and certificates on such Borrower's behalf.

(e) A current certificate issued by the Secretary of State of each Borrower's state of organization or formation, as applicable, certifying that such Borrower is in compliance with all applicable organizational requirements of such state.

(f) Evidence that the Borrowers are duly licensed or qualified to transact business in all jurisdictions where the character of the property owned or leased or the nature of the business transacted by it makes such licensing or qualification necessary except where the failure to be so licensed or qualified would not have a Material Adverse Effect.

SGR\9196860.1

(g)        Certificates of the insurance required hereunder, with all hazard insurance containing a lender's loss payable endorsement in the Lender's favor and with all liability insurance naming the Lender as an additional insured.

(h)        Payment of the expenses incurred by the Lender through the Closing Date required to be paid by the Borrowers under Section 8.5, including all legal expenses incurred through the Closing Date.

(i)        The initial Budget in the form of the 13-week Budget for the period commencing October __, 2011 annexed hereto as **Exhibit A**, with such modifications (if any) as are agreed to in writing by the Borrower and the Lender.

(j)        Such other documents as the Lender may reasonably require.

(k)        The Interim Borrowing Order and the first day orders set forth in **Exhibit J** shall have been entered by the Bankruptcy Court, and such orders shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated absent the prior written consent of the Lender and the borrowers.

**Section 4.2        Conditions Precedent to Subsequent Advances**.  In addition to the items described in Section 4.1, the Lender's obligation to make the Advances to the borrowers shall be subject to the satisfaction of the following conditions precedent in a manner and pursuant to documentation acceptable to the Lender in its discretion:

(a)        The conditions set forth in Section 4.1 shall have been met.

(b)        No Event of Default shall have occurred.

(c)        Except for representations and warranties made as of a specific date, the representations and warranties made by or on behalf of Borrowers in connection with the Credit Facility and the representations and warranties contained in this Agreement must be true and correct in all material respects on and as of the date of the request for each and every Advance.

(d)        There must have been no Material Adverse Change.

(e)        Within thirty (30) days of the date of this Agreement, the Borrowers shall have delivered to Lender a list of (and at Lender's request, copies of) all material unexpired executory contracts and unexpired leases to which either Borrower is a party.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Each Borrower represents and warrants to the Lender as follows:

19

**Section 5.1    Existence and Power; Name; Chief Executive Office; Inventory and Equipment Locations; Federal Employer Identification Number and Organizational Identification Number**.  Each Borrower is duly organized,  validly existing and in good standing under the laws of the state of its organization and is duly licensed or qualified to transact business in all jurisdictions where the character of the property owned or leased or the nature of the business transacted by it makes such licensing or qualification necessary.  Each Borrower has all requisite power and authority to conduct its business, to own its properties and to execute and deliver, and to perform all of its obligations under, the Loan Documents.  During each Borrower's existence, each has done business solely under the names set forth in Schedule 5.1.  Each Borrower's chief executive office and principal place of business is located at the address set forth in Schedule 5.1, and all of each Borrower's records relating to its business or the Collateral are kept at that location.  All Inventory and Equipment is located at that location or at one of the other locations listed in Schedule 5.1.  Each Borrower's federal employer identification number and organization identification number are correctly set forth in Section 3.8.

**Section 5.2    [Intentionally Reserved]**

**Section 5.3    Authorization of Borrowing; No Conflict as to Law or Agreements**.  The execution, delivery and performance by the Borrowers of the Loan Documents and the borrowings from time to time hereunder have been duly authorized by all necessary corporate action and do not and will not (a) require any consent or approval of the Borrowers' shareholders; (b) require any authorization, consent or approval by, or registration, declaration or filing with, or notice to, any governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, or any third party, except such authorization, consent, approval, registration, declaration, filing or notice as has been obtained, accomplished or given prior to the date hereof; (c) violate any provision of any law, rule or regulation (including Regulation X of the Board of Governors of the Federal Reserve System) or of any order, writ, injunction or decree presently in effect having applicability to the Borrowers or of the Borrowers' Constituent Documents; (d) result in a breach of or constitute a default under any post-petition indenture or loan or credit agreement or any other material agreement, lease or instrument to which a Borrower is a party or by which it or its properties may be bound or affected; or (e) result in, or require, the creation or imposition of any Lien (other than the Security Interest) upon or with respect to any of the properties now owned or hereafter acquired by the Borrowers.

**Section 5.4    Legal Agreements**.  This Agreement constitutes and, upon due execution by the Borrowers, the other Loan Documents will constitute the legal, valid and binding obligations of the Borrowers, enforceable against the Borrowers in accordance with their respective terms.

**Section 5.5    Subsidiaries**.  Except as set forth in Schedule 5.5 hereto, the Borrowers have no Subsidiaries.

**Section 5.6    Financial Condition; No Adverse Change**.

SGR\9196860.1

(a)     The Borrowers have furnished to the Lender their audited financial statements for its fiscal year ended April 2, 2011, and unaudited financial statements for the fiscal-year-to-date period ended [_____], 2011, and those statements fairly present the Borrowers' financial condition on the dates thereof and the results of its operations and cash flows for the periods then ended and were prepared in accordance with GAAP.

(b)     The Borrowers have furnished the Budget to the Lender.  The Budget is reasonable and was prepared on a reasonable basis and in good faith by the Borrowers and is based on reasonable assumptions based on the best information reasonably available to the Borrower, and the Borrowers are not aware of any facts or information that would lead it to believe that the Budget is incorrect or misleading in any material respect.

**Section 5.7     Litigation**.  Other than those matters specifically listed in Schedule 5.7, there are no unstayed actions, suits or proceedings pending or, to the Borrowers' knowledge, threatened against or affecting the Borrower or any of its Affiliates or the properties of the Borrower or any of its Affiliates before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which, if determined adversely to the Borrower or any of its Affiliates, would result in a final judgment or judgments against the Borrower or any of its Affiliates in an amount in excess of $10,000.00 after taking into account the effect of any applicable insurance policy.

**Section 5.8     Regulation U**.  The Borrowers are not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System), and no part of the proceeds of the Advances will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

**Section 5.9     Taxes**.  The Borrower and its Affiliates have paid or caused to be paid to the proper authorities when due all federal, state and local taxes required to be withheld by each of them.  The Borrower and its Affiliates have filed all federal, state and local tax returns which to the knowledge of the Officers of the Borrower or any Affiliate, as the case may be, are required to be filed, and the Borrower and its Affiliates have paid or caused to be paid to the respective taxing authorities all taxes as shown on said returns or on any assessment received by any of them to the extent such taxes have become due.

**Section 5.10     Titles and Liens**.  The Borrowers have good and absolute title to all Collateral free and clear of all Liens other than Permitted Liens.  No financing statement naming the Borrower as debtor is on file in any office except to perfect only Permitted Liens.

**Section 5.11     Intellectual Property Rights**.

(a)     Owned Intellectual Property.  Schedule 5.11 is a complete list of all patents, applications for patents, trademarks, applications to register trademarks, service marks, applications to register service marks, mask works, trade dress and copyrights for which the Borrowers are the owner of record (the "Owned Intellectual Property").

SGR\9196860.1

Except as disclosed on Schedule 5.11, (i) the Borrowers own the Owned Intellectual Property free and clear of all restrictions (including covenants not to sue a third party), court orders, injunctions, decrees, writs or Liens, whether by written agreement or otherwise, (ii) no Person other than a Borrower owns or has been granted any right in the Owned Intellectual Property, (iii) all Owned Intellectual Property is valid, subsisting and enforceable and (iv) the Borrowers have taken all commercially reasonable action necessary to maintain and protect the Owned Intellectual Property.

(b)     Intellectual Property Rights Licensed from Others.  Schedule 5.11 is a complete list of all agreements under which the Borrowers have licensed Intellectual Property Rights from another Person ("Licensed Intellectual Property") other than readily available, non-negotiated licenses of computer software and other intellectual property used solely for performing accounting, word processing and similar administrative tasks ("Off-the-shelf Software") and a summary of any ongoing payments the Borrowers are obligated to make with respect thereto.  Except as disclosed on Schedule 5.11 and in written agreements, copies of which have been given to the Lender, the Borrowers' licenses to use the Licensed Intellectual Property are free and clear of all restrictions, Liens, court orders, injunctions, decrees, or writs, whether by written agreement or otherwise.  Except as disclosed on Schedule 5.11, the Borrowers are not obligated or under any liability whatsoever to make any payments of a material nature by way of royalties, fees or otherwise to any owner of, licensor of, or other claimant to, any Intellectual Property Rights.

(c)     Other Intellectual Property Needed for Business.  Except for Off-the-shelf Software and as disclosed on Schedule 5.11, the Owned Intellectual Property and the Licensed Intellectual Property constitute all material Intellectual Property Rights used or necessary to conduct the Borrowers' business as it is presently conducted or as the Borrowers reasonably foresee conducting it.

(d)     Infringement.  Except as disclosed on Schedule 5.11, the Borrowers have no knowledge of, and has not received any written claim or notice alleging, any Infringement of another Person's Intellectual Property Rights (including any written claim that the Borrowers must license or refrain from using the Intellectual Property Rights of any third party) nor, to the Borrowers' knowledge, is there any threatened claim or any reasonable basis for any such claim.

**Section 5.12   Plans**.  Except as disclosed to the Lender in writing prior to the date hereof, neither the Borrowers nor any ERISA Affiliate (a) maintains or has maintained any Pension Plan, (b) contributes or has contributed to any Multiemployer Plan or (c) provides or has provided post-retirement medical or insurance benefits with respect to employees or former employees (other than benefits required under Section 601 of ERISA, Section 4980B of the IRC or applicable state law.  Neither the Borrowers nor any ERISA Affiliate has received any notice or has any knowledge to the effect that it is not in full compliance with any of the requirements of ERISA, the IRC or applicable state law with respect to any Plan.  No Reportable Event exists in connection with any Pension Plan.  Each Plan which is intended to qualify under the IRC is so qualified, and no fact or circumstance exists which may have an adverse effect on the Plan's tax qualified status.  Neither the Borrowers nor any ERISA Affiliate has (i) any accumulated funding

22

deficiency (as defined in Section 302 of ERISA and Section 412 of the IRC) under any Plan, whether or not waived, (ii) any liability under Section 4201 or 4243 of ERISA for any withdrawal, partial withdrawal, reorganization or other event under any Multiemployer Plan or (iii) any liability or knowledge of any facts or circumstances which could result in any liability to the Pension Benefit Guaranty Corporation, the Internal Revenue Service, the Department of Labor or any participant in connection with any Plan (other than routine claims for benefits under the Plan).

**Section 5.13    [Intentionally Omitted]**

**Section 5.14    Environmental Matters**.

(a)    Except as disclosed on Schedule 5.14, there are not present in, on or under the Premises any Hazardous Substances in such form or quantity as to create any material liability or obligation for either the Borrowers or the Lender under the common law of any jurisdiction or under any Environmental Law, and no Hazardous Substances have ever been stored, buried, spilled, leaked, discharged, emitted or released in, on or under the Premises in such a way as to create any such material liability.

(b)    Except as disclosed on Schedule 5.14, the Borrowers have not disposed of Hazardous Substances in such a manner as to create any material liability under any Environmental Law.

(c)    Except as disclosed on Schedule 5.14, there have not existed in the past, nor are there any threatened or impending, requests, claims, notices, investigations, demands, administrative proceedings, hearings or litigation relating in any way to the Premises or the Borrowers, alleging material liability under, violation of, or noncompliance with any Environmental Law or any license, permit or other authorization issued pursuant thereto.

(d)    Except as disclosed on Schedule 5.14, the Borrowers' businesses are and have in the past always been conducted in accordance with all Environmental Laws and all licenses, permits and other authorizations required pursuant to any Environmental Law and necessary for the lawful and efficient operation of such businesses are in the Borrowers' possession and are in full force and effect, nor has either Borrower been denied insurance on grounds related to potential environmental liability.  No permit required under any Environmental Law is scheduled to expire within 12 months and there is no threat that any such permit will be withdrawn, terminated, limited or materially changed.

(e)    Except as disclosed on Schedule 5.14, the Premises are not and never have been listed on the National Priorities List, the Comprehensive Environmental Response, Compensation and Liability Information System or any similar federal, state or local list, schedule, log, inventory or database.

(f)    The Borrowers have delivered to the Lender all environmental assessments, audits, reports, permits, licenses and other documents describing or relating

23

in any way to the Premises or the Borrowers' businesses, in each case to the extent the same are in the Borrowers' possession.

**Section 5.15    Submissions to Lender**.  All financial and other information provided to the Lender by or on behalf of the Borrowers in connection with the Borrowers' request for the Advances contemplated hereby (a) is true and correct in all material respects, (b) does not omit any material fact necessary to make such information not misleading and, (c) as to projections, valuations or pro forma financial statements, present a good faith opinion as to such projections, valuations and pro forma condition and results.

**Section 5.16    Financing Statements**.  The Borrowers have authorized the filing of a financing statement sufficient when filed with the appropriate filing offices to perfect the Security Interest and the other security interests created by the Security Documents to the extent such may be perfected by filing.  When the Interim Borrowing Order is entered, the Lender will have a valid, perfected, first-priority security interest in all Collateral, regardless of whether or not any financing statement is filed, subject to the Prior Permitted Liens.

**Section 5.17    Administrative Priority; Lien Priority**.

(a)    The Obligations constitute allowed administrative expenses in the Chapter 11 Cases, having priority in payment over all other administrative expenses and claims against the Borrowers now existing or hereafter arising, of any kind or nature whatsoever, including without limitation all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code.

(b)    Pursuant to Section 364(c)(2) of the Bankruptcy Code and the Financing Orders, all Obligations are secured by a perfected Lien on the Collateral, subject to no other Lien other than the Adequate Protection Liens (as defined in the Financing Orders) which is not encumbered by valid, perfected, non-avoidable and enforceable Liens in existence as of the Petition Date other than Permitted Liens;

(c)    Pursuant to Section 364(d)(1) of the Bankruptcy Code and the Financing Orders, all Obligations are secured by a perfected Lien on the Collateral, subject to no other Lien other than Liens consisting of (i) the Prior Permitted Liens (including the Lien of Metlife in the Metlife Primary Collateral), (ii) the Adequate Protection Liens (as defined in the Financing Orders), (iii) valid, perfected, non-avoidable and enforceable Liens in existence as of the Petition Date, including the Liens of the Pre-Petition Lenders; and (iv) valid Liens in existence at the time of the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) or 362(b) of the Bankruptcy Code; and

(d)    On the Closing Date, the Interim Borrowing Order is, and from and after the entry of the Final Borrowing Order, the Final Borrowing Order will be, in full force and effect, and neither Financing Order has been reversed, vacated, modified, amended or stayed, except for modifications and amendments that are reasonably acceptable to the Lender and are not subject to a pending appeal or stayed in any respect.

SGR\9196860.1

**Section 5.18    Appointment of Trustee or Examiner; Liquidation**.  No order has been entered or is pending in the Chapter 11 Cases (a) for the appointment of a Chapter 11 trustee, (b) for the appointment of an examiner with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Sections 1104(d) and 1106(b) of the Bankruptcy Code or (c) to convert either Chapter 11 Case to a Chapter 7 case or to dismiss a Chapter 11 Case.

**Section 5.19    The Chapter 11 Cases**.  The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law, and proper notice thereof has been given to all Persons entitled thereto, and the Chapter 11 Cases have not been dismissed.  The motion for approval of this Agreement was proper and sufficient pursuant to the Bankruptcy Code, the Bankruptcy Rules and the rules and procedures of the Bankruptcy Court.

## ARTICLE VI

## COVENANTS

So long as any Obligations remain unpaid, or the Credit Facility shall remain outstanding, the Borrowers will comply with the following requirements, unless the Lender shall otherwise consent in writing:

**Section 6.1    Reporting Requirements**.  The Borrowers will deliver, or cause to be delivered, to the Lender each of the following, which shall be in form and detail acceptable to the Lender:

(a)    Monthly Financial Statements.  As soon as available and in any event within 20 days after the end of each month, (i) an unaudited/internal balance sheet and statements of income and retained earnings of the Borrowers as at the end of and for such month and for the year to date period then ended, prepared, if the Lender so requests, on a consolidating and consolidated basis to include any Affiliates, in reasonable detail and stating in comparative form the figures for the corresponding date and periods in the previous year, all prepared in accordance with GAAP, subject to year-end audit adjustments and which fairly represent the Borrowers' financial position and the results of its operations; and (ii) a Compliance Certificate stating (A) that such financial statements have been prepared in accordance with GAAP, subject to year-end audit adjustments, and fairly represent the Borrowers' financial position and the results of its operations, (B) whether or not such Officer has knowledge of the occurrence of any Default or Event of Default not theretofore reported and remedied and, if so, stating in reasonable detail the facts with respect thereto, and (C) all relevant facts in reasonable detail to evidence, and the computations as to, whether or not the Borrowers are in compliance with the Budget and the provisions of Section 6.2(a).

(b)    Litigation.  Immediately after the commencement thereof, notice in writing of all litigation and of all proceedings before any governmental or regulatory agency affecting the Borrowers (i) of the type described in Section 5.14(c) or (ii) which seek a monetary recovery against the Borrowers in excess of $10,000.

SGR\9196860.1

(c)      Defaults.   When any Officer of the Borrowers becomes aware of the probable occurrence of any Default or Event of Default, and no later than one Business Day after such Officer becomes aware of such Default or Event of Default, notice of such occurrence, together with a detailed statement by a responsible Officer of the Borrowers of the steps being taken by the Borrowers to cure the effect thereof.

(d)      Plans.   As soon as possible, and in any event within 30 days after any Reportable Event with respect to any Pension Plan has occurred, a statement signed by the Officer who is the Borrowers' chief financial officer setting forth details as to such Reportable Event and the action which the Borrowers propose to take with respect thereto, together with a copy of the notice of such Reportable Event to the Pension Benefit Guaranty Corporation.  As soon as possible, and in any event within 10 days after the Borrowers fail to make any quarterly contribution required with respect to any Pension Plan under Section 412(m) of the IRC, the Borrowers will deliver to the Lender a statement signed by the Officer who is the Borrowers' chief financial officer setting forth details as to such failure and the action which the Borrowers propose to take with respect thereto, together with a copy of any notice of such failure required to be provided to the Pension Benefit Guaranty Corporation.  As soon as possible, and in any event within ten days after the Borrowers know or has reason to know that it has or is reasonably expected to have any liability under Sections 4201 or 4243 of ERISA for any withdrawal, partial withdrawal, reorganization or other event under any Multiemployer Plan, the Borrowers will deliver to the Lender a statement of the Borrowers' chief financial officer setting forth details as to such liability and the action which a Borrower proposes to take with respect thereto.

(e)      Officers and Directors.   Promptly upon knowledge thereof, notice of any change in the persons constituting the Borrowers' Officers and Directors.

(f)      Collateral.   Promptly upon knowledge thereof, notice of any material loss of or material damage to any Collateral or of any substantial adverse change in any Collateral or the prospect of payment thereof.

(g)      Commercial Tort Claims.   Promptly upon knowledge thereof, notice of any commercial tort claims it may bring against any Person, including the name and address of each defendant, a summary of the facts, an estimate of the Borrowers' damages, copies of any complaint or demand letter submitted by the Borrowers, and such other information as the Lender may request.

(h)      Intellectual Property.

(i)      30 days prior written notice of the Borrowers' intent to acquire material Intellectual Property Rights; except for transfers permitted under Section 6.18, the Borrowers will give the Lender 30 days prior written notice of its intent to dispose of material Intellectual Property Rights and upon request shall provide the Lender with copies of all proposed documents and agreements concerning such rights.

SGR\9196860.1

(ii)    Promptly upon knowledge thereof, notice of (A) any Infringement of its Intellectual Property Rights by others, (B) claims that the Borrowers are Infringing another Person's Intellectual Property Rights and (C) any threatened cancellation, termination or material limitation of its Intellectual Property Rights.

(iii)    Promptly upon receipt, copies of all registrations and filings with respect to its Intellectual Property Rights.

(i)    <u>Reports to Shareholders</u>.  Promptly upon their distribution, copies of all financial statements, reports and proxy statements which the Borrowers shall have sent to their shareholders.

(j)    <u>SEC Filings</u>.  Promptly after the sending or filing thereof, copies of all regular and periodic reports which the Borrowers shall file with the Securities and Exchange Commission or any national securities exchange.

(k)    <u>Tax Returns of Borrowers</u>.  As soon as possible, and in any event no later than five days after they are due to be filed, copies of the state and federal income tax returns of the Borrowers and all schedules thereto.

(l)    <u>Violations of Law</u>.  Promptly upon knowledge thereof, notice of the Borrowers' violation of any law, rule or regulation, the non-compliance with which could have a Material Adverse Effect.

(m)    <u>Chapter 11 Case Pleadings</u>.  Promptly (and in any event within two days) after filing thereof, copies of all pleadings, motions, applications, financial information and other papers and documents filed by the Borrowers in the Chapter 11 Cases, which copies may be provided by service of such papers and documents on the Lender's counsel.

(n)    <u>Other Reports</u>.  From time to time, with reasonable promptness, any and all receivables schedules, inventory reports, collection reports, deposit records, equipment schedules, copies of invoices to account debtors, shipment documents and delivery receipts for goods sold, and such other material, reports, records or information as the Lender may reasonably request.

**Section 6.2    <u>Compliance with Budget; Updated Budget; Variance Reports</u>.**

(a)    <u>Compliance with Budget</u>.  On each Tuesday of each week (no later than 5:00 p.m. eastern time), a responsible officer of the Borrowers shall provide to the Lender a completed Compliance Certificate, together with a report in form and detail satisfactory to the Lender showing (a) sales, actual cash collections and disbursements, in each case on a weekly and cumulative basis through the previous Friday and (b) a comparison to the same periods in the Budget.  For any weekly Budget period, (y) actual disbursements for any line item may not exceed the amount budgeted for that line item and (z) total disbursements may not exceed the amount budgeted.  To the extent disbursements set forth in the Budget for a Budget period are not, in fact, disbursed during the Budget period, the budgeted disbursements for subsequent Budget periods shall be amended so

that the Borrowers may carry forward any unspent budgeted disbursements from prior periods.

(b)    <u>Updated Budgets</u>.  At least three weeks prior to the last date included in the then-applicable Budget, the Borrowers shall submit to the Lender an updated Budget for the immediately succeeding 13-week period, commencing with the end of the period covered by the then-applicable Budget.  Each such Budget must be satisfactory to the Lender, in its sole discretion, in form, substance and detail and shall not be effective until accepted in writing by the Lender.

(c)    <u>Variance Reports</u>.  By 5:00 p.m. eastern time on the first Business Day of each week, the Borrowers shall submit to the Lender a variance report in form and detail satisfactory to the Lender in its sole discretion which fully and accurately describes the extent to which the Borrowers complied with the Budget for the immediately preceding calendar week.

**Section 6.3    Permitted Liens; Financing Statements**.

(a)    The Borrowers will not create, incur or suffer to exist any Lien upon or of any of its assets, now owned or hereafter acquired, to secure any indebtedness; excluding, however, from the operation of the foregoing, the following (each a "Permitted Lien"; collectively, "Permitted Liens"):

(i)    in the case of any of the Borrowers' property which is not Collateral, covenants, restrictions, rights, easements and minor irregularities in title which do not materially interfere with the Borrowers' business or operations as presently conducted;

(ii)    Liens in existence on the date hereof and listed in <u>Schedule 6.3</u> hereto, including without limitation the Liens of Metlife on the Metlife Primary Collateral which shall be the only Liens which have priority over the Liens granted hereunder (the "Prior Permitted Liens");

(iii)    the Security Interest and Liens created by the Security Documents;

(iv)    Liens in favor of the Pre-Petition Lender securing the Pre-Petition Obligations under the Pre-Petition Loan Documents;

(v)    Liens granted to the Pre-Petition Lender for adequate protection under the Financing Orders;

(vi)    such other Liens as Lender may hereafter approve in writing.

(b)    The Borrowers will not amend any financing statements in favor of the Lender except as permitted by law.  Any authorization by the Lender to any Person to amend financing statements in favor of the Lender shall be in writing.

**Section 6.4    Capital Expenditures; Indebtedness**.

SGR\9196860.1

(a)    The Borrowers will not make or incur any Capital Expenditure without the prior written consent of the Lender.

(b)    The Borrowers will not incur, create, assume or permit to exist any indebtedness or liability on account of deposits or advances or any indebtedness for borrowed money or letters of credit issued on the Borrowers' behalf, or any other indebtedness or liability evidenced by notes, bonds, debentures or similar obligations, except:

(i)    Obligations arising hereunder;

(ii)    indebtedness of the Borrowers in existence on the date hereof; and

(iii)    indebtedness relating to Permitted Liens.

**Section 6.5    Guaranties**.    The Borrowers will not assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person, except:

(a)    The endorsement of negotiable instruments by the Borrowers for deposit or collection or similar transactions in the ordinary course of business; and

(b)    Guaranties, endorsements and other direct or contingent liabilities in connection with the obligations of other Persons, in existence on the date hereof.

**Section 6.6    Investments and Subsidiaries**.    The Borrowers will not make or permit to exist any loans or advances to, or make any investment or acquire any interest whatsoever in, any other Person or Affiliate, including any partnership or joint venture, nor purchase or hold beneficially any stock or other securities or evidence of indebtedness of any other Person or Affiliate, except:

(a)    Investments in direct obligations of the United States of America or any agency or instrumentality thereof whose obligations constitute full faith and credit obligations of the United States of America having a maturity of one year or less, commercial paper issued by U.S. corporations rated "A 1" or "A 2" by Standard & Poor's Ratings Services or "P 1" or "P 2" by Moody's Investors Service or certificates of deposit or bankers' acceptances having a maturity of one year or less issued by members of the Federal Reserve System having deposits in excess of $100,000,000 (which certificates of deposit or bankers' acceptances are fully insured by the Federal Deposit Insurance Corporation);

(b)    Prepaid rent not exceeding one month and security deposits; and

(c)    Current investments in the Subsidiaries in existence on the date hereof and listed in Schedule 5.5 hereto.

**Section 6.7    Dividends and Distributions**.    The Borrowers will not declare or pay any dividends (other than dividends payable solely in stock of the Borrowers) on any class of its

SGR\9196860.1

stock, or make any payment on account of the purchase, redemption or other retirement of any shares of such stock, or other securities or evidence of its indebtedness or make any distribution in respect thereof, either directly or indirectly.

**Section 6.8** **Salaries**. The Borrowers will not pay excessive or unreasonable salaries, bonuses, commissions, consultant fees or other compensation; or increase the salary, bonus, commissions, consultant fees or other compensation of any Director, Officer or consultant, or any member of their families, by more than 5% in any one year for all such persons in the aggregate.

**Section 6.9** **Books and Records; Collateral Examination, Inspection and Appraisals**.

(a) The Borrowers will keep accurate books of record and account for itself pertaining to the Collateral and pertaining to the Borrowers' business and financial condition and such other matters as the Lender may from time to time request in which true and complete entries will be made in accordance with GAAP and, upon the Lender's request, will permit any officer, employee, attorney, accountant or other agent of the Lender to audit, review, make extracts from or copy any and all company and financial books and records of the Borrowers at all times during ordinary business hours, to send and discuss with account debtors and other obligors requests for verification of amounts owed to the Borrowers, and to discuss the Borrowers' affairs with any of its Directors, Officers, employees or agents.

(b) The Borrowers hereby irrevocably authorize all accountants and third parties to disclose and deliver to the Lender or its designated agent, at the Borrowers' expense, all financial information, books and records, work papers, management reports and other information in their possession regarding the Borrowers (other than any privileged information, papers, reports and other documents).  The Lender shall provide to the Borrowers a copy of any request to any such accountant or other third party for information pursuant to this clause (b).

(c) The Borrowers will permit the Lender or its employees, accountants, attorneys or agents, to examine and inspect any Collateral or any other property of the Borrowers at any time during ordinary business hours.

(d) The Lender may also, from time to time, obtain at the Borrowers' expense an appraisal of some or all of the Collateral by an appraiser acceptable to the Lender in its sole discretion.

**Section 6.10**  **Account Verification**.

(a) The Lender or its agent may at any time and from time to time send or require the Borrowers to send requests for verification of accounts or notices of assignment to account debtors and other obligors.  The Lender or its agent may also at any time and from time to time telephone account debtors and other obligors to verify accounts.

SGR\9196860.1

**Section 6.11    Compliance with Laws**.

(a)    The Borrowers shall (i) comply with the requirements of applicable laws and regulations, the non compliance with which would materially and adversely affect its business or its financial condition and (ii) use and keep the Collateral, and require that others use and keep the Collateral, only for lawful purposes, without a violation of any federal, state or local law, statute or ordinance.

(b)    Without limiting the foregoing undertakings, the Borrowers specifically agree that it will comply with all applicable Environmental Laws in all material respects and obtain and comply in all material respects with all permits, licenses and similar approvals required by any Environmental Laws, and will not generate, use, transport, treat, store or dispose of any Hazardous Substances in such a manner as to create any material liability or obligation under the common law of any jurisdiction or any Environmental Law.

(c)    The Borrowers shall (i) ensure that no shareholder shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, (ii) not use or permit the use of the proceeds of the Credit Facility or any other financial accommodation from the Lender to violate any of the foreign asset control regulations of OFAC or other applicable law, (iii) comply with all applicable Bank Secrecy Act laws and regulations, as amended from time to time, and (iv) otherwise comply with the USA Patriot Act as required by federal law and the Lender's policies and practices.

**Section 6.12    Payment of Taxes and Other Claims**.  Provided that they are included in the Budget, the Borrowers will pay or discharge, when due, (a) all post-petition taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties belonging to it (including the Collateral) or upon or against the creation, perfection or continuance of the Security Interest, prior to the date on which penalties attach thereto, (b) all post-petition federal, state and local taxes required to be withheld by it, and (c) all lawful post-petition claims for labor, materials and supplies which, if unpaid, might by law become a Lien upon any properties of the Borrowers; provided, that the Borrowers shall not be required to pay any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate proceedings and for which proper reserves have been made.

**Section 6.13    Maintenance of Properties**.

(a)    The Borrowers will keep and maintain the Collateral and all of their other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) and will from time to time replace or repair any worn, defective or broken parts; provided, however, that nothing in this covenant shall prevent the Borrowers from discontinuing the operation and maintenance of any of its properties if such discontinuance is, in the Borrowers' judgment, desirable in the conduct of the Borrowers' business and not disadvantageous in any material respect to the Lender.  Each

31

Borrower will take all commercially reasonable steps necessary to protect and maintain its material Intellectual Property Rights.

(b)    The Borrowers will defend the Collateral against all Liens, claims or demands of all Persons (other than the Lender) claiming the Collateral or any interest therein.  The Borrowers will keep all Collateral free and clear of all Liens except Permitted Liens.  The Borrowers will take all commercially reasonable steps necessary to prosecute any Person Infringing its Intellectual Property Rights and to defend itself against any Person accusing it of Infringing any Person's Intellectual Property Rights.

**Section 6.14    Insurance**.  The Borrowers will obtain and at all times maintain insurance with insurers acceptable to the Lender, in such amounts, on such terms (including any deductibles) and against such risks as may from time to time be required by the Lender, but in all events in such amounts and against such risks as is usually carried by companies engaged in similar business and owning similar properties in the same general areas in which the Borrowers operate, provided that such expenses are provided for in the Budget.  Without limiting the generality of the foregoing, the Borrowers will at all times maintain business interruption insurance including coverage for force majeure and keep all tangible Collateral insured against risks of fire (including so-called extended coverage), theft, collision (for Collateral consisting of motor vehicles) and such other risks and in such amounts as the Lender may reasonably request, with any loss payable to the Lender to the extent of its interest, and all policies of such insurance shall contain a lender's loss payable endorsement for the Lender's benefit.  All policies of liability insurance required hereunder shall name the Lender as an additional insured.

**Section 6.15    Preservation of Existence**.  The Borrowers will preserve and maintain its existence and all of its rights, privileges and franchises necessary or desirable in the normal conduct of its business and shall conduct its business in an orderly, efficient and regular manner.

**Section 6.16    Delivery of Instruments, etc**.  Upon request by the Lender, the Borrowers will promptly deliver to the Lender in pledge all instruments, documents and chattel paper constituting Collateral, duly endorsed or assigned by the Borrowers.

**Section 6.17    Sale or Transfer of Assets; Suspension of Business Operations**.  The Borrowers will not sell, lease, assign, transfer or otherwise dispose of (a) the stock of any Subsidiary, (b) all or a substantial part of its assets, or (c) any Collateral or any interest therein (whether in one transaction or in a series of transactions) to any other Person other than the sale of Inventory in the ordinary course of business and will not liquidate, dissolve or suspend business operations.  The Borrowers will not transfer any part of its ownership interest in any Intellectual Property Rights and will not permit any agreement under which it has licensed material Intellectual Property to lapse, except that the Borrowers may transfer such rights or permit such agreements to lapse if it shall have reasonably determined that the applicable Intellectual Property Rights are no longer useful in its business.  If the Borrowers transfer any Intellectual Property Rights for value, the Borrowers will pay over the proceeds to the Lender for application to the Obligations.  The Borrowers will not license any other Person to use any of the Borrowers' Intellectual Property Rights, except that the Borrowers may grant licenses in the ordinary course of its business in connection with sales of Inventory or provision of services to its customers.

32

**Section 6.18    Consolidation and Merger; Asset Acquisitions**.  The Borrowers will not consolidate with or merge into any Person, or permit any other Person to merge into it, or acquire (in a transaction analogous in purpose or effect to a consolidation or merger) all or substantially all the assets of any other Person.

**Section 6.19    Sale and Leaseback**.  The Borrowers will not enter into any arrangement, directly or indirectly, with any other Person whereby the Borrowers shall sell or transfer any real or personal property, whether now owned or hereafter acquired, and then or thereafter rent or lease as lessee such property or any part thereof or any other property which the Borrowers intend to use for substantially the same purpose or purposes as the property being sold or transferred.

**Section 6.20    Restrictions on Nature of Business**.  The Borrowers will not engage in any line of business materially different from that presently engaged in by the Borrowers and will not purchase, lease or otherwise acquire assets not related to its business.

**Section 6.21    Accounting**.  The Borrowers will not adopt any material change in accounting principles other than as required by GAAP.  The Borrowers will not adopt, permit or consent to any change in its fiscal year.

**Section 6.22    Discounts, etc**.  After notice from the Lender during a Default Period, the Borrowers will not (a) grant any discount, credit or allowance to any customer of the Borrowers or accept any return of goods sold, or (b) modify, amend, subordinate, cancel or terminate the obligation of any account debtor or other obligor of the Borrowers.

**Section 6.23    Plans**.  Unless disclosed to the Lender pursuant to Section 5.12, neither the Borrowers nor any ERISA Affiliate will (a) adopt, create, assume or become a party to any Pension Plan, (b) incur any obligation to contribute to any Multiemployer Plan, (c) incur any obligation to provide post-retirement medical or insurance benefits with respect to employees or former employees (other than benefits required by law) or (d) amend any Plan in a manner that would materially increase its funding obligations.

**Section 6.24    Place of Business; Name**.  The Borrowers will not transfer their chief executive office or principal place of business, or move, relocate, close or sell any business location without the consent of the Lender.  The Borrowers will not permit any tangible Collateral or any records pertaining to the Collateral to be located in any state or area in which, in the event of such location, a financing statement covering such Collateral would be required to be, but has not in fact been, filed in order to perfect the Security Interest.  The Borrowers will not change their names or jurisdiction of organization.

**Section 6.25    Constituent Documents; S Corporation Status**.  Neither Borrower will amend its Constituent Documents.  Neither Borrower will become an S Corporation.

**Section 6.26    Adequate Protection Payments**.  Notwithstanding anything herein to the contrary, unless otherwise directed by the Lender during a Default Period, the Borrowers shall be permitted to make adequate protection payments to the Pre-Petition Lender in accordance with the Financing Orders, provided that such amounts are included in the Budget.

**Section 6.27    Financing Orders; Administrative Priority; Lien Priority; Payment of Claims**.

(a)    The Borrowers will not, at any time, seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacation of any of the Financing Orders, except for modifications and amendments agreed to in writing by the Lender.

(b)    The Borrowers will not, at any time, suffer to exist a priority for any administrative expense or unsecured claim against the Borrowers or the Estates (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c) 726 and 1114 of the Bankruptcy Code) equal or superior to the priority of the Lender in respect of the Obligations other than as provided for in the Financing Orders.

(c)    The Borrowers will not, at any time, suffer to exist any Lien on the Collateral having a priority equal or superior to the Lien in favor of the Lender in respect of the Collateral other than Permitted Liens.

(d)    To the extent having applicability to the Borrowers, the Borrowers shall comply with the Interim Borrowing Order, the Final Borrowing Order and all other orders entered by the Bankruptcy Court in the Chapter 11 Cases.  Without limiting the generality of the foregoing, the Borrowers shall comply with the provisions and deadlines set forth in the Interim Borrowing Order with respect to the Proposed Sale, as such term is defined in the Interim Borrowing Order, and the Borrowers shall promptly provide the Lender with such information regarding the status thereof as the Lender may request from time to time.

**Section 6.28    Reserved**.

**Section 6.29    Performance by the Lender**.  If the Borrowers at any time fails to perform or observe any of the foregoing covenants contained in this Article VI or elsewhere herein, and if such failure shall continue for a period of ten calendar days after the Lender gives the Borrowers written notice thereof (or in the case of the agreements contained in Section 6.13 and Section 6.15, immediately upon the occurrence of such failure, without notice or lapse of time), the Lender may, but need not, perform or observe such covenant on behalf and in the name, place and stead of the Borrowers (or, at the Lender's option, in the Lender's name) and may, but need not, take any and all other actions which the Lender may reasonably deem necessary to cure or correct such failure (including the payment of taxes, the satisfaction of Liens, the performance of obligations owed to account debtors or other obligors, the procurement and maintenance of insurance, the execution of assignments, security agreements and financing statements, and the endorsement of instruments); and the Borrowers shall thereupon pay to the Lender on demand the amount of all monies expended and all costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by the Lender in connection with or as a result of the performance or observance of such agreements or the taking of such action by the Lender, together with interest thereon from the date expended or incurred at the Default Rate. To facilitate the Lender's performance or observance of such covenants of the Borrowers, the

SGR\9196860.1

Borrowers hereby irrevocably appoint the Lender, or the Lender's delegate, acting alone, as the Borrowers' attorney in fact (which appointment is coupled with an interest) with the right (but not the duty) from time to time to create, prepare, complete, execute, deliver, endorse or file in the name and on behalf of the Borrowers any and all instruments, documents, assignments, security agreements, financing statements, applications for insurance and other agreements and writings required to be obtained, executed, delivered or endorsed by the Borrowers hereunder.

## ARTICLE VII

## EVENTS OF DEFAULT, RIGHTS AND REMEDIES

  **Section 7.1**  **Events of Default**. "Event of Default", wherever used herein, means any one of the following events:

    (a)  Default in the payment of any Obligations when they become due and payable;

    (b)  Default in the performance, or breach, of any covenant or agreement of the Borrowers contained in this Agreement, any Financing Order or any other Loan Document, or any other default or event of default under any Financing Order or any other Loan Document and such default or breach continues after five days written notice from Lender;

    (c)  [Intentionally Reserved];

    (d)  [Intentionally Reserved];

    (e)  Any representation or warranty made by the Borrowers in this Agreement, or by the Borrowers (or any Officer) in any Budget, any Compliance Certificate or any other agreement, certificate, instrument or financial statement or other statement contemplated by or made or delivered pursuant to or in connection with this Agreement shall prove to have been incorrect in any material respect when deemed to be effective;

    (f)  The rendering against the Borrowers of an arbitration award, final judgment, decree or order for the payment of money in excess of $10,000 and the continuance of such arbitration award, judgment, decree or order unsatisfied and in effect for any period of 30 consecutive days without a stay of execution;

    (g)  A default under any post-petition bond, debenture, note or other evidence of material indebtedness of the Borrowers owed to any Person other than the Lender, or under any indenture or other instrument under which any such evidence of indebtedness has been issued or by which it is governed, or under any material lease or other contract, and the expiration of the applicable period of grace, if any, specified in such evidence of indebtedness, indenture, other instrument, lease or contract;

    (h)  The Borrowers shall liquidate, dissolve, terminate or suspend their business operations or otherwise fail to operate its business in the ordinary course, merge

SGR\9196860.1

with another Person unless the Borrowers are the surviving entity; or sell all or substantially all of its assets, without the Lender's prior written consent;

(i)       [Intentionally Reserved];

(j)       [Intentionally Reserved];

(k)       Any Material Adverse Change shall occur;

(l)       The conviction of any Director or Officer of either Borrower for a felony offense under state or federal law;

(m)       The Borrowers shall fail to comply or shall default in the performance of any term of the Financing Orders or any other "Event of Default" under and as defined in either of the Financing Orders shall occur;

(n)       The Borrowers or any other Person other than the Lender (except following the Lender's prior written request or with the Lender's express prior written consent, and no such consent shall be implied from any other action, inaction, or acquiescence of the Lender) shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Financing Orders or any of the Loan Documents;

(o)       The Borrowers shall file any motion seeking Bankruptcy Court approval of, or any other Person shall obtain Bankruptcy Court approval of, a Disclosure Statement or a Plan of Reorganization other than an Acceptable Plan, unless the Lender has expressly joined in or consented to such plan, such order, or such motion in writing;

(p)       The Borrowers shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of (i) the authority to use any cash collateral, or (ii) any claim, Lien, or security interest ranking junior, equal or senior in priority to the claims, Liens and security interests granted to the Lender under the Financing Orders or the Loan Documents or any such equal or prior claim, Lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the Financing Orders and other than Prior Permitted Liens or claims in favor of holders of Prior Permitted Liens;

(q)       The Bankruptcy Court shall not have entered the Final Borrowing Order by 30 days from the date of this Agreement, or any Financing Order shall cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court;

(r)       The appointment in either Chapter 11 Case of a trustee, or any other fiduciary for a Borrower or any property of an Estate, or of any examiner;

(s)       The entry of an order dismissing either Chapter 11 Case or converting either Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

SGR\9196860.1

(t)     The entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor, other than the Lender or the Pre-Petition Lender, to realize upon, or to exercise any right or remedy with respect to, any asset of the Borrowers (or to terminate any license, franchise, or similar agreement) with a book value in excess of $100,000 in any single instance or $250,000 in the aggregate;

(u)     If any creditor of the Borrowers receives any adequate protection payment or any Lien is granted as adequate protection other than as set forth in the Interim Borrowing Order or the Final Borrowing Order;

(v)     The entry of an order for the substantive consolidation of the Borrowers or the Estates with any other Person;

(w)     The Borrowers shall not have sufficient funds on any date to pay, or shall otherwise fail to pay as and when due and payable, all costs and expenses of administration that are incurred by the Borrowers in the Chapter 11 Cases, provided that such amounts are included in the Budget;

(x)     The Borrowers shall file a pleading in the Bankruptcy Court or any court of competent jurisdiction (i) challenging the validity, perfection or priority of any Liens of the Lender, (ii) challenging the validity or enforceability of the Lender's Loan Documents, or (iii) asserting any claims against the Lender;

(y)     [Intentionally Reserved];

(z)     The Borrowers shall file with the Bankruptcy Court or enter into any asset purchase agreement with any third party unless such asset purchase agreement has been approved by Lender in Lender's reasonable discretion.

(aa)    The Borrowers' expenses in any week exceed the Budget by five percent (5%).

(bb)    [Intentionally Reserved];

(cc)    The entry of an order in the Chapter 11 Cases granting any other super priority administrative claim or Lien equal or superior to that granted to Lender other than as provided in the Financing Orders.

**Section 7.2    Rights and Remedies**.  During any Default Period, after giving any notice required by the Financing Orders, the Lender may exercise any or all of the following rights and remedies:

(a)     The Lender may, by notice to the Borrowers, declare the Commitment to be terminated, whereupon the same shall forthwith terminate;

(b)     The Lender may, by notice to the Borrowers, declare the Obligations to be forthwith due and payable, whereupon all Obligations shall become and be forthwith due

37

and payable, without presentment, notice of dishonor, protest or further notice of any kind, all of which the Borrowers hereby expressly waive;

(c)     The Lender may, without notice to the Borrowers and without further action, apply any and all money owing by the Lender to the Borrowers to the payment of the Obligations;

(d)     The Lender may exercise and enforce any and all rights and remedies available upon default to a secured party under the UCC, including the right to take possession of Collateral, or any evidence thereof, proceeding without judicial process or by judicial process (without a prior hearing or notice thereof, which each Borrower hereby expressly waives) and the right to sell, lease or otherwise dispose of any or all of the Collateral (with or without giving any warranties as to the Collateral, title to the Collateral or similar warranties), and, in connection therewith, the Borrowers will on demand assemble the Collateral and make it available to the Lender at a place to be designated by the Lender which is reasonably convenient to both parties;

(e)     The Lender may exercise and enforce its rights and remedies under the Security Documents and the other Loan Documents;

(f)     The Lender may apply any cash collateral to the Obligations or draw on any letter of credit in favor of the Lender with respect to the Obligations;

(g)     The Lender may without regard to any waste, adequacy of the security or solvency of the Borrowers, apply for the appointment of a receiver of the Collateral, to which appointment each Borrower hereby consents, whether or not foreclosure proceedings have been commenced under the Security Documents and whether or not a foreclosure sale has occurred;

(h)     The Lender may exercise any other rights and remedies available to it by law or agreement.

**Section 7.3     Certain Notices**.  If notice to the Borrowers of any intended disposition of Collateral or any other intended action is required by law in a particular instance, such notice shall be deemed commercially reasonable if given (in the manner specified in Section 8.3) at least ten calendar days before the date of intended disposition or other action.

**Section 7.4     Waiver of Marshaling**.  Recourse to the Collateral or other security for the Obligations will not at any time be required, and the Borrowers hereby waive any right of marshaling the Borrowers may have.

## ARTICLE VIII

## MISCELLANEOUS

**Section 8.1     No Waiver; Cumulative Remedies; Compliance with Laws**.  No failure or delay by the Lender in exercising any right, power or remedy under the Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or

SGR\9196860.1

remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy under the Loan Documents.  The remedies provided in the Loan Documents are cumulative and not exclusive of any remedies provided by law.  The Lender may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and such compliance will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

       **Section 8.2**    **Amendments, Etc**.  No amendment, modification, termination or waiver of any provision of any Loan Document or consent to any departure by the Borrowers therefrom or any release of a Security Interest shall be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No notice to or demand on the Borrowers in any case shall entitle the Borrowers to any other or further notice or demand in similar or other circumstances.

       **Section 8.3**    **Notices; Communication of Confidential Information; Requests for Accounting**.  Except as otherwise expressly provided herein, all notices, requests, demands and other communications provided for under the Loan Documents shall be in writing and shall be (a) personally delivered, (b) sent by first class United States mail, (c) sent by overnight courier of national reputation, or (d) transmitted by telecopy, in each case delivered or sent to the party to whom notice is being given to the business address or telecopier number set forth below or, as to each party, at such other business address or telecopier number as it may hereafter designate in writing to the other party pursuant to the terms of this Section.  All such notices, requests, demands and other communications shall be deemed to be an authenticated record communicated or given on (a) the date received if personally delivered, (b) when deposited in the mail if delivered by mail, (c) the date delivered to the courier if delivered by overnight courier, or (d) the date of transmission if sent by telecopy, except that notices or requests delivered to the Lender pursuant to any of the provisions of Article II shall not be effective until received by the Lender.  All notices, financial information, or other business records sent by either party to this Agreement may be transmitted, sent, or otherwise communicated via such medium as the sending party may deem appropriate and commercially reasonable; provided, however, that the risk that the confidentiality or privacy of such notices, financial information, or other business records sent by either party may be compromised shall be borne exclusively by the Borrowers. All requests for an accounting under Section 9-210 of the UCC (i) shall be made in a writing signed by a Person authorized under Section 2.2(b), (ii) shall be personally delivered, sent by registered or certified mail, return receipt requested, or by overnight courier of national reputation, (iii) shall be deemed to be sent when received by the Lender and (iv) shall otherwise comply with the requirements of Section 9-210.  The Borrowers requests that the Lender respond to all such requests which on their face appear to come from an authorized individual and releases the Lender from any liability for so responding.  The Borrowers shall pay the Lender the maximum amount allowed by law for responding to such requests.  Unless and until any party hereto notifies the other party as provided above, notices shall be sent in accordance with the following information:

If to the Borrowers:

Attention:     _____

SGR\9196860.1

Telecopier:            _____

With a copy to:

_____
_____
Attention:             _____
Telecopier:            _____

If to the Lender:

_____
_____
Attention:             _____
Telecopier:            _____

With a copy to:

_____
_____
Attention:             _____
Telecopier:            _____

     **Section 8.4**   **Further Documents**.  The Borrowers will from time to time execute, deliver, endorse and authorize the filing of any and all instruments, documents, conveyances, assignments, security agreements, financing statements, control agreements and other agreements and writings that the Lender may reasonably request in order to secure, protect, perfect or enforce the Security Interest or the Lender's rights under the Loan Documents (but any failure to request or assure that the Borrowers execute, deliver, endorse or authorize the filing of any such item shall not affect or impair the validity, sufficiency or enforceability of the Loan Documents and the Security Interest, regardless of whether any such item was or was not executed, delivered or endorsed in a similar context or on a prior occasion).

     **Section 8.5**   **Costs and Expenses**.  The Borrowers shall pay on demand all costs and expenses, including reasonable attorneys' fees, incurred by the Lender in connection with the Obligations, this Agreement, the Loan Documents and any other document or agreement related hereto or thereto, and the transactions contemplated hereby, including all such costs, expenses and fees incurred in connection with the negotiation, preparation, execution, amendment, administration, performance, collection and enforcement of the Obligations and all such documents and agreements and the creation, perfection, protection, satisfaction, foreclosure or enforcement of the Security Interest, together with all wire transfer and similar money transfer fees.

     **Section 8.6**   **Indemnity**.  In addition to the payment of expenses pursuant to Section 8.6, the Borrowers shall indemnify, defend and hold harmless the Lender, and any of its participants, parent corporations, subsidiary corporations, affiliated corporations, successor corporations, and all present and future officers, directors, employees, attorneys and agents of the foregoing (the "Indemnitees") from and against any of the following (collectively, "Indemnified Liabilities"):

SGR\9196860.1

(a)      Any and all transfer taxes, documentary taxes, assessments or charges made by any governmental authority by reason of the execution and delivery of the Loan Documents or the making of the Advances;

(b)      Any claims, loss or damage to which any Indemnitee may be subjected if any representation or warranty contained in Section 5.14 proves to be incorrect in any respect when made or deemed to have been made or as a result of any violation of the covenant contained in Section 6.12(b);

(c)      Any and all other liabilities, losses, damages, penalties, judgments, suits, claims, costs and expenses of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel) in connection with the foregoing and any other investigative, administrative or judicial proceedings, whether or not such Indemnitee shall be designated a party thereto, which may be imposed on, incurred by or asserted against any such Indemnitee, in any manner related to or arising out of or in connection with the making of the Advances and the Loan Documents or the use or intended use of the proceeds of the Advances; and

(d)      Any claim of compensation payable to any loan broker, investment banker or similar advisor in connection with the transactions contemplated hereby.

If any investigative, judicial or administrative proceeding arising from any of the foregoing is brought against any Indemnitee, upon such Indemnitee's request, the Borrowers, or counsel designated by the Borrowers and satisfactory to the Indemnitee, will resist and defend such action, suit or proceeding to the extent and in the manner directed by the Indemnitee, at the Borrowers' sole costs and expense.  Each Indemnitee will use its best efforts to cooperate in the defense of any such action, suit or proceeding.  If the foregoing undertaking to indemnify, defend and hold harmless may be held to be unenforceable because it violates any law or public policy, the Borrowers shall nevertheless make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law. The Borrowers' obligation under this Section 8.6 shall survive the termination of this Agreement and the discharge of the Borrowers' other obligations hereunder.

**Section 8.7      <u>Successors and Assigns</u>**.

(a)      Each and every of the provisions of this Agreement and of all of those contained in the various other Loan Documents are be binding upon, and will inure to the benefit of,  the Parties hereto and their respective successors and assigns; provided, however, that neither of the Borrowers may assign, delegate, or otherwise transfer any of its rights, remedies, privileges, or Obligations under this Agreement or any of the other Loan Documents without the prior written consent of the Lender, which consent the Lender may grant or withhold in Lender's sole and absolute discretion.

(b)      Without the prior consent or approval of either of the Borrowers, the Association, in its capacity as Lender, may, at any time, sell whole or partial participation interests in this Agreement and the other Loan Documents contemplated hereby (collectively, "Participation Interests") to one or more Persons (each and every such

SGR\9196860.1

Person, collectively, a "Participant"), and each and every such Participant may sell Participation Interests to other Participants. The Association and every such Participant making any such sale, promptly after making such sale, shall give written notice thereof to Borrowers. In the event of any such sale, unless the Parties otherwise expressly stipulate in writing, the Association's obligations under this Agreement and the other Loan Documents will remain unchanged; the Association shall remain solely responsible for the performance thereof; and the Borrowers shall continue to deal solely and directly with Association in connection with the Parties' respective rights and obligations under this Agreement and the other Loan Documents.

(c)    Borrowers hereby authorize the Association, each Lender, each Participant, and each other Assignor (collectively, a "Transferor") to disclose to any and all other  Participants or other transferees, as well as to any and all prospective transferees (individually and collectively, a "Transferee")  any and all financial information in  any Transferor's possession concerning Borrowers that has been delivered to any Transferor by Borrowers pursuant to this Agreement or any of the other Loan Documents, or that has been delivered  to any Transferor by Borrowers in connection with any Transferor's credit evaluation of Borrowers prior to entering into this Agreement, provided that such Transferee or prospective Transferee first stipulates and acknowledges in writing to take reasonable actions to preserve the confidentiality of any such confidential financial information so disclosed.

(d)    Anything in this Agreement to the contrary notwithstanding, any Lender may assign and pledge all or any portion of the Revolving Advance (and/or any and all of the Obligations owing to it) to any Federal Reserve Bank, to any Farm Credit Bank, to the United States Treasury, or as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System and any Operating Circular issued by such Federal Reserve Bank, provided that any payment in respect of such assigned Obligations made by Borrowers to the assigning and/or pledging Lender in accordance with the terms of this Agreement must satisfy Borrowers' Obligations hereunder in respect of such assigned  Obligations to the extent of such payment.  No such assignment will release the assigning and/or pledging Lender from its obligations hereunder.

**Section 8.8    Execution in Counterparts; Telefacsimile Execution**. This Agreement and other Loan Documents may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same instrument.  Delivery of an executed counterpart of this Agreement by telefacsimile shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

**Section 8.9    Retention of Borrowers' Records**. The Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices, agings, or other papers delivered to the Lender by the Borrowers or in connection with the Loan Documents for more than 30 days after receipt by the Lender. If there is a special need to retain specific records, the

Borrowers must inform the Lender of its need to retain those records with particularity, which must be delivered in accordance with the notice provisions of Section 8.3 within 30 days of the Lender taking control of same.

**Section 8.10    Binding    Effect;    Assignment;    Complete    Agreement;    Sharing Information**.  The Loan Documents shall be binding upon and inure to the benefit of the Borrowers and the Lender and their respective successors and assigns (including any trustee or examiner of the Borrowers or the Estates), except that the Borrowers shall not have the right to assign its rights thereunder or any interest therein without the Lender's prior written consent. This Agreement shall also bind all Persons who become a party to this Agreement as a borrower. This Agreement, together with the Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and supersedes all prior agreements, written or oral, on the subject matter hereof.   To the extent that any provision of this Agreement contradicts other provisions of the Loan Documents, this Agreement shall control.   Without limiting the Lender's right to share information regarding the Borrowers and any Affiliates with the Lender's participants, accountants, lawyers and other advisors, the Lender may share any and all information it may have in its possession regarding the Borrowers and any Affiliates with the Lender's subsidiaries and Affiliates, and each Borrower waives any right of confidentiality it may have with respect to such sharing of information.

**Section 8.11    Severability of Provisions**.  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

**Section 8.12    Headings**.  Article, Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**Section 8.13    Governing Law; Jurisdiction, Venue; Waiver of Jury Trial**.  The Loan Documents shall be governed by and construed in accordance with the substantive laws (other than conflict laws) of the State of Georgia.  The parties hereto hereby (i) consent to the personal jurisdiction of the Bankruptcy Court in connection with any controversy related to this Agreement; (ii) waive any argument that venue in any such forum is not convenient; (iii) agree that any litigation initiated by the Lender or the Borrowers in connection with this Agreement or the other Loan Documents shall be venued exclusively in the Bankruptcy Court; and (iv) agree that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

**Section 8.14    Release**.  Borrowers hereby acknowledge, effective upon entry of the Final Borrowing Order, that neither Borrowers nor any of their Subsidiaries have any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any party of the Borrowers' or Subsidiaries' liabilities to repay Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from Lender in its capacity as Lender hereunder, its officers, directors, servants, agents, attorneys, employees, assigns, heirs, parents, participants, subsidiaries and each Person acting for or on behalf of any of them (collectively, the "Released Parties").  Borrowers, each in their own right and on behalf of the Estates, and on behalf of all of

43

their successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "Releasing Parties"), hereby fully, finally and forever release and discharge Lender and all of the Released Parties of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law or equity or otherwise (including without limitation those arising under sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect or derivative, asserted or unasserted, forseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission of other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Borrowing Orders or the transactions contemplated hereby, or any other agreements, certificates, instruments or other documents and statements (whether written or oral) related to any of the foregoing.

Section 8.15   **Lender as Party-in-Interest**.  The Borrowers hereby stipulate and agree that the Lender is and shall remain a party in interest in the Chapter 11 Cases and shall have the right to participate, object and be heard in any motion or proceeding in connection therewith. Nothing in this Agreement or any other Loan Document shall be deemed to be a waiver of any of the Lender's rights or remedies under applicable law or documentation.  Without limitation of the foregoing, the Lender shall have the right to make any motion or raise any objection it deems to be in its interest (specifically including but not limited to objections to use of proceeds of the Revolving Advances, to payment of professional fees and expenses or the amount thereof, to sales or other transactions outside the ordinary course of business or to assumption or rejection of any executory contract or lease), provided that the Lender will not exercise such right if the action or inaction by the Borrowers which is the subject of such motion or objection is expressly permitted by any covenant or provision of this Agreement.

Section 8.16   **Waiver of Right to Obtain Alternative Financing**.  In consideration of the Advances to be made to the Borrowers by the Lender, the Borrowers hereby further waive any right it may have to obtain an order by the Bankruptcy Court authorizing the Borrowers to obtain financing pursuant to Section 364 of the Bankruptcy Code from any Person other than the Lender, unless such financing would result in Full Payment of all of the Obligations.

Section 8.17   **Credit Bids**.  The Lender shall maintain its right to credit bid the Lender's claims under the this Agreement or the Final Borrowing Order pursuant to Section 363(k) of the Bankruptcy Code, and each Borrower agrees that it shall not object to the Lender's right to credit bid or to the Lender's credit bid.

Section 8.18   **Conflict with Orders.**   To the extent any provision of the Agreement conflicts with a Financing Order, the provision of the Financing Order controls.

Section 8.19   **Cross Guaranty; Subordination**.

(a)      Guaranty.  Each Borrower hereby agrees that such Borrower is jointly and severally liable for, and hereby absolutely and unconditionally guarantees to Lender, the full and prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of, all Indebtedness owed or hereafter owing to Lender by each other Borrower.  Each Borrower agrees that its guaranty obligation hereunder is a continuing guaranty of payment and performance and not of collection, that its obligations under this Section shall not be discharged until payment and performance, in full, of the Indebtedness has occurred, and that its obligations under this Section shall be absolute and unconditional, irrespective of, and unaffected by:

> 1)      the genuineness, validity, regularity, enforceability or any future amendment of, or change in, this Agreement, any other Loan Document or any other agreement, document or instrument to which any Borrower is or may become a party;

> 2)      the absence of any action to enforce this Agreement (including this Section) or any other Loan Document or the waiver or consent by Lender with respect to any of the provisions thereof;

> 3)      the existence, value or condition of, or failure to perfect its security interest in or lien against, any security for the Indebtedness or any action, or the absence of any action, by Lender in respect thereof (including the release of any such security); or

> 4)      any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor.

Each Borrower shall be regarded, and shall be in the same position, as principal debtor with respect to the Indebtedness guaranteed hereunder.

(b)      <u>Waivers by Borrowers</u>.  Each Borrower expressly waives all rights it may have now or in the future under any statute, or at common law, or at law or in equity, or otherwise, to subrogation, to compel Lender to marshal assets or to proceed in respect of the Indebtedness guaranteed hereunder against any other Borrower, any other party or against any security for the payment and performance of the Indebtedness before proceeding against, or as a condition to proceeding against, such Borrower.  It is agreed among each Borrower and Lender that the foregoing waivers are of the essence of the transaction contemplated by this Agreement and the other Loan Documents and that, but for the provisions of this Section and such waivers, the Lender would decline to enter into this Agreement.

(c)      <u>Benefit of Guaranty</u>.  Each Borrower agrees that the provisions of this Section are for the benefit of the Lender and its successors, transferees, endorsees and assigns, and nothing herein contained shall impair, as between any other Borrower and the Lender, the obligations of such other Borrower under the Loan Documents.

SGR\9196860.1

(d)      Election of Remedies.  If the Lender may, under applicable law, proceed to realize its benefits under any of the Loan Documents giving Lender a security interest in or lien upon any Collateral, whether owned by any Borrower, either by judicial foreclosure or by non judicial sale or enforcement, the Lender may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this Section.  If, in the exercise of any of its rights and remedies, Lender shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against any Borrower, whether because of any applicable laws pertaining to "election of remedies" or the like, each Borrower hereby consents to such action by Lender and waives any claim based upon such action.  Any election of remedies that results in the denial or impairment of the right of Lender to seek a deficiency judgment against any Borrower shall not impair any other Borrowers' obligation to pay the full amount of the Indebtedness.  In the event Lender shall bid at any foreclosure or trustee's sale or at any private sale permitted by law or the Loan Documents, Lender may bid all or less than the amount of the Indebtedness and the amount of such bid need not be paid by Lender but shall be credited against the Indebtedness.  The amount of the successful bid at any such sale, whether Lender or any other party is the successful bidder, shall be conclusively deemed to be the fair market value of the Collateral and the difference between such bid amount and the remaining balance of the Indebtedness shall be conclusively deemed to be the amount of the Indebtedness guaranteed under this Section, notwithstanding that any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which Lender might otherwise be entitled but for such bidding at any such sale.

(e)      Liability Cumulative.  The liability of Borrowers under this Section 8.18 is in addition to and shall be cumulative with all liabilities of each Borrower to Lender under this Agreement and the other Loan Documents to which such Borrower is a party or in respect of any Indebtedness or obligation of the other Borrower, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

(f)      Subordination.

1)      Each Borrower covenants and agrees that the payment of all indebtedness, principal and interest (including interest which accrues after the commencement of any case or proceeding in bankruptcy, or for the reorganization of any Borrower) (collectively, the "Intercompany Obligations"), is subordinated, to the extent and in the manner provided in this Section 8.18(f), to the prior payment in full of all Indebtedness (herein, the "Senior Obligations") and that the subordination is for the benefit of the Lender, and Lender may enforce such provisions directly.

2)      Each Borrower executing this Agreement hereby (i) authorizes Lender to demand specific performance of the terms of this Section 8.18(f), whether or not any other Borrower shall have complied with any of the provisions hereof applicable to it, at any time when such Borrower shall have failed to comply with any provisions of this Section

SGR\9196860.1

8.18 which are applicable to it and (ii) irrevocably waives any defense based on the adequacy of a remedy at law, which might be asserted as a bar to such remedy of specific performance.

3)     Upon any distribution of assets of any Borrower in any dissolution, winding up, liquidation or reorganization (whether in bankruptcy, insolvency or receivership proceedings or upon an assignment for the benefit of creditors or otherwise):

i.     The Lender shall first be entitled to receive payment in full in cash of the Senior Obligations before any Borrower is entitled to receive any payment on account of the Intercompany Obligations.

ii.     Any payment or distribution of assets of any Borrower of any kind or character, whether in cash, property or securities, to which any other Borrower would be entitled except for the provisions of this Section 8.18(f)(3), shall be paid by the liquidating trustee or agent or other person making such payment or distribution directly to the Lender, to the extent necessary to make payment in full of all Senior Obligations remaining unpaid after giving effect to any concurrent payment or distribution or provisions therefor to the Lender.

iii.     In the event that notwithstanding the foregoing provisions of this Section 8.18(f)(3), any payment or distribution of assets of any Borrower of any kind or character, whether in cash, property or securities, shall be received by any other Borrower on account of the Intercompany Obligations before all Senior Obligations are paid in full, such payment or distribution shall be received and held in trust for and shall be paid over to the Lender for application to the payment of the Senior Obligations until all of the Senior Obligations shall have been paid in full, after giving effect to any concurrent payment or distribution or provision therefor to the Lender.

No right of the Lender or any other present or future holders of any Senior Obligations to enforce the subordination provisions herein shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Borrower or by any act or failure to act, in good faith, by any such holder, or by any noncompliance by any Borrower with the terms hereof, regardless of any knowledge thereof which any such holder may have or be otherwise charged with.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Debtor in Possession Credit and Security Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

<div style="margin-left:45%">

**Borrowers:**

CAGLE'S, INC.

By:_____

_____
(Name & Title) (Please Print)

CAGLE'S FARMS, INC.

By:_____

_____
(Name & Title) (Please Print)

**Lender:**

AgSOUTH FARM CREDIT, ACA

By:_____

_____
(Name & Title) (Please Print)

</div>

48

## <u>EXHIBIT B</u>

**Form of Proposed Interim Order**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| CAGLE'S, INC., et al. | ) | CASE NUMBER _____-___ |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

## INTERIM ORDER (I) AUTHORIZING DEBTORS TO INCUR POSTPETITION SECURED SUPERPRIORITY INDEBTEDNESS PURSUANT TO SECTIONS 105(a), 362, 364(c)(1), 364(c)(2), 364(c)(3) AND 364(d);(II) MODIFYING THE AUTOMATIC STAY; AND (III) SCHEDULING
### A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c)

THIS MATTER having come before this Court on the motion dated _____, 2011 (the "Motion")[1] of Cagle's, Inc. and Cagle's Farms, Inc., as debtors and debtors in possession (the "Debtors") seeking, among other things, entry of an interim order (the "Interim Order"):

(i)    Authorizing the Debtors, pursuant to sections 105, 362, and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), from the commencement of these cases through and including the date of the Final Hearing (as defined below) to obtain post-petition loans and advances from AgSouth Farm Credit, ACA ("Association" or the "Lender"), consisting of a debtor-in-possession facility of "Revolving Advances" in an aggregate principal amount not to exceed $6,000,000 at any time outstanding on a senior secured and superpriority basis pursuant to the terms and conditions contained herein (the "DIP Facility") and to utilize on an interim basis up to $_____ under the DIP Facility pending the Final Hearing;

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Motion or the DIP Loan Agreement (as defined herein).

(ii)    Establishing the *Debtor-in-Possession Credit and Security Agreement*, by and between the Debtors and the Lender in the form annexed as Exhibit 1 to the Motion and all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the Lender, including, without limitation, security agreements, notes, guaranties, mortgages, and Uniform Commercial Code financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (collectively, as may be amended, modified or supplemented in accordance with the terms of this Interim Order and in effect from time to time, the "DIP Loan Agreement"); and incur the "Obligations" under and as defined in the DIP Loan Agreement (collectively, the "DIP Obligations");

(iii)    Authorizing the Debtors to perform such acts as may be reasonably necessary or desirable in order to give effect to the provisions of the DIP Loan Agreement on an interim basis;

(iv)    Authorizing the use of the proceeds of the DIP Facility on an interim basis in a manner consistent with the terms and conditions of the DIP Loan Agreement, and for working capital purposes in accordance with the Budget (as defined in the DIP Loan Agreement) and for repayment of the Emergency Pre-Petition Note Obligations;

(v)    Providing, pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, that all obligations owing to the Lender under the DIP Loan Agreement shall be accorded administrative expense status, and shall, subject only to the Carveout (as defined below), have priority over any and all other administrative expenses arising in this case (the "DIP Superpriority Claim");

(vi)    Granting the Lender, pursuant to section 364(c)(2) and section 364(c)(3) of the Bankruptcy Code, perfected security interests in and Liens (the "DIP Liens") on all of the Debtors' personal property and all of the Debtors' real property and fixtures (other than Avoidance Actions(as defined herein)(as defined below, the "Collateral"), subject to the terms and conditions set forth herein and in the DIP Loan Agreement which shall have a priority over all Liens other than Prior Permitted Liens as more fully set forth herein;

(vii)    Authorizing and directing the Debtors to pay, without further order of this Court, the principal, interest, fees, expenses and other amounts payable to the Lender under the DIP Loan Agreement as they become due, all as and to the extent provided in the DIP Loan Agreement, on an interim basis;

(viii)    Authorizing the use of Cash Collateral of the Lender under the Pre-Petition Credit Agreement and providing adequate protection to the Lender for any Diminution in Value of its interests in the Pre-Petition Collateral, including the Cash Collateral;

(ix)    Vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Agreement and this Order;

(x)    Scheduling a final hearing (the "Final Hearing") to consider entry of an order (the "Final Order") granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

(xi)    Waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order, on the terms set forth in this Interim Order,

3

all as described more fully in the Motion; and the Court having considered the Motion and the *Declaration of Mark M. Ham, IV In Support of Chapter 11 Petitions and First Day Motions and Applications*; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein on an interim basis being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the interim relief sought in the Motion being necessary and in the best interests of the Debtors, their estates and all parties in interest; and the Court having reviewed the Motion and having heard the statements in support of the interim relief requested therein at a hearing before the Court held and concluded on October 20, 2011 (the "Interim Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Interim Hearing establish just cause for the interim relief granted herein; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and otherwise is fair and reasonable and in the best interest of the Debtors, their creditors, their estates and equity holders and is essential for the continued operation of the Debtors' businesses; and it further appearing that the Debtors are unable to secure unsecured credit on similar or more favorable terms; and upon all the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE HEARING, THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

(A)    Petition Date. On October 19, 2011 (the "Petition Date"), the Debtors each filed a voluntary petition under Chapter 11 of the Bankruptcy Code in this Court,

commencing these cases.  The Debtors continue to manage and operate their businesses and property as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases, nor has an official committee of unsecured creditors been appointed as of the date hereof.

(B)    <u>Jurisdiction and Venue</u>.    This Court has jurisdiction over these proceedings, and over the property affected hereby, pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding as defined in and pursuant to 28 U.S.C. § 157(b)(2).  Venue for these cases and for the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

(C)    <u>Notice</u>.    The Interim Hearing was held pursuant to the authorization of Bankruptcy Rule 4001.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors to the United States Trustee for the Northern District of Georgia (the "<u>United States Trustee</u>"), those parties listed as the Debtors' thirty largest unsecured creditors on a consolidated basis, Metropolitan Life Insurance Company, the Lender, the District Director of the Internal Revenue Service and the Securities and Exchange Commission.  Under the circumstances, such notice of the Interim Hearing and the interim relief requested in the Motion is due and sufficient notice and complies with sections 102(1), 364(c) and 364(d) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(c) and 4001(d).

(D)    <u>Need for Postpetition Financing</u>.    The Debtors have demonstrated their immediate need to obtain postpetition financing pursuant to section 364 of the Bankruptcy Code. In the absence of the financing provided by the DIP Loan Agreement, the Debtors will be unable to continue operating their businesses and to successfully reorganize, to the detriment of the Debtors, their estates, their creditors, and other parties in interest.  An immediate need exists for

5

the Debtors to obtain funds from the DIP Facility in order to continue their operations to preserve and maximize the value of their estates.

(E)      <u>Immediate Irreparable Damage or Loss Will Result if Immediate Financing Is Not Obtained</u>.   There will be immediate and irreparable loss or damage to the estates if immediate financing is not obtained.  Without the requested financing, the Debtors will be unable, among other things, to meet their respective payroll requirements, to continue the needed delivery of feed and other supplies, to pay necessary insurance premiums, such as health insurance and workers' compensation, and to fund other ongoing and essential capital needs and obligations.  The Debtors must obtain interim financing in the amount of $6,000,000 to meet their immediate obligations, to effectuate an orderly continuation of their business operations.  It is in the best interests of the Debtors' estates to be allowed to establish the DIP Facility contemplated by the DIP Loan Agreement on an immediate interim basis.

(F)      <u>No Credit Available on More Favorable Terms</u>.   Given the Debtors' unique business, current financial condition, available assets and contingent liabilities, as well as current conditions in the credit markets, the Debtors are unable to obtain adequate, unsecured financing from any lender on substantially similar terms or terms more favorable than those provided by the Lender in the DIP Loan Agreement and within the time required to avoid immediate and irreparable harm to the Debtors.  The Debtors have been unable to obtain unsecured credit allowable solely as an administrative expense pursuant to sections 364(b) and 503(b) of the Bankruptcy Code.  The Debtors also have been unable to obtain credit solely having priority over all other administrative expenses specified in sections 503(b) and 507(a) and (b) of the Bankruptcy Code.

(G)      <u>Pre-Petition Obligations</u>.  The Debtors and the Association, in its capacity as the initial lender thereunder are parties to that certain Third Amended and Restated Revolving

Line of Credit and Security Agreement dated September 4, 2008, (as amended, modified and restated, the "Pre-Petition Credit Agreement"), pursuant to which the Lender made certain pre-petition loans, advances and other amounts totaling approximately $33.5 million as of the date hereof (collectively, the "Pre-Petition Obligations").  The Lenders assert that the Pre-Petition Obligations are secured by a first priority lien on certain of the Debtors' accounts, inventory, real estate and equipment and other personal property assets and a second priority security interest in the Metlife Primary Collateral (the "Pre-Petition Liens") and that all of the Debtors' cash on hand, including the cash in any deposit account, constitutes the Cash Collateral of the Lender for the Pre-Petition Obligations.

(H)    Metlife Obligations.  The Debtors and Metropolitan Insurance Company ("Metlife") are party to that certain Loan Agreement dated March 28, 2001 (as amended, modified and restated, the "Metlife Credit Agreement"), pursuant to which Metlife has made certain prepetition loans, advances and other amounts totaling approximately $_____ as of the date hereof (collectively, the "Metlife Obligations").  MetLife asserts that the Metlife Obligations are secured by a first priority security interest in the Metlife Primary Collateral.

(I)    Priming of Liens.  The priming of the Pre-Petition Liens under Section 364(d) of the Bankruptcy Code, as contemplated by the Credit Facility and as further described below, will enable the Debtors to obtain the Credit Facility and to continue to operate their businesses to the benefit of the estates and creditors.  However, the Lender is entitled to receive adequate protection as set forth in this Interim Order pursuant to Sections 361, 363 and 364 of the Bankruptcy Code, for any diminution in the value of its respective interests in the Pre-Petition Collateral (including Cash Collateral) resulting from, among other things, the Debtors' use, sale or lease of such collateral, market value decline of such collateral, the imposition of the automatic stay, the priming (to the extent provided for herein) of the Pre-Petition Liens, and the

subordination to the Carve Out (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value").

(J)    Adequate Protection.    The Lender is entitled to receive adequate protection to the extent of any Diminution in Value of its interests in the Pre-Petition Collateral (including Cash Collateral).  Pursuant to Sections 361, 363 and 507(b) and subject to the terms of this Interim Order, as adequate protection the Lender, will receive (a) adequate protection liens and superpriority claims, as more fully set forth in paragraphs 8 and 9 herein, and (b) ongoing payment of the reasonable fees, costs and expenses, including, without limitation, legal and other professionals' fees and expenses under the Pre-Petition Credit Agreement, subject to the right of the Debtors and other parties in interest to later assert that the aforementioned payments should be allocated to a reduction of principal amounts owed pursuant to Section 506(b) of the Bankruptcy Code.

(K)    Section 506(c) Waiver.    As a further condition of the DIP Loan Agreement and any obligation of the Lenders to make credit extensions pursuant to the DIP Loan Agreement, upon entry of the Final Order approving this provision, the Debtors, their estates, and any of their respective Subsidiaries and Affiliates (as defined in the DIP Loan Agreement), shall be deemed to have waived any claim to surcharge the Collateral under section 506(c) of the Bankruptcy Code excluding; however, any such claims for matters provided for in the Budget and incurred prior to the termination of the DIP Facility but not paid by the Debtors (subject to the Lender's rights to object to any such claims).

(L)    Use of Proceeds of the DIP Facility.    From and after the Petition Date, the Debtors shall use advances of credit under the Credit Facility only for the purposes specifically set forth in this Interim Order, the DIP Loan Documents and in compliance with the Budget, including for the full repayment of the Pre-Petition Emergency Note Obligations.  On

8

the Closing Date, the Debtors are authorized to draw the financing available under the Credit Facility to pay in full in cash the outstanding Emergency Pre-Petition Note Obligations (including, without limitation, accrued and unpaid interest, fees, expenses, legal fees, disbursements and other amounts properly chargeable thereunder).    The repayment of the Emergency Pre-Petition Note Obligations provided for herein shall be subject to the reservation of rights of parties in interest as to the validity, amount, extent, priority and character of such claims and the liens that secure such claims.

(M)    Extension of Financing.   The Lender has indicated a willingness to provide financing to the Debtors in accordance with the DIP Loan Agreement and subject to (i) the entry of this Interim Order and the Final Order; and (ii) findings by this Court that such financing is essential the Debtors' estates, that the Lender is a good faith financier, and that the Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order (and the Final Order) and the DIP Facility will not be affected by any subsequent reversal, modification, vacatur or amendment of this Interim Order or the Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

(N)    Business Judgment; Good Faith of the Lender.   The terms and conditions of the DIP Facility and the DIP Loan Agreement, and the fees paid and to be paid thereunder are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.    The Debtors and the Lender proposed and negotiated the terms of the DIP Loan Agreement in good faith, at arm's length and without collusion.    The Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code, and the Lender's claims, superpriority status, security interests and liens and other protections arising from or granted pursuant to this Order and the DIP Loan Agreement

9

will not be affected by any subsequent reversal, modification, vacatur or amendment of this

Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

(O)    <u>Entry of Interim Order</u>.  For the reasons stated above, the Debtors have

requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

BASED UPON THE FOREGOING FINDINGS AND CONCLUSIONS, AND
UPON THE MOTION AND THE RECORD MADE BEFORE THIS COURT
AT THE HEARING, AND WITH THE CONSENT OF THE DEBTORS AND
THE LENDER TO THE FORM AND ENTRY OF THIS INTERIM ORDER,
AND GOOD AND SUFFICIENT CAUSE APPEARING THEREFOR, IT IS
HEREBY ORDERED THAT:

1.    <u>Motion Granted</u>.  The Motion is hereby granted on an interim basis, solely to the

extent set forth herein.

2.    <u>Objections Overruled</u>.  All objections to the entry of this Interim Order to the

extent not withdrawn or resolved, are hereby overruled.

3.    <u>DIP Loan Agreement</u>.    The Debtors are hereby expressly and immediately

authorized, empowered and directed to execute and deliver the DIP Loan Agreement and to

perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order

and the DIP Loan Agreement, and to execute and deliver all instruments, certificates, agreements

and documents which may be required or necessary for the performance by the Debtors under

the DIP Facility and the creation and perfection of the DIP Liens described in and provided for

by this Interim Order and the DIP Loan Agreement; in connection therewith, the Debtors are

expressly and immediately authorized and empowered to incur any such DIP Obligations in

accordance with, and subject to, the terms of this Interim Order and the DIP Loan Agreement.

The Debtors are hereby authorized and directed to do and perform all acts, pay the principal,

interest, fees, expenses and other amounts described in the DIP Loan Agreement and all other

documents comprising the DIP Facility as such become due, including, without limitation, closing fees, administrative fees, a non-refundable origination fee of $55,000, due and payable upon the earlier of the Maturity Date or the Termination Date, reasonable attorneys' fees and disbursements actually incurred, and other fees and charges as provided for in the DIP Loan Agreement, which amounts shall not otherwise be subject to approval of this Court. Upon execution and delivery, the DIP Loan Agreement shall represent valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with its terms.

4.      Authorization to Borrow on an Interim Basis.  In order to enable the Debtors to continue to operate their businesses, during the period from the date of this Interim Order through the date of entry of a Final Order (the "Interim Period") and subject to the terms and conditions of this Interim Order, the DIP Loan Agreement, documents comprising the DIP Facility, and the Budget, the Debtors are hereby authorized under the DIP Facility to borrow up to a total amount of $6,000,000 on an interim basis.

5.      Collateral Account.  The Debtors shall be authorized to maintain the  Collateral Account (as defined in the DIP Loan Agreement) in accordance with the DIP Loan Agreement.

6.      Application of the DIP Proceeds.  The Debtors shall use the proceeds of Advances in the Interim Period for the purpose of repayment in full of the Emergency Pre-Petition Note Obligations and funding post-petition operations solely in accordance with the Budget.

7.      Authorization to use Cash Collateral.  Subject to the terms and conditions of this Interim Order, the Credit Facility and the DIP Loan Agreement and in accordance with the Budget, the Debtors are authorized to use Cash Collateral until the Termination Date.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates

11

outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the Credit Facility, the DIP Loan Agreement, and in accordance with the Budget.

8.      Adequate Protection Liens.

i)      Pursuant to Sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Lender in the Pre-Petition Collateral against any Diminution in Value of such interests in the Pre-Petition Collateral on account of, among other things, the granting of the DIP Liens, the Debtors' use of Cash Collateral, the use, sale or lease of any other Pre-Petition Collateral, market value decline of collateral, the priming of the Pre-Petition Liens and the imposition of the automatic stay, the Debtors hereby grant to the Lender, continuing valid, binding, enforceable and perfected postpetition security interests in and liens on the Collateral (the "Adequate Protection Liens") to the extent of any Diminution in Value.

ii)      The Adequate Protection Liens shall be junior only to: (A) Prior Permitted Liens (including the Liens of Metlife in the Metlife Primary Collateral); (B) the Carve Out; (C) the DIP Liens in the Collateral; and (D) the Pre-Petition Liens on the Pre-Petition Collateral.  The Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the Collateral.  Except as provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted or created in the Chapter 11 Cases, and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases, or upon the dismissal of any of the Chapter 11 Cases.  The Adequate Protection Liens shall not be subject to Section 510 (except to the extent of the Pre-Petition Liens

and the Prior Permitted Liens), 549 or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Pre-Petition Liens or the Adequate Protection Liens.

9.      <u>Adequate Protection Superpriority Claims</u>.

(a)      <u>Lender's Superpriority Claim Related to Pre-Petition Collateral</u>.  As further adequate protection of the interests of the Lender in the Pre-Petition Collateral to the extent of any Diminution in Value of such interests in the Pre-Petition Collateral on account of, among other things, the granting of the DIP Liens, the Debtors' use of Cash Collateral, the use, sale or lease of any other Pre-Petition Collateral, market value decline of the collateral, the priming of the Pre-Petition Liens, and the imposition of the automatic stay, the Lender is hereby granted, on a final basis, as and to the extent provided by Section 507(b) of the Bankruptcy Code and, to the extent of any Diminution in Value, an allowed superpriority administrative expense claim in each of the Cases (the "<u>Pre-Petition Superpriority Claim</u>").

(b)      <u>Priority of the Adequate Protection Superpriority Claims</u>.  Except as set forth herein, the Pre-Petition Superpriority Claim shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Section 105, 326, 328, 330, 331, 365, 503(a), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code; *provided, however,* that the Pre-Petition Superpriority Claim shall be junior to

the DIP Superpriority Claim and to the Carve Out and shall not attach to or be paid from the Avoidance Actions or the proceeds thereof.

10.     Section 507(b) Reservation.  Except as provided in paragraph 9 of this Interim Order, nothing herein shall impair or modify the application of Section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Lender hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Pre-Petition Collateral during the Chapter 11 Cases or any Successor Cases.

11.     Joint Liability.  The Debtors are jointly and severally liable for, and hereby absolutely and unconditionally guarantee to the Lender, the full and prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of, all DIP Obligations owed or hereafter owing to the Lender by each other Debtor.

12.     Conditions Precedent.  The Lender shall have no obligation to make any loan or advance under the DIP Loan Agreement during the Interim Period unless the conditions precedent to make such loan under the DIP Loan Agreement have been satisfied in full or waived in accordance with the DIP Loan Agreement.

13.     Post-Petition Liens.  Effective immediately upon the entry of this Interim Order, the Lender is hereby granted pursuant to sections 361, 362, 364(c)(2) and 364(c)(3) of the Bankruptcy Code and constitute first priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests and liens (collectively, the "DIP Liens"), senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates except as otherwise provided in this Interim Order and the Final Order, upon and to all presently owned and hereafter acquired assets and real and personal property of the

14

Debtors, including, without limitation, the following: all of the Borrowers' Accounts, chattel paper and electronic chattel paper, deposit accounts, documents, Equipment, General Intangibles, Goods, Instruments, Inventory, Investment Property, letter-of-credit rights, letters of credit, Commercial Tort Claims (excluding Avoidance Actions); life insurance policies; the Association Stock; all real property, whether owned or leased, and any improvements, rents, permits, contracts, records and proceeds related thereto, together with (a) all substitutions and replacements for and products of any of the foregoing; (b) in the case of all goods, all accessions; (c) all accessories, attachments, parts, equipment and repairs now or hereafter attached or affixed to or used in connection with any goods; (d) all warehouse receipts, bills of lading and other documents of title now or hereafter covering such goods; (e) all collateral subject to the Lien of any Security Document; (f) any money, or other assets of the Borrowers that now or hereafter come into the possession, custody, or control of the Lender; (g) all sums on deposit in any deposit account of the Borrowers; (h) to the extent not covered in the foregoing, all other property of the Borrowers, whether tangible or intangible, real or personal; (i) proceeds of any and all of the foregoing; (j) books and records of the Borrowers, including all mail or electronic mail addressed to the Borrowers; (k) to the extent not covered in the foregoing, all other property of the Borrowers, whether tangible or intangible, real or personal, and (l) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which the Borrowers now have or hereafter acquire any rights (together, the "Collateral"), as security for the payment and performance of the DIP Obligations (which include the Emergency Pre-Petition Note Obligations) and as an element of the consideration for the Revolving Advances. The DIP Liens to be created and granted to the Lender, as provided herein, (A) are created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code; (B) are first, valid, prior, perfected,

unavoidable, and superior to any security, mortgage, or collateral interest or lien or claim to the Collateral, subject only to the the Carve-Out and Prior Permitted Liens (including the Liens of Metlife on the Metlife Primary Collateral) solely to the extent that such Prior Permitted Liens constitute valid, perfected and non-avoidable Liens as of the Petition Date.

14.    <u>Lien Priority</u>.  The Liens securing the Obligations are valid, automatically and properly perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the Collateral, except that the DIP Liens shall be junior only to (a) Prior Permitted Liens (including the Liens of Metlife in the Metlife Primary Collateral); and (b) the Carve Out.  Pursuant to Section 364(d) of the Bankruptcy Code, the DIP Liens shall be senior to the Pre-Petition Liens on all Collateral.  Except as expressly set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any other subsequent proceedings under the Bankruptcy Code, including, without limitation, any Chapter 7 proceeding if any of the Cases are converted to cases under Chapter 7 of the Bankruptcy Code (collectively, the "<u>Successor Cases</u>"), and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, and/or upon the dismissal of any of the Chapter 11 Cases.  No lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

15.    <u>Superiority Administrative Claim Status</u>.    Subject to the Carveout, the DIP Obligations shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code, a superpriority administrative claim having priority over any and all administrative expenses of and unsecured claims against the Debtors now existing or hereafter arising, of any kind or nature

whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code (the "DIP Superpriority Claim").  The DIP Superpriority Claim shall be prior, senior and superior to any other claim, including any other superpriority administrative expense claim of any kind or nature, except as provided herein and/or in the DIP Loan Agreement other than any such claim granted to any holder of a Prior Permitted Lien for failure of adequate protection.  The DIP Obligations are claims to be afforded priority over administrative expenses pursuant to section 364(c)(1) of the Bankruptcy Code, as provided herein and in the DIP Loan Agreement and secured by liens pursuant to section 364 of the Bankruptcy Code as provided herein.  The DIP Superpriority Claim shall not attach to or be paid from proceeds of Avoidance Actions.

16.    Post-Petition Lien Perfection.    This Interim Order shall be sufficient and conclusive evidence of the validity, perfection and priorities of the DIP Liens and Adequate Protection Liens upon the Collateral, without the necessity of filing or recording any financing statement, assignment, mortgage, deed of trust, trademark security agreement, copyright security agreement, patent security agreement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens or Adequate Protection Liens or to entitle the Lender to the priorities granted herein and in the DIP Loan Agreement; provided, however, that the Debtors shall, promptly following the request of the Lender, execute such instruments, assignments, mortgages, deeds of trust, trademark security agreements, copyright security agreements, patent security agreements or other documents as are necessary to perfect the Lender's liens upon any of the Collateral and

17

shall take such other action as may be required to perfect or to continue the perfection of the Lender's Liens upon the Collateral pursuant to the terms of the DIP Loan Agreement.

17.    <u>Carveout</u>.    (i) As used in this Interim Order, the "**Carve Out**" means (i) statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6); and (ii) after the occurrence of an Event of Default under the DIP Loan Documents and following delivery of written notice of the occurrence of such Event of Default to the Debtors and counsel for any official committee of unsecured creditors in these Cases (the "Statutory Committee") by the Lender (the "**Carve Out Trigger Notice**"), the following expenses:  an amount (the "**Case Professionals Carve Out**") equal to the sum of (a) the allowed and unpaid professional fees and disbursements for any Case Professional (as defined below) incurred after the delivery of a Carve Out Trigger Notice in an aggregate amount not in excess of $250,000, plus (b) all unpaid professional fees and disbursements of such Case Professionals incurred prior to the delivery of a Carve Out Trigger Notice to the extent allowed or later allowed and payable by order of the Court (which order has not been vacated or stayed, unless the stay has been vacated) under Sections 328, 330, 331 or 363 of the Bankruptcy Code and any interim compensation procedures order, but solely to the extent that the same constitute Budgeted Professional Fees.  "**Budgeted Professional Fees**" shall mean those fees and expenses incurred by Case Professionals in accordance with the professional fee schedule which is incorporated as part of the Budget.  "**Case Professionals**" shall mean any professional retained by the Debtors and any official committee appointed in these Cases (a "<u>Statutory Committee</u>") pursuant to a final order of the Court (which order has not been vacated or stayed, unless the stay has been vacated) under Sections 327, 328, 363 or 1103(a) of the Bankruptcy Code and any claims agent.  To the extent that any payment to a Case Professional is subsequently disallowed and/or disgorged, the proceeds of any claim against the

Case Professional for amounts so disallowed or disgorged shall constitute DIP Collateral and as such, shall be subject to the liens and claims granted hereunder.  On Monday of each week, the Debtor shall deposit the Budgeted Professional Fees for such week in an escrow account maintained by counsel for the Debtor.

(ii)   <u>Payment of Allowed Professional Fees Prior to the Event of Default</u>.  Prior to the delivery of a Carve Out Trigger Notice, the Debtors shall be permitted to pay Budgeted Professional Fees.  The amounts so paid shall not reduce the Case Professionals Carve Out.

(iii)   <u>Payment of Carve Out After An Event of Default</u>.   Any payment or reimbursement made on or after the delivery of a Carve Out Trigger Notice in respect of any professional fees and disbursements to a Case Professional shall permanently reduce the Case Professionals Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out by the DIP Lenders shall be added to and made a part of the Obligations under the DIP Loan Documents and secured by the Collateral and otherwise entitled to the protections granted under this Interm Order, the DIP Loan Documents, the Bankruptcy Code and applicable law.  The Budgeted Professional Fees and Carve-out shall not be used to pay any fees or expenses incurred in the prosecution of any litigation or the assertion of any claims raised against or with respect to the Lender or the Collateral.

18.   <u>Acceptable Plan</u>.  It shall be an Event of Default under the DIP Loan Agreement for the Debtors to file any plan of reorganization which does not provide for (i) Full Payment of all DIP Obligations on the effective date of such plan; (ii) an effective date no later than 30 days after the date of entry of the Confirmation Order with respect to such plan; and (iii) a full and complete release of any and all claims that the Debtors or their estates might have or assert

against the Lender, or which is not otherwise acceptable to the Lender in its reasonable discretion.

19.    <u>Rights and Remedies Upon Event of Default</u>.  Any automatic stay otherwise applicable to the Lender is hereby modified so that after the occurrence of any Event of Default and at any time thereafter, upon five (5) business days prior written notice of such occurrence, in each case given to each of the Debtors, counsel to the Debtors, counsel to any Statutory Committee, if any, and the United States Trustee, the Lender shall be entitled to exercise their rights and remedies in accordance with the DIP Loan Agreement, as applicable.  Immediately following the giving of notice by the Lender of the occurrence of an Event of Default: (i) the Debtors shall pay 100% of their revenues to the Lender as provided in the DIP Loan Agreement and this Interim Order; (ii) the Lender shall continue to apply such proceeds in accordance with the provisions of this Interim Order and of the DIP Credit Agreement; (iii) the Debtors shall have no right to use any of such proceeds other than towards the satisfaction of the DIP Obligations and the Carveout; and (iv) any obligation otherwise imposed on the Lender to provide any loan or advance to the Debtors pursuant to the DIP Facility shall be suspended.  If the Debtors do not contest the right of the Lender to exercise its remedies based upon whether an Event of Default has occurred within such five (5) business day time period, or this Court, after notice and hearing, declines to stay the enforcement thereof, the automatic stay as to the Lender shall automatically terminate at the end of such notice period.  Nothing included herein shall prejudice, impair, or otherwise affect the Lender's rights to seek any other or supplemental relief in respect of the Debtors nor the Lender's rights, as provided in the DIP Loan Agreement, to suspend or terminate the making of loans under the DIP Loan Agreement.

20.    <u>Expenses and Indemnity</u>.  As provided in the DIP Loan Agreement, the Debtors shall pay on demand all costs and expenses, including reasonable attorneys' fees actually incurred by the Lender in connection with the Obligations, the DIP Loan Agreement, the Loan Documents and any other document or agreement related hereto or thereto, and the transactions contemplated hereby, including all such costs, expenses and fees incurred in connection with the negotiation, preparation, execution, amendment, administration, performance, collection and enforcement of the Obligations and all such documents and agreements and the creation, perfection, protection, satisfaction, foreclosure or enforcement of the Security Interest, together with all wire transfer and similar money transfer fees.

21.    <u>Termination Date</u>.  Immediately upon the Termination Date, (i) all DIP Obligations shall be immediately due and payable in the principal sum of $6,000,000 or the aggregate unpaid principal balance of all (A) Revolving Advances made by the Lender to the Debtors under the DIP Loan Agreement, and (B) Emergency Pre-Petition Note Obligations, each together with unpaid interest on the principal amount hereunder remaining unpaid from time to time; (ii) all other fees provided for under the DIP Loan Agreement shall be immediately due and payable; and (iii) the Lender's obligations under the DIP Loan Agreement shall cease.

22.    <u>Proofs of Claim</u>.  The Debtors acknowledge and agree that the DIP Obligations, including the Emergency Pre-Petition Note Obligations, and the related liens, rights, priorities and protections granted to or in favor of the Lender, respectively, as set forth herein and in the DIP Loan Agreement, shall constitute a proof of claim on behalf of the Lender in the chapter 11 cases.  The Lender shall not be required to file proofs of claim in the chapter 11 cases or in any

successor cases, however, the Lender is hereby authorized and entitled to file (and amend and/or supplement) proofs of claim in the chapter 11 cases or any successor cases.

23.    <u>Compensation</u>.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of the Debtors, any Statutory Committee, or of any person, or shall affect the right of the Lender to object to the allowance and payment of such fees and expenses or to permit the Debtors to pay any such amounts not set forth in the Budget.

24.    <u>Section 506(c) Claims</u>.  In accordance with this Interim Order and subject to entry of a Final Order approving this provision, the Debtors, their Subsidiaries and Affiliates and the Debtors' bankruptcy estates hereby waive and shall cause each of their respective Subsidiaries to waive, any claims to surcharge the DIP Collateral under section 506(c) of the Bankruptcy Code excluding, however, any such claims for matters provided for in the Budget and incurred prior to termination of the Credit Facility but not paid by the Debtors (subject to the Lender's rights to object to any such claims).

25.    <u>Vacating the Automatic Stay</u>.  The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified to permit (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claim, and to perform such acts as the Lender may request to assure the perfection and priority of the DIP Liens; and (b) the implementation of the terms of this Interim Order.

26.    <u>Enforceable Obligations</u>.  The DIP Loan Agreement shall constitute and evidence the valid and binding obligations of the Debtors, which obligations shall be enforceable against each Debtor, their estates and any successors thereto and their creditors, in accordance with the terms and conditions of the DIP Loan Agreement.

27.    <u>Protection of Lender and Other Rights</u>.  During the Interim Period, the Debtors are authorized to use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Loan Agreement and this Interim Order and in compliance with the Budget.

28.    <u>Government Acceptance</u>.  Each and every federal, state, and local governmental agency, department or office is hereby directed to accept this Interim Order and any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by this Interim Order and the DIP Loan Agreement.

29.    <u>Waiver of any Priming Rights and Violative Use of Cash Collateral</u>.  Upon the Closing Date of the DIP Loan Agreement, and on behalf of themselves and their estates, and for so long as any DIP Obligations shall be outstanding, the Debtors shall irrevocably waive any right pursuant to sections 364(c) or 364(d) of the Bankruptcy Code or otherwise to grant any Lien of equal or greater priority than the Lien securing the DIP Obligations, or to approve a claim of equal or greater priority than the DIP Obligations.

30.    <u>Protections of 364(e)</u>.  If any provision of this Interim Order is hereafter modified, vacated, or stayed by subsequent order of this Court or any other court for any reason, the Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code.

31.    <u>Binding Effect</u>.  Except as otherwise provided in this Interim Order, the terms and provisions of this Interim Order shall, immediately upon entry of this Interim Order by this Court, become valid and binding upon the Debtors, the Lender, all other creditors of the Debtors, any Statutory Committee, and all other parties in interest and their respective successors and

assigns, including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtors' estates in these cases or in any subsequent chapter 7 cases.

32.    <u>No Waiver</u>.  The failure of the Lender to seek relief or otherwise exercise their rights and remedies under the DIP Loan Agreement, the DIP Facility or this Interim Order, as applicable, shall not constitute a waiver of any of the Lender's rights hereunder, thereunder, or otherwise.  Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the Lender under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the Lender to: (i) request conversion of the chapter 11 cases to cases under chapter 7, dismissal of the chapter 11 cases, or the appointment of a trustee in the chapter 11 cases; or (ii) propose, subject to the provisions of Section 1121 of the Bankruptcy Code, a plan; or (iii) exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) of the Lender.

33.    <u>No Third Party Rights</u>.  Except as specifically provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity security holders, or any direct, indirect, or incidental beneficiary.

34.    <u>No Marshaling</u>.  Pursuant to the DIP Loan Agreement, the Debtors hereby waive any right of marshaling the Debtors may have.

35.    <u>Survival of Interim Order</u>.  The terms of this Interim Order and any actions taken pursuant hereto, shall survive the entry of any order which may be entered: (a) confirming any plan in the Chapter 11 Cases; (b) dismissing the Chapter 11 Cases; (c) converting the Chapter 11 Cases to any other chapter under the Bankruptcy Code; (d) withdrawing of the references of the

Chapter 11 Cases from the Bankruptcy Court; and (e) providing for abstention from handling or retaining of jurisdiction of these Chapter 11 Cases in the Bankruptcy Court.  The terms and provisions of this Interim Order as well as the  protections granted pursuant to this Interim Order and the DIP Loan Agreement, shall continue in full force and effect notwithstanding the entry of such order, and such protections shall maintain their priority as provided by this Interim Order until all the obligations of the Debtors to the Lender pursuant to the DIP Loan Agreement are indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).  The DIP Obligations shall not be discharged by the entry of an order confirming a plan, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.  The Debtors shall not propose or support any plan that is not conditioned upon the payment in full in cash of all of the DIP Obligations, on or prior to the earlier to occur of (i) the effective date of such plan; and (ii) the Termination Date.

36.   <u>Inconsistency</u>.  To the extent any provisions of the DIP Loan Agreement are in conflict with the terms and conditions of this Interim Order, the terms and conditions of this Interim Order shall control.

37.   <u>Amendment</u>.  The Debtors and the Lender may amend, modify, supplement, or waive any provision of the DIP Facility, provided that such amendment or waiver, in the judgment of the Debtors and the Lender, is either non-prejudicial to the rights of third parties or is not material.  Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by the Debtors and the Lender (after having obtained the approval of the Lender in accordance with the terms of

the DIP Loan Agreement) and approved by the Bankruptcy Court, upon notice in advance to counsel for any Statutory Committee, parties requesting notice and the United States Trustee.

38.    <u>Enforceability</u>.    This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable by Rule 9014, and shall take effect and be fully enforceable immediately upon execution hereof.

39.    <u>Waiver of Stay</u>.    Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim Order.

40.    <u>*Nunc Pro Tunc* Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

41.    <u>Exclusive Jurisdiction</u>.  This Court shall retain exclusive jurisdiction to interpret and enforce the provisions of the DIP Loan Agreement and this Order in all respects; <u>provided</u>, <u>however</u>, that in the event this Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this paragraph or is without jurisdiction, such abstention, refusal, or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

42.    <u>Final Hearing</u>.  The Debtors shall, on or before _____, 2011 serve by U.S. mail copies of the notice of entry of this Interim Order, together with a copy of this Interim Order and proposed Final Order to (i) the parties having been given notice of the emergency hearing; (ii) any other party which has filed a request for special notice with this Court and served such

requested upon the Debtors' counsel; (iii) counsel for any Statutory Committee; and (iv) the United States Trustee. The notice of entry of this Interim Order shall state that any party in interest objecting to the DIP Facility or the terms of the Final Order shall file written objections with the United States Bankruptcy Court Clerk for the Northern District of Georgia, Atlanta Division no later than _____ 2011, which objections shall be served so that they are received by no later than 4:00 p.m. prevailing Eastern time, on such date by: (i) _____, attorneys for the Debtors; (ii) _____, attorneys for the Lender; and (iii) the Office of the United States Trustee, _____.

43.     The Final Hearing to consider the Motion and entry of the Final Order shall be held on _____, 2011 at ___ a.m. before the Honorable Judge _____, United States Bankruptcy Judge.


Dated:     Atlanta, Georgia
           _____, 2011




                              _____
                              UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT 1**

## **DIP LOAN AGREEMENT**